## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 21-20060-JAR** |
| **KAABA MAJEED,** | |
| **YUNUS RASSOUL,** | |
| **a.k.a. YUNUS RASSOULL,** | |
| **JAMES STATON,** | |
| **a.k.a. ADAM WITHROP,** | |
| **RANDOLPH RODNEY HADLEY,** | |
| **DANIEL AUBREY JENKINS,** | |
| **DANA PEACH,** | |
| **ETENIA KINARD,** | |
| **a.k.a. ETENIA KINNARD, and** | |
| **JACELYN GREENWELL,** | |
| **Defendants.** | |

### MEMORANDUM AND ORDER

The Government filed an eight-count Indictment on October 20, 2021, against eight

Defendants: Kaaba Majeed, Yunus Rassoul a.k.a. Yunus Rassoull, James Staton a.k.a. Adam

Winthrop, Randolph Rodney Hadley, Daniel Aubrey Jenkins, Dana Peach, Etenia Kinard a.k.a.

Etenia Kinnard, and Jacelyn Greenwell.[1]  Count 1 alleges a claim against all Defendants for

conspiracy to commit forced labor in violation of 18 U.S.C. §§ 371 and 1589.  Counts 2 through

8 allege substantive forced labor violations under 18 U.S.C. §§ 1589, 1594(a), and 2.  Each

forced labor count is based on a different victim, and is alleged against different subgroups of

Defendants.

---

[1] Doc. 1.

Defendants in this matter filed several pretrial motions, and the Court has grouped these motions for purposes of ruling.  In this Memorandum and Order, the Court considers Defendant Yunus Rassoul's Motion to Dismiss Based on Pre-Indictment Delay (Doc. 158),[2] and Motion to Dismiss for Grand Jury Abuse (Doc. 159).[3]   The Government filed responses in opposition to both motions.[4]  The Court heard oral argument on June 26, 2023.  Having fully considered the briefs and the parties' arguments at the hearing, the Court is prepared to rule.  As explained more fully below, the Court denies Rassoul's motions to dismiss.

## I.      Motion to Dismiss Based on Pre-Indictment Delay

### A.      Factual Background

This case involves the now-defunct United Nation of Islam ("UNOI"), an organization that was founded by unindicted co-conspirator Royall Jenkins.  The Indictment alleges that Royall Jenkins represented that he, himself, was Allah, or God, and claimed that in approximately 1978, he was abducted by angels who transported him through the galaxy in a spaceship and instructed him how to rule on Earth.  Royall Jenkins eventually established UNOI headquarters in Kansas City, Kansas in the late 1990s, where the organization continued to grow in membership.  Royall Jenkins led UNOI until approximately 2012.  His responsibility was to oversee all activities of UNOI and approve all decisions after consultation with his wives and officials, who assisted him in managing UNOI operations.  Royall Jenkins created, drove, and asserted UNOI principles, which included rules that members had to follow, required "duty" or unpaid labor, and emphasized the eternal consequences of noncompliance.

---

[2] This motion is joined by Defendants Majeed, Hadley, Jenkins, Peach, and Greenwell

[3] This motion is joined by Defendants Peach and Greenwell.

[4] Docs. 181, 187.

Royall Jenkins appointed local and national UNOI officials.  The named Defendants were national officials within the organization and three of Royall Jenkins' many wives.  According to the Indictment, Defendants UNOI enticed members to send their children to Kansas City, Kansas, with promises of education and opportunity, but instead the children were forced to work extended hours at UNOI businesses without pay and received no legitimate education. Defendants helped enforce UNOI's strict rules—meals were limited, communications with families and non-members were controlled, minor victims were not allowed to seek outside medical attention, and minor victims were required to worked long hours at UNOI businesses, sometimes sixteen-hour days.  There were consequences for children who did not comply with the rules, including withholding food, silence, extra "duty" (i.e., work), as well as psychological and physical abuse.  Defendants instilled in the victims a culture of fear.  They convinced the victims that if they did not comply with the rules, including performing their duty, or if they left UNOI, they would burn in an "eternal hellfire" or experience tragedy.  Defendants benefited from the unpaid labor of the minor victims at UNOI businesses.

According to the Government, FBI investigators received the first report regarding Royall Jenkins in 2008.  This report involved potential fraud activity regarding welfare proceeds but no case was pursued.  The Government provided the reports related to this investigation in discovery.

In 2017, Kendra Ross filed a civil case in this district against Royall Jenkins and three separate entities formerly known as UNOI, asserting sixteen different federal and state law claims, including claims under the Trafficking Victims Protection Reauthorization Act ("TVPRA")[5] for human trafficking and forced labor; it was assigned to The Honorable Daniel D.

---

[5] 18 U.S.C. §§ 1589, 1590, 1595.

Crabtree.[6]   At this point, the FBI had not opened an investigation into UNOI or the Defendants named in the Indictment.  The civil defendants failed to appear or otherwise defend, and default was entered.  Judge Crabtree conducted a damages hearing and then entered a multi-million dollar default judgment against the defendants on May 23, 2018.[7]

The Government maintains that the FBI first opened its criminal investigation leading to this Indictment on November 17, 2017, based on a report from a victim other than Ross.  The Government asserts that this victim (MV-5) heard about Ross's case, which prompted the report. Following this report, the FBI investigated leads, scheduled witness interviews, conducted surveillance, and issued subpoenas.  The FBI's first interview with Ross (MV-10) was on August 30, 2018, after the default judgment.

In an effort to collect on the judgment in the civil case, Ross's attorneys conducted several depositions in early 2019 that have been disclosed to the Defendants in this case.  The Government maintains that the FBI did not participate in these depositions.

Royall Jenkins died of COVID-19 complications in September 2021.  The Indictment was filed on October 20, 2021.

### B.      Standard

Pre-indictment delay is governed by the Fifth Amendment's Due Process Clause and the applicable statute of limitations.[8]  "[T]he outer limits of pre-indictment delay have been set by Congress in statutes of limitations for individual crimes."[9]  But the Due Process clause also plays

---

[6] The Court takes judicial notice of the civil case and relevant orders under Fed. R. Evid. 201.

[7] *Ross v. Jenkins*, No. 17-2547-DDC, ECF 40 (May 23, 2018).

[8] *United States v. Garcia*, –F.4th–, 2023 WL 4341599, at *17 (10th Cir. July 5, 2023).

[9] *Id.*

a limited role "in protecting against oppressive delay."[10]  To show a Fifth Amendment due process violation based on pre-indictment delay, the moving party must show (1) actual prejudice, and (2) "that the delay was purposefully designed to gain tactical advantage or to harass the defendants."[11]  And to determine whether dismissal is an appropriate remedy for pre-indictment delay, the following burden-shifting test applies in this circuit:

> Upon a prima facie showing of fact by a defendant that the delay in charging him has actually prejudiced his ability to defend, and that this delay was intentionally or purposely designed and pursued by the Government to gain some tactical advantage over or to harass him, the burden of going forward with the evidence shifts to the Government.  Once the Government presents evidence showing that the delay was not improperly motivated or unjustified, the defendant then bears the ultimate burden of establishing the Government's due process violation by a preponderance of evidence.[12]

### C.    Discussion

#### 1.    Actual Prejudice

The Court first addresses whether Rassoul has met his burden of showing a prima facie case that the delay in charging him actually prejudiced his ability to defend in this case.  In demonstrating actual prejudice, "the defendant must show that he has suffered definite and not speculative prejudice."[13]  More than ordinary negligence is required.[14]

Rassoul argues that he suffers actual prejudice in two ways: (1) the delay in filing after Royall Jenkins' death means that he cannot elicit testimony that Royall Jenkins was solely in

---

[10] *Id.* at *13 (quoting *United States v. Lovasco*, 431 U.S. 783, 789 (1977)).

[11] *Id.* (quoting *United States v. Revada*, 574 F.2d 1047, 1048 (10th Cir. 1978)).

[12] *Id.* at *14 (quoting *United States v. Comosona*, 614 F.2d 695, 696–97 (10th Cir. 1980)).

[13] *Id.* at *16 (quoting *United States v. Colonna*, 360 F.3d 1169, 1176 (10th Cir. 2004), *overruled on other grounds by Henderson v. United States*, 575 U.S. 622 (2015)).

[14] *Id.* (quoting *United States v. Glist*, 594 F.2d 1374, 1378 (10th Cir. 1979)).  Although Rassoul does not specifically argue this in his motion, the Court notes that the length of delay, standing alone, is not enough to demonstrate actual prejudice.  *Id.* at *19 (citing *Comosona*, 614 F.2d at 696).

charge of and responsible for UNOI's forced labor enterprise; and (2) the delay caused him to lose access to the recordings of UNOI "Board" meetings, which he claims would show that he was not aware that his and others' work was for the benefit of Royall Jenkins, and that when he learned this information, he tried to correct it.

### a.    Royall Jenkins' Death

First, Rassoul argues that Royall Jenkins' untimely death before the Indictment was filed means he cannot provide testimony that would be helpful to his case.  Specifically, although Rassoul acknowledges that Royall Jenkins likely would have been charged in this matter had he survived, "the nature of his leadership of UNOI was such that he quite likely would have been quick to reassure anyone who asked that he was in fact, the singular leader responsible for UNOI."[15]

Rassoul is unable to demonstrate a prima facie showing of actual prejudice based on Royall Jenkins' death because any prejudice is purely speculative.  There is no way to know that Royall Jenkins would have made incriminating statements about his own role in the UNOI enterprise that would exculpate the other Defendants.[16]  Moreover, in pre-indictment delay cases involving witness deaths, the Tenth Circuit has held that the defendant must be able to explain why the deceased witness would be any more helpful to him than the witnesses who survived and provided adverse testimony.[17]  Any statements Royall Jenkins made to others would be admissible at trial under the co-conspirator testimony exception to the hearsay rule.  Also, Defendants are not precluded from placing blame on him at trial and presenting other evidence

---

[15] Doc. 158 at 9.

[16] *See Garcia*, 2023 WL 4341599, at *17 ("Like the witnesses who did testify, it is probable [that the two deceased witnesses] would be unwilling to implicate themselves in the murders . . . .").

[17] *Id.*

implicating Royall Jenkins.  Accordingly, Rassoul cannot show actual prejudice stemming from Royall Jenkins' death approximately one month before the Indictment was filed.

### b.    Lost Board Meeting Recordings

Next, Rassoul argues that the Government's pre-indictment delay caused him to lose access to the recordings of UNOI "Board" meetings, which he claims would show that he was not aware that his and others' work was for the benefit of Royall Jenkins, and that when he learned this information, he tried to correct it.  Rassoul contends that this evidence would have allowed him to prove the date he withdrew from the conspiracy, which he contends is outside the statute of limitations.

The Government acknowledges in its response that it was previously unaware that these Board meetings were recorded.  But the Court agrees with the Government that Rassoul is unable to show actual prejudice associated with the loss of some of these recordings.  The content of the Board meetings can be addressed with any witness who may have knowledge about them (i.e. other attendees).  As was apparent at the hearing, Defendants do not solely rely on these Board meetings to establish the timing of their withdrawal from the conspiracy.  They also heavily rely on victim and other witness statements to the FBI about their level of involvement in and knowledge about the UNOI operation.

Additionally, the Government represents that it has provided the defense with over 400 recordings of UNOI meetings and sermons, dating back as far as 1992.  Also, after Rassoul filed his motion, the Government preserved these recordings, which are currently available on a public website in order to ensure they remain available to defense.  The Court therefore finds that Rassoul has not shown actual prejudice associated with the loss of any specific Board meeting recordings.

## 2.      Tactical Advantage

On the second prong, Rassoul must show that the Government's delay "was intentionally or purposely designed and pursued by the Government to gain some tactical advantage over or to harass him."[18]  While the Government is not required to "'file charges as soon as probable cause exists,' this court looks to whether the government has gained a tactical advantage by the delay that violates the 'community's sense of fair play and decency.'"[19]

Generally, Defendants argue that the Government should have been able to present this case to the grand jury by 2018 and that the almost three-year delay was used as a tactical advantage.  But they have no evidence to support this conclusory assertion.  There is no evidence that the FBI investigated facts leading to the Indictment before 2017—the 2008 report involved fraudulent activity regarding welfare proceeds.  The FBI's investigation began on November 17, 2017, approximately four years before the Indictment was presented. Some delay in this case occurred due to the COVID-19 pandemic in and after March 2020, but follow-up interviews and investigation continued to the extent possible throughout that time.  The Government represents that the majority of the delay, not accounting for COVID-19, stemmed from continued investigation of the Defendants and the charges.  Moreover, the Court agrees with the Government that this is a complex case, with numerous Defendants, an extensive list of victims, delayed reporting, and a years-long, continuing conspiracy.  The length of time between the beginning of the investigation and return of the Indictment was a reasonable length of time for such a complicated matter.  The Court cannot find that the Government's delay for these reasons

---

[18] *Id.* at *20 (quoting *United States v. Comosona*, 614 F.2d 695, 696–97 (10th Cir. 1980)).

[19] *Id.* (quoting *Lovasco*, 431 U.S. at 790–91).

caused the Government to gain a tactical advantage that violates the "community's sense of fair play and decency."[20]

Rassoul urges that the Government impermissibly waited to charge this case in order to gain a tactical advantage by first obtaining information from the discovery in Kendra Ross's civil case. But Defendants do not dispute the Government's contention that it did not begin the investigation leading to this Indictment until a witness other than Ross came forward, after the civil case was underway. Although Ross's civil attorneys conducted a series of depositions following the default judgment in an attempt to track down proceeds that could be used to satisfy the judgment, there is no evidence that these depositions were conducted in coordination with the FBI.

Rassoul also suggests that the Government was aware that Royall Jenkins was in poor health and evading arrest and that delaying the Indictment with this knowledge shows a conscious disregard of circumstances that might make him unavailable as a witness. However, the Court cannot find that Royall Jenkins' death was foreseeable, particularly given that he died from complications due to COVID-19, a condition that would not have been foreseeable to anyone in the United States before early 2020. There is no evidence to suggest that the Government delayed the Indictment in this case in order to gain a tactical advantage by avoiding charging Royall Jenkins or obtaining statements by him.

Finally, Rassoul argues that the Tenth Circuit's test should be expanded to include circumstances where the Government's delay is "in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the

---

[20] *Id.* (quoting *Lovasco*, 431 U.S. at 790–91).

ability to mount an effective defense."[21]  The Supreme Court in *Lovasco* acknowledged the Government's concession that such a standard applies, but noted no such evidence of recklessness in that case.[22]  Very recently, the Tenth Circuit in *United States v. Garcia* likewise declined an opportunity to expand the standard for pre-indictment delay to include a reckless disregard component.  Finding that the defendant "fail[ed] to make a specific argument that the Government here acted with 'reckless disregard[,]' . . . .  we leave for another day the question of whether this circuit's test should be expanded."[23]  Likewise, here the Court declines to consider whether the Tenth Circuit's test should be expanded.  Even if a reckless disregard standard applies, the Court finds no evidence to support recklessness in this case.

In sum, Rassoul is unable to demonstrate a prima facie case of a due process violation based on pre-indictment delay because he cannot show actual prejudice, or that the Government used that delay as a tactical advantage.  Accordingly, Rassoul's motion to dismiss for pre-indictment delay is denied.

## II.     Motion to Dismiss for Grand Jury Abuse

### A.     Standard

Rassoul moves to dismiss the Indictment under Rule 12(b)(3)(A)(v) based on alleged errors in the grand jury proceeding.  Dismissal on this basis is only appropriate if Rassoul can show that he was prejudiced due to the alleged errors, which in turn requires a showing that the errors "substantially influenced the grand jury's decision to indict, or . . . there is a grave doubt that the decision to indict was free from the substantial influence of such violations."[24]  "A grand

---

[21] *See United States v. Lovasco*, 431 U.S. 783, 795 n.17 (1977).

[22] *Id.*

[23] *Garcia*, 2023 WL 4341599, at *14.

[24] *United States v. Cooper*, 396 F. Supp. 3d 992, 994 (D. Kan. 2019) (quoting *United States v. Moya-Breton*, 329 F. App'x 839, 844 (10th Cir. 2009)).

jury's independent judgment is compromised when the prosecutor's misconduct invades the grand jury's independent deliberative process and substantially affects its decision to indict."[25] When, such as here, a defendant claims that the Government elicited false testimony before the grand jury, the Tenth Circuit "require[s] a showing the government deliberately attempted to influence the grand jury with false testimony."[26]

### B.    Discussion

Rassoul argues that the Government committed misconduct that invalidated the independent deliberative process of the grand jury by eliciting testimony from SA Ramana that was either false or recklessly inaccurate, and by failing to ask questions of SA Ramana to clarify or correct such testimony.  First, Rassoul argues that SA Ramana attributed statements to witnesses that were directly contrary to the witness's actual statement, or gave such testimony knowing that the witness's statement contradicted it.  Second, Rassoul argues that SA Ramana attributed statements to witnesses that did not appear in any witness statement.  Finally, Rassoul argues that SA Ramana failed to include certain exculpatory facts to the grand jury.  Rassoul urges the Court to consider both the individual and cumulative effect of these errors and dismiss the Indictment.

### 1.    Testimony That is Contradicted by Witness Statements

Rassoul challenges several statements made by SA Ramana during her testimony to the grand jury on the basis that witness statements on the same subject contradict her testimony. First, Rassoul challenges SA Ramana's testimony that he made one of the victims, A.K., return to work one time after hitting her head and another time after breaking her wrist.  Rassoul argues

---

[25] *United States v. Hillman*, 642 F.3d 929, 933 (10th Cir. 2011) (citations omitted).

[26] *Cooper*, 396 F. Supp. 3d at 995 (citations omitted).

that in the Government's written report summarizing its witness interview of A.K., referred to as a "302 Report,"[27] A.K. stated that after she hit her head Rassoul was driving her home, not taking her to work as SA Ramana testified, and makes no mention of Rasoul forcing her to return to work after she broke her wrist.  Second, Rassoul challenges SA Ramana's testimony that he was in charge at the organization's North Carolina location where another victim, J.D., alleged he was verbally abused.  Rassoul argues that this testimony is contradictory to the Government's 302 Report for J.D., where J.D. stated that he himself was in charge at the North Carolina location and that Rassoul had the same job but in Connecticut.  Finally, Rassoul challenges SA Ramana's testimony that the organization's leaders like Rassoul were not forced to live under the same conditions as the workers.  Here, Rassoul points to the Government's 302 Report for victim M.K., where she stated that Rassoul lived with a lot of workers in Connecticut.  Rassoul argues that these statements made by SA Ramana to the grand jury, which contradict the Government's 302 Reports on the same subjects, constitute such grave inaccuracies and falsehoods that the Indictment should be dismissed.

Rassoul relies primarily on *United States v. Cooper*,[28] where the District of Kansas dismissed an indictment on the basis of an agent provided false and inaccurate testimony regarding a medical report in a sexual assault case.  In response, the Government argues that any alleged inaccuracies—which the Government maintains are not falsehoods—do not rise to the level found in *Cooper*.  In that case, the Government argues, the false testimony went to the heart of the indicted charges—the defendant in *Cooper* was charged with sexually abusing his stepdaughter, and the agent testified to the grand jury that the rape kit indicated penetration,

---

[27]

[28] 396 F. Supp. 3d 992 (D. Kan. 2019).

when that was not at all true, which led to the grand jury indicting him for aggravated sexual assault.  This case is distinguishable, according to the Government, because the inaccuracies referenced by Rassoul do not go to the core of the charges against him, nor has he met his burden of showing that the Indictment is based on perjured, material testimony.  Rather, it is the Government's position that Rassoul has merely shown that SA Ramana's testimony does not fit within his own theory of the case.

The Court agrees with the Government and finds that the record does not support Rassoul's allegation that SA Ramana testified falsely such that the Indictment should be dismissed.  Rassoul bases his arguments on the Government's 302 Reports, which are nothing more than summaries of interviews the Government conducted with the witnesses; they are not witness statements that are signed and attested to as complete and accurate.[29]  Thus, it is entirely possible that SA Ramana's challenged testimony is, in fact, accurate, but is based on some evidence not recorded in the Government's 302 Reports.  And even if Rassoul could somehow prove at this point that the testimony was patently false, the Court remains unconvinced that such falsehoods would rise to the level of materiality so as to call into question the grand jury's ability to exercise independent judgment, or that the Government deliberately attempted to influence the grand jury with false testimony.  Therefore, the Court denies Rassoul's motion to dismiss the Indictment based on these challenged statements.

---

[29] *See, e.g., United States v. Davita Inc.*, No. 21-cr-00229, 2022 WL 833368, at *4 (D. Colo. Mar. 21, 2022) (explaining that "[f]orm 302 is a form on which government representatives, typically an FBI agent, summarizes the statements made to the agent by a prospective witness prior to trial" that "may or may not include quotes from the witness, but regardless, it is typically not signed by or otherwise verified by the witness" and holding that, therefore, Form 302s may be used for purposes of impeachment but not as substantive evidence).

### 2.    Testimony That is Not Supported by Witness Statements

Next, Rassoul argues that the following three statements made by SA Ramana to the grand jury are not supported by any witness statement and, therefore, constitute grand jury abuse such that the Indictment should be dismissed: (1) that Rassoul was among those who issued fasting punishments to victim A.K.; (2) that Rassoul was one of the "transporters"; and (3) that Rassoul administered "beat downs."  Notably, Rassoul does not contend that these statements are false or inaccurate—he merely asserts that they are not supported by any of the Government's 302 Reports.

In response, the Government argues that Rassoul's motion regarding these statements should be denied because he failed to point to any authority that SA Ramana's testimony (or testimony from any other Government witness) was restricted to statements found in 302 Reports.  Further, the Government asserts that to the extent Rassoul disputes the truth of these facts, that is an issue for trial.  The Court agrees on both fronts.  Rassoul has not cited, and the Court has not found, any authority requiring the Government's witnesses to limit their grand jury testimony to only those facts found in 302 Reports or other documentary evidence.  And while Rassoul does not argue, and the record does not support, that the challenged statements were false or inaccurate, should he wish to raise that argument, it is an evidentiary issue that should be resolved at trial.  Therefore, the Court denies Rassoul's motion to dismiss the Indictment based on these challenged statements.

### 3.    Withheld Relevant and Exculpatory Facts

Finally, Rassoul's arguments with regard to relevant and exculpatory facts being withheld from the grand jury can be placed into two categories: (1) challenges to specific testimony by SA Ramana to the grand jury that left out facts related to that testimony that are relevant and

exculpatory; and (2) a challenge to SA Ramana's testimony as a whole on the basis that she left out other relevant and exculpatory facts altogether.

As to the first category, Rassoul first argues that when SA Ramana testified that minor victims did not typically live with their parents while being subjected to forced labor, she should have also testified that victim T.K. had stated that she lived with her father while working in the bakery.  Second, Rassoul points to SA Ramana's testimony regarding the ages of victims T.K., J.D., and R.F. when they were victimized, and argues that because he was also a minor at those relevant times, SA Ramana should have informed the jury of his age as well.  Third, Rassoul argues that when SA Ramana testified that numerous witnesses did not know any other life than forced labor, she should have informed the jury that he had been brought into the organization by his parents at a very young age and began uncompensated work himself at the age of 10 and, therefore, was similarly situated to those witnesses.  Finally, Rassoul argues that when SA Ramana testified that he participated in beating up two victims in New Jersey, she should have clarified that victim A.K. named two individuals other than Rassoul as the perpetrators of that incident.

As to the second category, Rassoul asserts that SA Ramana should have, but did not, provide the following facts to the grand jury during her testimony: that victims A.K. and N.K. pointed to other women as being in charge of the females; that victim A.K. and M.K. stated that Rassoul was trying to make sure people were paid for working; that witnesses stated that Royall Jenkins was in charge; that victims E.M. and A.K. stated that Rassoul was trying to dismantle the organization and remove Royall Jenkins; and that victim E.M. referred to the organization as a "cult."

The Government responds that none of the alleged omissions of fact that Rassoul points to were exculpatory but, rather, merely constituted facts supporting Rassoul's own theory of the case.  Further, the Government argues, even if the omitted facts were exculpatory, prosecutors are under no constitutional obligation to present exculpatory evidence to the grand jury.  Again, the Court agrees.  Whether or not these challenged statements were relevant to the allegations against Rassoul or exculpatory for him, the Government was under no obligation to present them to the grand jury.[30]  Therefore, the Court denies Rassoul's motion to dismiss the Indictment based on these challenged statements.

In sum, the Court finds no errors in the grand jury proceeding such that the Indictment should be dismissed.  Even when viewed cumulatively, the challenged statements and omissions do not amount to the showing required to dismiss an indictment.  Indeed, Rassoul has not shown that SA Ramana's testimony was knowingly false or misleading such that the Court has doubts as to the grand jury's independent judgment.  Moreover, to the extent Rassoul argues a lack of sufficient evidence against him, that is an issue that must be resolved by the finder of fact at trial.  Similarly, because the Government is under no obligation to present exculpatory evidence to the grand jury, Rassoul's argument that failure to do so constituted a grand jury error is unavailing.  Rassoul will have the opportunity to present his position and theory of the case at trial.  Thus, Rassoul's motion to dismiss based on statements made to and facts withheld from the grand jury is denied.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant Yunus Rassoul's Motion to Dismiss Based on Pre-Indictment Delay (Doc. 158) is **denied**.

---

[30] *See, e.g., United States v. Williams*, 504 U.S. 36, 52 (1992).

**IT IS FURTHER ORDERED THAT** Defendant Yunus Rassoul's Motion to Dismiss for Grand Jury Abuse (Doc. 159) is **denied**.

**IT IS SO ORDERED.**

Dated: July 27, 2023

                                    S/ Julie A. Robinson
                                    JULIE A. ROBINSON
                                    UNITED STATES DISTRICT JUDGE