## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **Plaintiff,** | |
| **v.** | **Case No. 21-20060-JAR** |
| **KAABA MAJEED,** | |
| **YUNUS RASSOUL,** | |
| **a.k.a. YUNUS RASSOULL,** | |
| **JAMES STATON,** | |
| **a.k.a. ADAM WINTHROP,** | |
| **RANDOLPH RODNEY HADLEY,** | |
| **DANIEL AUBREY JENKINS,** | |
| **DANA PEACH,** | |
| **Defendants.** | |

## GOVERNMENT'S OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL AND FOR A NEW TRIAL

COMES NOW the United States of America, by and through the undersigned attorneys, and respectfully submits this omnibus response to the defendants' motions for judgment of acquittal and motions for a new trial, based on the following points and authorities.

## I.   RELEVANT PROCEDURAL AND FACTUAL BACKGROUND

The defendants were charged in an eight-count Indictment on October 20, 2021. The charges arose out of the defendants' participation in the United Nation of Islam (UNOI), an organization led by unindicted co-conspirator Royall Jenkins. The Indictment alleged that from at least October 28, 2000, continuing through November 30, 2012, the defendants, acting in various capacities, engaged in a conspiracy in which they used one or more prohibited means to compel the unpaid labor of children for UNOI, in violation of 18 U.S.C. § 371. The defendants also were charged with substantive violations of the forced labor statute, 18 U.S.C. § 1589. Before trial, count five of the Indictment was dismissed by the government. After a twenty-six-day trial,

including three days of jury deliberations, all defendants were found guilty of count one, which charged conspiracy to commit forced labor, and defendant Kaaba Majeed was additionally convicted of counts two, three, six, seven, and eight which charged forced labor in violation of Title 18 U.S.C. § 1589.

The evidence at trial proved that the defendants held leadership roles and assisted the founder of UNOI, Royall Jenkins, with running and managing UNOI. UNOI enticed parents to send their children to Kansas City, Kansas, with promises of education and opportunity, but instead the children were forced to work extended hours without pay and received no legitimate education. The charged defendants helped enforce UNOI's strict rules—meals were limited, communications with families and non-members were controlled, minor victims were not allowed to seek outside medical attention, and minor victims were required to work long hours at UNOI businesses, sometimes sixteen-hour days. There were consequences for children who did not comply with the rules, including withholding food, forced silence, extra "duty" (*i.e.*, work), as well as psychological and physical abuse. To maximize the benefits of the children's work, the defendants participated in meetings where they decided where around the country children would be moved to work in UNOI businesses, sometimes without notice and without parental permission. The defendants benefited from the unpaid, coerced labor of the minor victims. And the defendants did not follow the same strict rules of UNOI; while the children lived in crowded conditions, followed a strict diet, and worked long hours, the defendants and their families lived in spacious accommodations, ate what they wanted, and worked at their own discretion.[1]

---

[1] The government relies on the record as a whole, which supports the jury's verdict. Listing all of the supporting or corroborating testimony and evidence would be unwieldy. Accordingly, while the government provides record citations throughout this response, it does so by way of example. The citations are not meant to be exhaustive on any given point.

## II. ARGUMENT

### A. RULE 29

The heavy burden a defendant faces on a Rule 29 motion for judgment of acquittal "reflects a deep respect for the fact-finding function of the jury." *United States v. White*, 673 F.2d 299, 302 (10th Cir. 1982). In considering a Rule 29 motion, the court must "examine the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Brooks*, 438 F.3d 1231, 1236 (10th Cir. 2006); *see also United States v. Xiang*, 12 F.4th 1176, 1184 (10th Cir. 2021). The court must make its determination "without weighing conflicting evidence or considering the credibility of witnesses[.]" *White*, 673 F.2d at 302; *see also Brooks*, 438 F.3d at 1236 (stating "it is not [the court's] duty to weigh conflicting evidence nor to consider the credibility of witnesses"). The Supreme Court has emphasized that "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Cavazos v. Smith*, 656 U.S. 1, 2 (2011) (*per curiam*). Thus, the court must "rely on the jury, as the fact finder, to resolve conflicting testimony, weigh the evidence, and draw inferences from the facts presented." *United States v. Radcliffe*, 331 F.3d 1153, 1157-58 (10th Cir. 2003); *see also Jackson v. Virginia*, 443 U.S. 307, 326 (1979) (stating that a court, when considering overturning a jury's verdict, "must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution"). "The jury may base its verdict on both direct and circumstantial evidence, together with all reasonable inferences that could be drawn therefrom, in the light most favorable to the government." *United States v. Guerra-Javalera*, No. 03-cr-20054, 2006 U.S. Dist. LEXIS 61626 (D. Kan. Aug. 28, 2006) (citing *United States v. Hooks*, 780 F.2d 1526, 1531 (10th Cir. 1986)).

Furthermore, "the evidence necessary to support a verdict need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt." *United States v. Wood*, 207 F.3d 1222, 1228 (10th Cir. 2000) (quotation omitted). The court must not "overturn a jury's finding unless no reasonable juror could have reached the disputed verdict." *United States v. Carter*, 130 F.3d 1432, 1439 (10th Cir. 1997); *see also White*, 673 F.2d at 301 (stating that overturning a jury's verdict is appropriate only if the evidence implicating defendant is nonexistent or is "so meager that no reasonable jury could find guilt beyond a reasonable doubt").

Although the defendants acknowledge this high standard in their motions for judgment of acquittal, each ignores this standard in their argument.[2] That is, despite acknowledging that the Court may not weigh conflicting evidence or assess the credibility of witnesses, defendants ask that the Court not only consider but also fully credit defense evidence, resolve conflicting testimony in favor of the defense, and find government witnesses incredible. (Doc. 554, p. 7-10; Doc. 557, p. 9-11; Doc. 563, p. 10-11, 13-17; Doc. 556, p. 6-7, 9-12, 14-15, 18-22; Doc. 567, p. 12-15; Doc. 570, p. 6-8, 11-15). The defendants' attempts to whitewash the integral roles they played in this forced labor conspiracy is not a basis to disturb the jury's verdict. Their motions rehash arguments that were made prior to and during trial. Indeed, victims were subject to extensive cross-examination on the very topics that the defendants claim warrant judgments of acquittal. Two of the defendants testified over the course of three days and made the same points, which counsel repeated in closing and now in the defendants' post-trial motions. The jury was free to believe the victims and reject the defendants' arguments. And after the Court properly

---

[2] Citing two non-binding district court cases, defendants Rassoul and Majeed claim that the Court should consider the evidence presented by the defendants at trial. (Doc. 556, p. 2; Doc. 570, p. 2). But weighing defense evidence in favor of defendants is exactly what the well-established Rule 29 standard precludes.

instructed the jury on the law, the jury convicted the defendants.  The Court should decline to second-guess the jury's well-considered verdict and deny defendants' motions for judgment of acquittal.

### 1.  The Government Proved Each Element of Conspiracy to Commit Forced Labor.

A conspiracy conviction requires proof beyond a reasonable doubt of: "(1) an agreement by two or more persons to violate the law; (2) knowledge of the objectives of the conspiracy; (3) knowing and voluntary involvement in the conspiracy; and (4) interdependence among coconspirators." *United States v. Foy*, 641 F.3d 455, 465 (10th Cir. 2011); (*see also* Doc. 475, p. 28).

Each defendant argues that the government failed to prove beyond a reasonable doubt at trial one or more of these elements.  Applying the correct Rule 29 standard and viewing the totality of the evidence in the light most favorable to the government, there is no question that the government's evidence far exceeds the Rule 29 standard, and the Court should not disturb the jury's verdict.

### a.  First Element of Conspiracy:  Agreement

The first element necessary to find a defendant guilty of a conspiracy is the existence of a conspiratorial agreement.  *See Foy*, 641 F.3d at 465.  The "agreement" necessary for a conspiracy "is generally a matter of inference, deduced from the acts of the persons accused." *Telman v. United States*, 67 F.2d 716, 717 (10th Cir. 1933) (denying a motion for directed verdict, finding that "[t]he facts established, together with all the inferences to be drawn therefrom, were clearly sufficient to justify the jury finding the conspiracies to have existed, as charged in the indictment"). As the Tenth Circuit has observed, conspirators do not typically "put their agreements into writing, nor do they make public their plans." *Id.*  A conspiratorial agreement "is rarely susceptible of

proof by direct evidence, and may be deduced from the conduct of the parties, and the attending circumstances." *Id.* Indeed, "the jury can infer an agreement between parties based solely on circumstantial evidence demonstrating that the parties took concerted action in furtherance of a shared objective." *United States v. Woodmore*, 2025 U.S. App. LEXIS 1323 (10th Cir. Jan. 22, 2025); *see also United States v. Torres*, 53 F.3d 1129, 1153 (10th Cir. 1995) ("[T]he absence of any direct evidence of a conspiracy is immaterial so long as there is sufficient circumstantial evidence of a conspiracy to support a finding of guilt beyond a reasonable doubt.").

In this case, the "circumstances, acts, and conduct" of the defendants "are of such a character that the minds of reasonable men may conclude therefrom that an unlawful agreement exist[ed]." *United States v. Morehead*, 959 F.3d 1489, 1500 (10th Cir. 1992). The government's evidence at trial showed that the defendants each held leadership roles within UNOI and worked with UNOI leader Royall Jenkins to mutually benefit from the unpaid, coerced labor of the victims.[3] Amira K., Elijah M., Maryum M., Niesha K., and others described the detailed progression of each defendant's rise in the organization and subsequent additional responsibilities that their positions incurred. Majeed rose to Supreme Captain and member of the Board of Directors; Rassoull rose to Supreme Minister and member of the Board of Directors; Winthrop was already National Secretary at the time most of the victims were young children and remained in power until the end of his time in the nation; Aubrey and Hadley were enforcers, holding titles FOI leader and Captain, respectively; Peach held power as Royall's wife but also as "doctor" and

---

[3] Multiple defendants cloak their argument in religion, claiming they truly believed and were following the religious teachings of Royall Jenkins. (*See, e.g.*, Doc. 556, Doc. 567). But as discussed in pretrial briefings, the First Amendment does not protect the activity criminalized by 18 U.S.C. § 1589, and a Rule 29 motion is not the appropriate venue for a First Amendment challenge. (Doc. 183, Doc. 207).

lead concerns such as the secretarial department, health facilities, and finances within the home of every location in which she lived.[4]  Victim testimony was corroborated by defense witnesses, UNOI phone lists, internal emails, and Board of Directors documents.[5]  By accepting these roles and the responsibilities they carried, each defendant became a cog in the wheel of the functioning of UNOI, from which they each played a role in propagating the climate of fear that compelled the victims to keep working.  As Amira testified: "They were the authoritarians, the said authority that children would be turned over to.  They ultimately at—earlier on received instructions to carry out, later on gave instructions for locals to carry out."[6]  It was not merely that they were leaders, it was that—as leaders—they performed their individual roles within UNOI which, together, created a climate of fear such that victims and members believed they would suffer physical and verbal abuse, spiritual retribution, excommunication, homelessness, and/or starvation if they did not continue to work.  From their leadership positions, and in the eyes of their victims, the defendants' agreement to keep UNOI functioning—through a climate of fear—can easily be inferred.

### b. Second Element of Conspiracy: Knowledge of Objectives of the Conspiracy

To convict a defendant of conspiracy, the government also must prove that the defendant knew the essential elements of the conspiracy.  *See Foy*, 641 F.3d at 465.  "A defendant need not have knowledge of all the details or all the members of the conspiracy and may play only a minor role in the conspiracy."  *United States v. Small*, 432 F.3d 1164, 1182 (10th Cir. 2005).  The government must "only prove by direct or circumstantial evidence 'that the defendant knew at least the essential objectives of the conspiracy, and the defendant knowingly and voluntarily

---

[4] *See, e.g.*, Trial Tr. at 362 (Amira K.); Trial Tr. at 966 (Elijah M.); Trial Tr. at 2354 (Elijah M.); Trial Tr. at 2658 (Shakira M.); Trial Tr. at 1362 (Maryum M.).

[5] *See, e.g.*, Trial Tr. at 4711 (Kaaba Majeed); Trial Tr. at 3636 (Myesha Jenkins); Trial Tr. at 524 (Amira K.).

[6] Trial Tr. at 829 (Amira K.).

became part of it.'"  *Id.* at 1182-83 (quoting *United States v. Mendoza-Salgado*, 964 F.2d 993, 1005 (10th Cir. 1992)).  "Evidence of a defendant's actions can be used to establish the defendant's knowledge in the context of a conspiracy prosecution."  *United States v. Anaya*, 727 F.3d 1043, 1051 (10th Cir. 2013) (internal quotation omitted).

In this case, the essential object of the conspiracy, as charged in the Indictment, was essentially "for the defendants, and others known and unknown to the grand jury, to obtain the uncompensated labor and services of at least one victim in the District of Kansas and elsewhere" through means prohibited by 18 U.S.C. § 1589.  (Doc. 1).  The evidence showed that the defendants had knowledge of this essential objective.  For example, physical abuse of children was engrained into the culture of UNOI, which every official and defendant knew.[7]  Similarly, many of the coercive and fear-based tactics that Royall and officials like the defendants used against UNOI members were central to the organization and were either known or implemented by the defendants and other officials.  For example, officials like the defendants taught youth and other members that those who do not agree with the teachings of Royall and UNOI would burn in hellfire.[8]  Additionally, members who did not do as instructed by officials were routinely subjected to

---

[7] Indeed, the UNOI Instructor Notebook, which the government admitted into evidence as Government's Exhibit 303, directed officials at the University of the Art & Logistics of Civilization ("University") to paddle children, even those under the age of 7.  According to the Instructor Notebook, this physical abuse was a response to "transgressions," which instilled in those children the idea of obedience. That culture of fear and obedience did not leave those children when they left the school to work all day in various businesses.

[8] Trial Tr. at 876 (Devon Y.); 1045 (Elijah M.) (listing officials who ran math class and espoused Royall's teachings to include Aubrey, Winthrop, Majeed, Rassoull, and Hadley); Trial Tr. at 1071-72 (Elijah M.) (testifying that Royal, Winthrop, and Rassoul presided over national calls and announced discipline of members); Trial Tr. at 1820 (Tyneemah J.); Trial Tr. at 2231 (Etenia Kinard); 2660 (Shakira M.).

"scenarios," which were public airing of their transgressions and punishments designed to instill fear and obedience in the membership.[9]

The evidence also showed that the defendants promoted false information to disguise or cover up UNOI activity, indicating that the defendants knew their activity was illegal. *See United States v. Adegboye*, 732 F.3d 1195, 1205 (10th Cir. 2013) (finding "the most compelling evidence" that defendant knew about and aided and abetted a co-defendant's fraud was evidence that he "actively tried to cover up" the fraud). Specifically, the fact that the defendants—and Royall Jenkins—falsely promoted UNOI as an organization dedicated to Black empowerment and promised its members' children a well-rounded education in order recruit new members and new sources of free labor shows the defendants' consciousness of guilt and knowledge of the conspiracy's true purpose.[10] UNOI did not empower or educate its members. Rather, it took money members earned outside UNOI for the benefit of Royall Jenkins and others in positions of power, like the defendants. The children of UNOI worked long hours instead of receiving a proper education. UNOI, through the defendants, falsely branded their various businesses as "extended classrooms," and they communicated to members and the outside world that the children staffing these businesses were learning and participating in education akin to internships. But this claim was false, the defendants knew it was false, and the children staffing these businesses did not view

---

[9] Trial Tr. at 483-84 (Amira K.).

[10] For example, Maryum M. testified that at the annual celebration that Royall, the defendants, and other officials held every year, she and her parents were led to believe that Maryum could receive a quality education in UNOI. Trial Tr. at 1349 (Maryum M.). What Maryum and others saw at the celebration did not represent how she and other children lived their lives outside of celebration. Trial Tr. at 1348-50 (Maryum M.). The celebration was a ruse that the defendants used to lure in hopeful and unsuspecting families and children. Evidence that Royall Jenkins and the defendants organized a "celebration" in Kansas City to mislead parents about what was happening to the children also shows that defendants were aware of the true unlawful purpose of the conspiracy and attempted to conceal it.

working in diners and restaurants with little sleep and long hours as being in a classroom.[11]   The

Kansas-City-based University was not licensed or accredited, and its meager curriculum did not

include traditional, state-required subjects like reading or math.[12]   The studies simply further

indoctrinated the children.  Rather than leaving UNOI empowered and educated, victims found

themselves homeless, unable to get into real schools, unable to get their GEDs, unable to find

appropriate work, and struggling with long-lasting trauma.[13]   Furthermore, evidence that Majeed

and others instructed children working at restaurants to lie about their work to customers and labor

officials shows that defendants knew their activities were illegal.  Indeed, Majeed and Winthrop

instructed children like Khalib B. to lie to customers in the restaurant and say they were working

in an internship under their school; and after learning that members of the public submitted

complaints of child labor to local authorities, Winthrop instructed certain businesses to staff

public-facing positions, like cashiering and serving, with adults.[14]

In addition, evidence that the defendants did not follow the principles of UNOI they

espoused to members further indicates their knowledge of the essential objective of the conspiracy.

The defendants did not adhere to the strict rules of UNOI.  The defendants' freedom was not

limited and controlled like the victims' freedom was—some defendants drove expensive cars and

lived comfortably in nice houses; some ate chicken and pizza and enjoyed meals in non-UNOI

restaurants; and above all, Royall and officials like the defendants had freedoms that members like

the victims did not.[15]   Defendants enjoyed this freedom because the rules and restrictions were

---

[11] Trial Tr. at 2131, 2162 (Khalib B.).

[12] Trial Tr. at 465 (Amira K.).

[13] Trial Tr. at 585 (Amira K.); Trial Tr. at 1135 (Elijah M.); Trial Tr. at 3318 (Kendra R.).

[14] Trial Tr. at 557 (Amira K.); Trial Tr. at 2032 (Khalib B.).

[15] Trial Tr. at 417 (Amira K.) ("[Officials] had a little bit more freedom, access to funds, and different things. So what they choose to do on their own time, they weren't questioned."); Trial Tr. at 1115 (Elijah M.) (testifying that Majeed, Aubrey, Winthrop, Rassoull, and Peach lived in better

necessary only to coerce others to work for free—the rules were part of the coercive environment, that is, the climate of fear, that compelled the victims to work. There was no need for Royall Jenkins or the defendants to follow these rules themselves because they knew the object of the conspiracy and were working toward its end.

### c. Third Element of Conspiracy: Knowing and Voluntary Involvement in the Conspiracy

The third element the government must prove in a conspiracy case is that the defendants knowingly and voluntarily participated in the conspiracy. *See Foy*, 641 F.3d at 465. The "record need show only slight evidence of a particular defendant's connection with a conspiracy that has already been established through independent evidence." *United States v. Clark*, 717 F.3d 790, 805 (10th Cir. 2013). Moreover, a "jury may presume a defendant is a knowing participant in the conspiracy when he or she acts in furtherance of the objective of the conspiracy." *United States v. Carter*, 130 F.3d 1432, 1440 (10th Cir. 1997); *see also United States v. Brunetti*, 615 F.2d 899, 903 (10th Cir. 1980) ("Participation in a criminal conspiracy need not be established by direct evidence. In fact it seldom is. Common purpose and plan is generally inferred from a development and a collocation of circumstances.").

In this case, there was abundant evidence for the jury to conclude that each of the defendants knowingly and voluntarily participated in the conspiracy and furthered its objectives.

---

houses than members, and that they had freedom of movement that regular members did not); Trial Tr. at 1118-19 (Elijah M.) (testifying that Royall and his family, including Peach, ate chicken and drank alcohol, even though they forbade members from eating and drinking those things); Trial Tr. at 2014 (Khalib B.) ("[T]hey would use positions of authority as leverage in the sense where, if you were an official, you had extra perks because you had access and freedoms that other people didn't have like vehicles and more say about how things ran in your personal circle."); Trial Tr. at 2042 (Khalib B.) ("[Officials] received more favorable conditions in comparison to the actual members who did most of the work.").

Nearly every witness talked about the prominent roles each of the defendants played in UNOI, which financed its operations in large part through the unpaid labor of minor children.[16]

Witnesses testified about numerous personal interactions with the defendants. To name just a few:

- Majeed and Rassoull discussed separating sisters and had them dispatched to separate states.[17]

- After a victim hit her head working in the bakery and passed out, Rassoull drove her home told her that she could have the rest of the night off and return to work the next day.[18]

- Peach paddled a victim, slapped her, put her on fasts, and Class A on many occasions.[19]

- A victim testified that Majeed and Hadley were harshest when it came to physical punishment and that both seemed to enjoy it, as they would resort to it before anything else.[20]

- A victim testified that Hadley, Aubrey, Majeed, and Winthrop put him on fasts. On one occasion, Hadley and Aubrey held him over train tracks for stealing a salmon sandwich when he was hungry from fasting.[21] Hadley, Majeed, Aubrey, and

---

[16] *See, e.g.*, Trial Tr. at 509-510 (Amira K.), Trial Tr. at 856-57 (Devon), Trial Tr. at 1045, 1104 (Elijah M.), Trial Tr. at 1410-11, 1470 (Maryum M.), Trial Tr. at 1628-30 (Doneika D.), Trial Tr. at 1758-59, 1806 (Tyneemah J.), Trial Tr. at 1984, 2013-14 (Khalib B.), Trial Tr. at 2726-27 (Niesha K.) [Majeed]; Trial Tr. at 381, 514, 591 (Amira K.), Trial Tr. at 1045, 1104-05 (Elijah M.), Trial Tr. at 1470-71 (Maryum M.), Trial Tr. at 1628-30 (Doneika D.), Trial Tr. at 1758-59, 1809, 1818-19 (Tyneemah J.), Trial Tr. at 1984 (Khalib B.), Trial Tr. at 2726-27 (Niesha K.) [Rassoull]; Trial Tr. at 382, 506, 509-510, 519 (Amira K.), Trial Tr. at 856-57 (Devon Y.), Trial Tr. at 1045, 1104-05, 1112 (Elijah M.), Trial Tr. at 1628 (Doneika D.), Trial Tr. at 1759 (Tyneemah J.), Trial Tr. at 1984, 2017 (Khalib B.), Trial Tr. at 2726-27 (Niesha K.), Trial Tr. at 3446 (Stacey G.) [Winthrop]; Trial Tr. at 509-510, 828 (Amira K.), Trial Tr. at 1045 (Elijah M.), Trial Tr. at 1754, 1811 (Tyneemah J.), Trial Tr. at 1984 (Khalib B.), Trial Tr. at 2726-27 (Niesha K.) [Hadley]; Trial Tr. at 856-57 (Devon Y.), Trial Tr. at 1049, 1111-1112 (Elijah M.), Trial Tr. at 1627-28 (Doneika D.), Trial Tr. at 1988 (Khalib B.), Trial Tr. at 2726-27 (Niesha K.) [A. Jenkins)]; Trial Tr. at 506-510 (Amira K.), Trial Tr. at 1746, 1753, 1767, 1771, 1783 (Tyneemah J.) [Peach].

[17] Trial Tr. at 437 (Amira K.).

[18] *Id.* at 418-19.

[19] Trial Tr. at 1749-1751, 1757 (Tyneemah J.).

[20] Trial Tr. at 2001-04 (Khalib B.).

[21] Trial Tr. at 880-82 (Devon Y.).

Winthrop all paddled him.  Winthrop and Hadley paddled him on occasion because he wet the bed at Winthrop's house.[22]

- Peach paddled a victim eighteen times for "bringing demons" into the home.[23]

- Numerous witnesses testified that Majeed supervised them at NY and New Jersey restaurants and coached them to lie to the public and investigators about their age and what they were doing at the restaurants.  After the New York Department of Labor visited the restaurant and started an investigation, Majeed moved of the child workers to New Jersey.  He lied to the New York Department of Labor and said that the children had been sent back to Kansas.[24]

- Hadley paddled a victim more than thirteen times.  The victim could not sit on the bus of sleep comfortably for a week.[25]

- When one victim lived with Winthrop, she was forced to stay in a room for extended periods of time and was not allowed to use her inhaler.[26]

- One victim testified that when she was thirteen or fourteen Hadley and another official took a child into a room, and when he came out the child was unrecognizable, with a severely beaten face and eyes nearly swollen shut.[27]

Witnesses also testified about the privileges and material possessions (such as nice homes, vehicles, clothing, freedom of movement, and children serving as live-in nannies) the defendants had compared to other members.   The jury could have reasonably inferred that the defendants were motivated by the power and influence they enjoyed and benefits they received compared to other members of UNOI and the unpaid child workers.

Each defendant performed these particular roles within UNOI that contributed to developing and maintaining the climate of fear that drove the forced labor scheme.  Based on this evidence of the defendants acting in furtherance of the scheme, the jury could reasonably infer that

---

[22] *Id.* at 883-87.
[23] Trial Tr. at 3411 (Stacey G.).
[24] Trial Tr. at 1090-92 (Elijah M.); Trial Tr. at 1441-44 (Maryum M.); Trial Tr. at 2032-36 (Khalib B.); Trial Tr. at 2184-85 (Carla Valencia); Trial Tr. at 2778-85 (Niesha K.).
[25] Trial Tr. at 982-88 (Elijah M.).
[26] Trial Tr. at 2766-69 (Niesha K.).
[27] Trial Tr. at 3282-83 (Kendra R.).

each defendant knowingly and voluntarily participated in the conspiracy. *See Carter*, 130 F.3d at 1440.

### d. Fourth Element of Conspiracy: Interdependence Among Coconspirators

The fourth element that the government is required to show in a conspiracy case is interdependence among coconspirators. *See United States v. Wardell*, 591 F.3d 1279, 1291 (10th Cir. 2009). "Interdependence is present if 'the activities of a defendant charged with conspiracy facilitated the endeavors of other alleged coconspirators or facilitated the venture as a whole.'" *Id.* (quoting *United States v. Horn*, 946 F.2d 738, 740-41 (10th Cir. 1991)). Interdependence requires "proof that the conspirators intended to act together for their shared mutual benefit within the scope of the conspiracy charged." *United States v. Hamilton*, 587 F.3d 1199, 1208 (10th Cir. 2009). "The 'shared mutual benefit' need not be material or personal to each actor; it requires only evidence that a defendant's activities facilitated the endeavors of another alleged coconspirator or facilitated the venture as a whole." *United States v. Busch*, 2024 U.S. App. LEXIS 18904 (10th Cir. July 30, 2024) (internal quotation omitted). "Circumstantial evidence alone is often sufficient to demonstrate interdependence, and a single act can constitute sufficient proof." *United States v. Cornelius*, 696 F.3d 1307, 1317 (10th Cir. 2012) (citation omitted). If testimony suggests that a defendant "was privy to information regarding" the nature and objectives of the conspiracy, that "supports an inference of interdependence." *Id.* at 1318. So too does evidence that a defendant was at meetings of coconspirators. *Id.*

In this case, the interdependence element is easily satisfied by the evidence presented at trial. As discussed above, the success of UNOI depended on Royall Jenkins, the defendants, and the rest of Royall's inner circle working together to cultivate and maintain the culture of fear in UNOI. The defendants performed different functions within UNOI, each of which facilitated the

14

obtaining and maintaining of unpaid, coerced labor of victims and members, for the benefit of Royall and UNOI as a whole, and in turn for the benefit of the defendants. *See United States v. Hamilton*, 587 F.3d 1199, 1208 (10th Cir. 2009) (finding interdependence even though defendant was not a member of the drug-distribution business and did not benefit directly from the business, because defendant's conduct in procuring payment for one supplier facilitated the overall venture).

For example, multiple witnesses testified about math class, which as described, was a means of reinforcing the rules of the organization.[28]  As such, these classes were for the shared mutual benefit of the defendants because leading math classes facilitated the endeavors of other coconspirators, including Royall Jenkins, as well as the venture as a whole.  Many of the defendants ran math class or called people up to the microphone, including Majeed,[29] Rassoull,[30] Winthrop,[31] Aubrey,[32] and Peach.[33]  In addition to math class, Majeed told youth to lie about their ages, not to volunteer any information to officials like department of labor employees, and if anyone from the department of labor were to show up in the restaurant, he instructed youth members to leave the business immediately.[34]  These statements facilitated the endeavors of other coconspirators and the venture as a whole by attempting to keep law enforcement from intervening

---

[28] Trial Tr. at 856 (Devon Y.); Trial Tr. at 1046-48 (Elijah M.); Trial Tr. at 1360, 1373-74, 1403 (Maryum M.); Trial Tr. at 3078-80 (Tymiah K.); Trial Tr. at 2744-45, 2752-53 (Niesha K.); Trial Tr. at 3274-77 (Kendra R.); Trial Tr. at 3382-86 (Stacey G.).

[29] Trial Tr. at 856-57 (Devon Y.); Trial Tr. at 1045, 1124 (Elijah M.); Trial Tr. at 2658-59 (Shakira M.).

[30] Trial Tr. at 1045 (Elijah M.); Trial Tr. at 856-67 (Devon Y.); Trial Tr. at 1045 (Elijah M.); Trial Tr. at 1746 (Tyneemah J.); Trial Tr. at 2658-59 (Shakira M.).

[31] Trial Tr. at 856-57 (Devon Y.); Trial Tr. at 1045 (Elijah M.); Trial Tr. at 1363, 1404 (Maryum M.); Trial Tr. at 1746 (Tyneemah J.); Trial Tr. at 2634 (Shakira M.); Trial Tr. at 3080 (Tymiah K.); Trial Tr. at 2752-53 (Niesha K.); Trial Tr. at 3276 (Kendra R.); Trial Tr. at 3382-83 (Stacey G.).

[32] Trial Tr. at 856-67 (Devon Y.); Trial Tr. at 1045 (Elijah M.); Trial Tr. at 1406-08 (Maryum M.).

[33] Trial Tr. at 1746 (Tyneemah J.).

[34] Trial Tr. at 1090-92 (Elijah M.); Trial Tr. at 1441-44 (Maryum M.); Trial Tr. at 2032-33 (Khalib B.), Trial Tr. at 3296-97 (Kendra R.).

and shutting down a business where youth were working illegally. Finally, the evidence at trial proved that Royall could not have run or led UNOI alone; rather, Royall and all of the coconspirators, including the defendants, were dependent on each other to keep UNOI running. Indeed, even defendant Winthrop's own witness, Sharon Staton, admitted as much during her cross-examination.

> Q. So Royall as just a man, not a God, couldn't have run all of those businesses and done all the things required to keep The Nation afloat without people helping him do it; is that fair?
>
> A. Yes.
>
> Q. People like Adam.
>
> A. Yes.[35]

Thus, the evidence is more than sufficient to prove the interdependence element of conspiracy.

### e. Fifth Element of Conspiracy: Overt Act

Finally, to prove a conspiracy, the government must show "at least one of the coconspirators . . . commit[ted] an overt act in furtherance of the conspiracy." *Wardell*, 591 F.3d at 1287. An act from any one of the conspirators is enough to satisfy this element. If a particular conspirator "knowingly became a part of the conspiracy, it doesn't matter if he wasn't involved in every part of the process." *United States v. Johnson*, 821 F.3d 1194, 1203 (10th Cir. 2016).

The following non-exhaustive list of overt acts were proven at trial.

- In or about and between 2004 and 2006, STATON denied Minor Victim 4 (Niesha) use of her inhaler to treat her diagnosed asthma when MV-4 lived and performed household work in his home located in Kansas.[36]

---

[35] Trial Tr. at 3895 (Sharon Staton).
[36] Trial Tr. at 2764-66 (Niesha K.).

- In or about 2008, MAJEED instructed victims to lie to customers about their age and working status so that they could continue to work in the restaurant that he managed in New York.[37]

- Beginning on or about October 28, 2000 and continuing through on or about December 31, 2009, GREENWELL was responsible for youth-related matters. In this capacity, she made decisions about victims' labor and services, as well as whether and how to discipline victims.[38]

- Beginning on or about October 28, 2000 and continuing through on or about December 31, 2009, AUBREY engaged in "Fruit of Islam Beatdowns" or "FOI Beatdowns" in which he physically abused male UNOI members as punishment for infractions.[39]

- In or about and between 2008 and 2009, Minor Victim 5 (Elijah M.) who was a local UNOI lieutenant in Kansas at the time, observed HADLEY punish a member by knocking him unconscious in the District of Kansas.[40]

- In or about and between 2005 and 2011, PEACH supervised UNOI businesses in New Jersey and New York. In her roles as supervisor, she made decisions about victims' labor and services, as well as whether and how to discipline victims.[41]

- On or about and between October 28, 2000 and December 31, 2011, KINARD was responsible for youth-related matters. In this capacity, she made decisions about victims' labor and services, as well as whether and how to discipline victims.[42]

- In or about and between 2003 and 2012, RASSOUL supervised a UNOI-operated restaurant in Connecticut. In his role as supervisor, he made decisions about victims' labor and services, as well as whether and how to discipline victims.[43]

---

[37] Trial Tr. at 1090-92 (Elijah M.); Trial Tr. at 1441-44 (Maryum M.); Trial Tr. at 2032-33 (Khalib B.); Trial Tr. at 3296-97 (Kendra R.).

[38] Trial Tr. at 2944-45, 2961-63 (Jacelyn Greenwell); Trial Tr. at 1062-64 (Elijah M.).

[39] Trial Tr. at 1048-49, 1124-25, 1128-29 (Elijah M.); Trial Tr. at 1992-93 (Khalib B.); Trial Tr. at 2326-27 (Etenia Kinard); Trial Tr. at 2743-46 (Niesha K.).

[40] Trial Tr. at 1097-99 (Elijah M.).

[41] Trial Tr. at 542-43 (Amira K.); Trial Tr. at 3412-15 (Stacey G.); Trial Tr. at 4861 (Kaaba Majeed).

[42] Trial Tr. at 432 (Amira K.); Trial Tr. at 453-55 (Amira K.); Trial Tr. at 1056 (Elijah M.); Trial Tr. at 2225-27 (Etenia Kinard).

[43] Trial Tr. at 418-20 (Amira K.); Trial Tr. at 4315-19 (Yunus R.).

- In or about and between 2005 and 2012, MAJEED supervised a UNOI location in New Jersey where multiple victims and other UNOI members lived in overcrowded conditions, such as ten or more individuals in a bedroom.[44]

- On or about and between October 28, 2000 and January 2012, Jenkins, MAJEED, RASSOUL, AUBREY, and STATON led meetings in which they publicly chastised the victims and other individuals for violating UNOI rules. The defendants held these meetings in the District of Kansas and elsewhere.[45]

- Beginning in or about October 28, 2000 and continuing through in or about November 30, 2012, all dates being approximate and inclusive, in the District of Kansas and elsewhere, HADLEY used a paddle on multiple occasions to hit victims as punishment.[46]

- On or about and between October 28, 2000 and November 30, 2012, MAJEED and HADLEY engaged in "Fruit of Islam Beatdowns" or "FOI Beatdowns" in which they physically abused male UNOI members as punishment for infractions.[47]

- On or about and between October 28, 2000 and November 30, 2012, Jenkins led and participated in meetings in which he addressed UNOI members and discussed UNOI principles. Jenkins held these meetings in Kansas and elsewhere.[48]

- On or about and between January 1, 2005 and November 30, 2012, MAJEED supervised UNOI businesses in New Jersey and New York. In his role as supervisor, he made decisions about victims' labor and services, as well as whether and how to discipline victims.[49]

## 2. The Jury Was Properly Instructed and Reached a Considered Verdict on Conspiracy.

The Court correctly instructed the jury on each of the above-described elements and what

the government was required to prove beyond a reasonable doubt for the jury to find a defendant

---

[44] Trial Tr. at 432-33 (Amira K.); Trial Tr. at 1054-63, 1077-80, and 2033 (Elijah M.); Trial Tr. at 1339-45 (Maryum M.); Trial Tr. at 3063-71 (Tymiah K.).

[45] Trial Tr. at 856-67 (Devon Y.); Trial Tr. at 1045-48, 1124 (Elijah M.); Trial Tr. at 1360, 1363, 1373-74, 1403-04 (Maryum M.); Trial Tr. at 3078-80 (Tymiah K.); Trial Tr. at 2744-45, 2752-53 (Niesha K); Trial Tr. at 3274-77 (Kendra R.); Trial Tr. at 3382-86 (Stacey G.); Trial Tr. at 2634, 2658-59 (Shakira M.); Trial Tr. at 1746 (Tyneemah J.).

[46] Trial Tr. at 884 (Devon Y.); Trial Tr. at 982-90 (Elijah M.).

[47] Trial Tr. at 1124-32 (Elijah M.).

[48] *See*, *e.g.*, Trial Tr. at 517, 1110 (Amira K.); Trial Tr. at 1333-38 (Maryum M.); Trial Tr. at 3158 (Wilma M.).

[49] Trial Tr. at 432-33 (Amira K.); Trial Tr. at 1054-63, 1077-80, 2033 (Elijah M.); Trial Tr. at 1339-45 (Maryum M.); Trial Tr. at 3063-71 (Tymiah K.).

guilty of conspiracy.  After four days of deliberations, the jury convicted all defendants on the conspiracy charge and defendant Majeed on substantive forced labor charges, Counts 2, 3, 6, 7, and 8.  The jury completed a detailed special verdict form, which made explicit the jury's findings on Count 1 that (1) at least one overt act was committed for the purpose of advancing or helping the conspiracy on or after October 21, 2011; (2) no defendant withdrew from the conspiracy on or before October 20, 2011; and (3) the offense involved the sexual or physical abuse or kidnapping of a child under the age of 18 years as to each defendant.  (Doc. 480).  The Court did not err in allowing the charge to proceed to the jury.  Rather, the Court allowed the jury to decide the facts after being fully and correctly instructed on the law, and that is exactly what the jury did.  The Court should not now revisit the jury's considered weighing of the evidence and credibility determinations.  *See Radcliffe*, 331 F.3d at 1157-58.  Rather, because the government presented substantial evidence that would allow a rational fact finder to find the defendants guilty of conspiracy beyond a reasonable doubt, the Court should not disturb the jury's verdict and should deny the defendants' motions for judgment of acquittal on Count 1.  *See Brooks*, 438 F.3d at 1236.

### 3.  The Government's Evidence Proved that Defendant Majeed Committed Forced Labor and Majeed's Motion for Judgment of Acquittal Under Rule 29 Should Be Denied as to Forced Labor Counts 2, 3, 6, 7, and 8.

After a six-week trial and lengthy deliberation, the jury convicted Majeed of Counts 1, 2, 3, 6, 7, and 8 of the Indictment.  These Counts were substantive violations of 18 U.S.C. § 1589(a) and pertained to victims Amira, Tymiah K., Kendra R., Elijah, and Niesha, respectively. Majeed now moves for a judgment of acquittal as to Counts 2, 3, 6, 7 and 8 in addition to his motion for judgment of acquittal as to Count 1.

In order to find Majeed guilty of This Court instructed the jury that, in order to find Majeed guilty of 18 U.S.C. § 1589(a), it must find: *first*, on or about the date listed in the Indictment, the

defendant knowingly provided or obtained the labor or services of the person named in that particular count of the Indictment (for example, Amira for Count 2); and *second*, the defendant knowingly used at least one of the following prohibited means:

a) threats of serious harm to, or physical restraint against, the person named in that particular count of the Indictment or another person; or

b) any scheme, plan or pattern intended to cause the person to believe that non-performance of the labor or services would result in serious harm to, or physical restraint against, the person named in that particular count of the Indictment or another person.

(Doc. No. 475 at 40); 15 U.S.C. § 1589(a).

As discussed in detail above, a court must not "overturn a jury's finding unless no reasonable juror could have reached the disputed verdict." *United States v. Carter*, 130 F.3d 1432, 1439 (10th Cir. 1997). For the reasons stated below, a rational trier of fact, after reviewing the evidence in the light most favorable to the government, could find Majeed guilty beyond a reasonable doubt and Majeed has not met the heavy burden necessary for a judgment of acquittal.

### a. The Evidence At Trial Established the Required Nexus Between Climate of Fear and Labor.

Majeed hangs the majority of his argument for acquittal on one section of Jury Instruction No. 24. Specifically, Majeed argues that the testimony failed to establish the nexus between threats and/or a climate of fear required under the second element of forced labor:

> To prove this second element, the government is not required to link specific threats or actions taken against the alleged victim to particular labor tasks performed. Instead, the government needs to establish that there was a connection between the threats made or physical restraint by the defendant(s) and the labor and services she rendered. Thus, the government could satisfy the second element by showing a connection between punishments imposed by the defendant(s) and the labor or

20

services at issue, or a climate of fear that was sufficient to cause the alleged victim
to perform labor or services against their will.

(Doc. 475 at 40).

In his motion, Majeed cites only brief, isolated excerpts of victim testimony, which he
argues "fails to establish that there was a connection between the threats made or physical restraint
by the defendant(s) and the labor services at issue, nor does it establish a climate of fear that was
sufficient to cause the alleged victim to perform labor or services against their will." (Doc. 570 at
12-16). Defendant Majeed fails to offer any specific argument as to why the government's
evidence, including testimony of 18 victims and witnesses, is "so meager that no reasonable jury
could find guilt beyond a reasonable doubt." *White*, 673 F.2d at 301. Piecemeal quotations from
disjointed portions of testimony do not capture the totality of the evidence that came in at trial and
do not show that the evidence was insufficient as a matter of law. In fact, the same instruction
Majeed cites to also instructed the jury look to all *surrounding circumstances* the victims found
themselves in:

> The term "serious harm" means any harm, whether physical or non-physical,
> including psychological, financial, or reputational harm, that is sufficiently serious,
> under all the surrounding circumstances, to compel a reasonable person of the same
> background and in the same circumstances as the alleged victim to perform or to
> continue performing labor or services in order to avoid incurring that harm.

(Doc. 475 at 40). "[C]onsider[ing] the evidence in its totality, not in isolation," and viewed in the
light most favorable to the government, the evidence more than satisfies the Rule 29 standard.
*United States v. Autouri*, 212 F.3d 105, 114 (2d Cir. 2000).

As discussed in pretrial briefing and briefing on jury instructions, since the passage of the
Victims of Trafficking and Violence Protection Act of 2000 ("TVPA"), courts have held that the
relevant analysis in human trafficking cases is not whether the defendant exacted a particular
service or task through specific threats or acts, but rather whether the totality of the defendant's

21

conduct created a climate of fear that compelled the victim's service. Indeed, the Court itself thoroughly discussed this issue, noting that federal courts—using the same analysis in both sex trafficking and forced labor statutes—have consistently upheld convictions where evidence of threats or force was not explicitly connected to labor (or commercial sex acts) but contributed to a climate of fear that required a jury to evaluate the *totality* of a defendant's conduct. (Doc. 317); *see, e.g.*, *United States v. McIntyre*, 612 F. App'x 77, 80 (3d. Cir. 2015) (holding that § 1591 does not require a "direct cause-and-effect connection" between threats or acts of violence and commercial sex acts). Indeed, courts have found that the totality of a defendant's incremental behavior—such as threats of abuse, psychological abuse, restrictions on movement and food, or isolation—can create a "climate of fear" that, coupled with the victim's circumstances—such as age, level of education, debt, drug addiction, or experience—forms the "scheme, plan, or pattern" designed to compel a victim to perform labor or services (or to engage in commercial sex, as prohibited by 18 U.S.C. § 1591). *See United States v. Marcus*, 487 F. Supp. 2d 289, 310 (E.D.N.Y. 2007), *rev'd in part, vacated in part, and remanded on other grounds*, 628 F.3d 36 (2d Cir. 2010) (affirming forced labor conviction and finding that a jury could reasonably find that defendant obtained labor "through a persistent pattern of punishing [the victim] when he was dissatisfied with her work," which created "a climate of fear that was sufficient to cause her to perform labor or services against her will"); *United States v. Aman*, No. 3:19-cr-00085, 2022 U.S. Dist. LEXIS 146651 (E.D. Va. Aug. 16, 2022) (affirming forced labor convictions and holding "[a]s for the instances in which the abuse [the victim] endured did not immediately relate to the labor she provided, these instances contributed to the climate of fear created by the defendants to coerce [the victim] to remain working in the home"); *United States v. Callahan*, 801 F.3d 606, 619-21 (6th Cir. 2015) (rejecting a sufficiency challenge to defendants' § 1589 convictions where evidence

showed defendants knowingly used squalid living conditions, deprivation of food, restrictions on movement, blackmail, acts of humiliation, and physical violence to coerce a developmentally disabled victim to provide labor); *United States v. Wilkins*, 538 F. Supp. 49, 72 ("When evaluating if a defendant exerted coercive force over a complainant, juries are . . . directed to evaluate the totality of a defendant's conduct toward a trafficking victim, including any threats or specific instances of past violence that may have created a 'culture of fear' . . . . [S]uch a culture of fear and coercion can be created even in the absence of a defendant's abuse of a specific victim, when the victim is made aware of the defendant's history of physical or sexual violence against others"); *United States v. Farrell*, 563 F.3d 364, 373 (8th Cir. 2009) (upholding defendants' convictions for peonage and related crimes and finding that the convictions were supported by the totality of evidence of defendants' threats to put victims in a "balikbayan box and ship them back to the Philippines," threats of arrest and deportation, victims' isolation as well as working and living conditions, that a defendant regularly "lost his temper" in meetings, and that workers reasonably believed defendants were powerful people who would make good on threats); *United States v. Udeozor*, 515 F.3d 260 (4th Cir. 2008) (affirming defendant's convictions, including for conspiracy to violate 18 U.S.C. § 1584, the predecessor to 18 U.S.C. § 1589, as well as the district court's ruling to admit "evidence that sexual abuse was [one of the forms of force] used to make the victim believe she had no choice but to comply with the [defendant's] demands"); *United States v. Bonetti*, 277 F.3d 441, 447 (4th Cir. 2002) (finding that one spouse's physical abuse of an illegally harbored alien was "committed in furtherance" of the couple's conspiracy to obtain free labor, because such abuse intimidated the victim "from asserting her right to payment or resisting [defendants'] demands that she work"); *see also Victims of Trafficking and Violence Protection Act*, 22 U.S.C. §§ 7101(b)(6)-(8) (congressional findings that "Victims are often forced through

23

physical violence to . . . perform slavery-like labor.  Such force includes rape and other forms of sexual abuse, torture, starvation, imprisonment, threats, psychological abuse, and coercion. . . . Trafficking in persons is increasingly perpetrated by organized, sophisticated criminal enterprises. Such trafficking is the fastest growing source of profits for organized criminal enterprises worldwide.").

At trial, the evidence of Majeed's role in compelling victims' labor and manipulating the climate of fear was overwhelming:

- Many witnesses testified to Majeed's rise to the top of the hierarchy at UNOI, and his responsibilities overseeing members, work, and discipline in the organization. Majeed himself confirmed his titles and the power he had, discussing how he made the organization more productive and streamlined.

- Multiple witnesses testified to Majeed's known use of physical force against the youth and other UNOI members and how this affected them. This included Devon Y., Elijah, Niesha, Khalib B., Tyneemah J., and Khalib B., who even testified that Majeed seemed to enjoy the violence.

- Multiple witnesses testified to Majeed's leadership role in "math class" where members were called up in a public setting, demoralized, embarrassed, and made examples of. Others described instances of psychological and verbal abuse at the hands of Majeed, with demoralization and threats of burning in hellfire. This included Devon, Tymiah, Khalib B., and Shakira M.

- Multiple witnesses testified to Majeed's use of punishments such as fasts, additional work, separations from family, and how this affected them and others. This included Tymiah, Amirah K., Maryum, Khalib B., Wilma M., Stacey G., and Elijah.

- Multiple witnesses testified to Majeed's role in the management of restaurants where youth worked. Much of this testimony included his instructions to the youth to lie about their ages, and to lie to investigators or customers who inquired why they were working. This included Tymiah, Niesha, Elijah, Khalib B., Kendra, and Wilma M.

- Multiple witnesses testified that after Royall Jenkins took a lesser role, Majeed continued his teachings and continued overseeing youth labor. This included Stacey, Maryum, Elijah, Amira, and others.

Each piece of testimony is a part of the large mosaic of evidence that painted a picture of abuse and coercion orchestrated by Majeed.  The jury was instructed to view all the evidence and

accept all, part, or none of it. (Doc. 475 at 52). In the six weeks of trial, Majeed had the opportunity to cross-examine each victim named in the counts of conviction, and all the witnesses called by the government, and to present his theories of witness credibility to the jury. The jury nonetheless unanimously found Majeed guilty of Forced Labor in Counts 2, 3, 6, 7, and 8 of the Indictment. Viewed in the light most favorable to the government, this mountain of evidence indicates that Majeed's conduct provides a sufficient basis for a rational trier of fact to find guilt. Indeed, other juries have convicted defendants in similar circumstances and other federal districts have upheld convictions with similar evidence. *See, e.g.*, *United States v. Alzanki*, 54 F.3d 994, 999, 1004-05 (1st Cir. 1995) (finding that depriving the victim of food and medical care, while simultaneously threatening violence or deportation, contributed to the climate of fear that compelled the victim into involuntary servitude).

Additionally, the government charged Majeed with forced labor under an aiding and abetting theory. (Doc. 1). As the Court instructed the jury, the jury could find Majeed guilty of forced labor if he intentionally helped someone else, like Royall Jenkins, commit forced labor. (Doc. 475 at 44). More specifically, the jury could convict Majeed of forced labor if it found that Majeed intentionally associated himself in some way with the crime and intentionally participated in it as he would in something he wished to bring about. (Doc. 475 at 44). The jury was not required to find that Majeed performed the underlying criminal act, was present when it was performed, or was aware of the details of its commission to convict him of forced labor. *See id.* The evidence at trial showed that Majeed worked hand in glove with Royall and other UNOI officials to carry out the forced labor scheme, including the forced labor at issue in Counts 2, 3, 6, 7 and 8. Although Majeed may not have committed every underlying criminal act as to each named victim, the evidence showed that he intentionally associated himself with people like Royall

to institute a climate of fear and coerce the named victims into performing years of unpaid labor. Accordingly, a reasonable jury could convict Majeed of the substantive counts of forced labor, either as a principal or on an aiding and abetting theory.

The court must not "overturn a jury's finding unless no reasonable juror could have reached the disputed verdict." *United States v. Carter*, 130 F.3d 1432, 1439 (10th Cir. 1997). Viewing the evidence in the light most favorable to the government, it is clear that Majeed is unable to meet this demanding standard.

## B. RULE 33

Under Rule 33(a), "the court may vacate any judgment and grant a new trial if the interest of justice so requires." When considering a Rule 33 motion, courts are generally "free to weigh the evidence and assess witness credibility." *United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir. 1999). But the Court should not grant a new trial simply because it feels a different result would be more reasonable. *See United States v. Fritzel*, No. 5:18-CR-40058-HLT, 2019 WL 4670204, at *2 (D. Kan. Sept. 25, 2019) (citing *United States v. Yoakam*, 168 F.R.D. 41, 44 (D. Kan. 1996)). While courts have greater discretion under Rule 33 than Rule 29, the Tenth Circuit has routinely emphasized that new trials are "regarded with disfavor," *Quintanilla*, 193 F.3d at 1146, and should be granted "only in exceptional circumstances in which the evidence preponderates heavily against the verdict." *United States v. Evans*, 42 F.3d 586, 593 (10th Cir. 1994) (citation omitted); *see also United States v. Herrera*, 481 F.3d 1266, 1269-70 (10th Cir. 2007) (citing *United States v. Trujillo*, 136 F.3d 1388, 1394 (10th Cir. 1998)); *United States v. Custodio*, 141 F.3d 965, 966 (10th Cir. 1998) ( "A motion for a new trial 'is not regarded with favor and should be granted only with great caution.'" (quoting *United States v. Stevens*, 978 F.2d 565, 570 (10th Cir. 1992))).

As a preliminary matter, if the Court denies the defendants' Rule 29 motion, then it should also deny their motions for a new trial, as there was no miscarriage of justice. *See United States v. Drage*, 681 F. App'x 656, 664 (10th Cir. 2017) (reversing conditional grant of new trial, as abuse of discretion, because the evidence was sufficient to support the jury's guilty verdict).

### 1. The Court Should Deny Defendants' Motions for New Trial as to the Conspiracy Count.

Each defendant has filed a Rule 33 motion for a new trial in the interest of justice. (Docs. 549, 554, 557, 558, 563, 567, 570). The defendants primarily contend that the evidence preponderates heavily against the verdict. Rassoul additionally argues that the Court's pretrial rulings constitute reversible error requiring a new trial. Rassoul and Hadley argue that certain statements that the government made in its closing argument constitute reversible error requiring a new trial.

The common thread in the defendants' Rule 33 motions is that the government's witnesses were unreliable and untrustworthy, yet the defense only takes issue with a handful of witnesses. Specifically, the defense mostly calls into question the testimony of Elijah, Devon, Niesha, Tyneemah, and Etenia Kinard. While it is no surprise that the defendants seek to discredit the witnesses whose testimony was most devastating to their defense, the government did not rely only on those few witnesses to meet its burden of proof. The government called 18 witnesses who testified about their experience in UNOI and the defendants' participation in a common scheme, plan, or pattern to compel the free labor of children. The government also introduced internal UNOI documents and email communications that supported its forced labor theory and shed light on the coercive scheme, the defendants' knowledge and unlawful agreement, and their interdependence. The jury properly evaluated all this evidence, not independently, but as a whole.

27

In support of his argument that the evidence preponderates heavily against the verdict, Aubrey baselessly attacks the credibility of a handful of government witnesses. Specifically, he claims "[i]t's a matter of record that a number of the government's witnesses perjured themselves." (Doc. 552 at 21). Indeed, Aubrey urged the government to provide a "principled argument" that witnesses like Elijah, Niesha, Devon, and Etenia Kinard testified truthfully. (Doc. 552 at 21-22). Aubrey made the same unpersuasive argument to the jury; they obviously credited these witnesses, despite the defendants' attacks and arguments, as does the government.

These witnesses testified truthfully to the best of their abilities, despite each being subjected to hours of cross-examination by six different defense attorneys. They were emotional and cried on the witness stand. They testified about being away from family as children, suffering physical abuse, neglect, emotional abuse, starvation, and receiving threats of homelessness and burning in hell. While their testimony, at times, was inconsistent with or different from other witnesses or reports of prior interviews with the FBI, such inconsistencies or differences hardly establish perjury or a miscarriage of justice. Indeed, if inconsistencies among witnesses or prior inconsistent statements constituted perjury, then virtually every witness who takes the stand would perjure themselves. And while it is true—as Winthrop points out in his motion—that witnesses like Elijah, Niesha, and Devon testified as adults about events that happened years ago when they were children, that is hardly a reason to discredit their testimony. To the contrary, it explains some of their inconsistencies. The government's witnesses uniformly stated throughout their testimony that dates they testified to were approximate because of the passage of time, the length of their time in UNOI, and the fact that they were in UNOI as children. Indeed, their difficulties with exact dates were on full display when counsel for Winthrop attempted to have them chart out their time in UNOI on the witness stand.

Because Aubrey and other defendants have called into question the credibility of witnesses like Elijah,[50] Niesha, Tyneemah, and Etenia Kinard, the government will address some of their arguments below.

Aubrey described Elijah as the "core of the government's case." (Doc. 554 at 12). Because the jury acquitted Aubrey of committing forced labor against Elijah and instead only convicted Aubrey of conspiracy to commit forced labor, Aubrey's characterization of Elijah's role in the case, as to Aubrey, is grossly overstated. As noted above, Elijah was just one of 18 government witnesses, all of whom testified about the defendants' unlawful agreement and coercive scheme.

Aubrey first claims that the Court should set aside Elijah's testimony because "no other government witness endorsed or corroborated" the "absurd statement" that Aubrey orchestrated chest cavities in math class. (Doc. 554 at 13). By characterizing Elijah's testimony on that topic as "patently incredible," *see id.*, Aubrey suggests that no other evidence in the record supports the notion that UNOI members received chest cavities or that Aubrey was involved in such conduct. In support of his argument, Aubrey cites to Kinard's testimony that she was not aware of chest cavities.[51] But Aubrey neglected to mention Greenwell's testimony that she had heard of chest cavities,[52] Maryum's testimony that she saw a peer after "jack up time" with a "foot bruise imprint

---

[50] Aubrey made a number of disparaging remarks about the government's witnesses, including calling Elijah an "artful liar." (Doc. 554 at 12). The government supports counsel's right to zealously advocate for his client, but such name-calling of a young man who experienced a traumatic childhood at the hands of the defendants and their co-conspirators is inappropriate, and the Court should reject these improper and unwarranted attacks.

[51] A common theme among the defense is to simultaneously attack the credibility of government witnesses, like Kinard, to the extent that their testimony implicates the defense while endorsing as undisputed fact the portions of their testimony that help the defense. Defendants like Aubrey used similar tactics during their closing arguments, and the government asks the Court to follow the jury's lead and reject these unpersuasive arguments.

[52] Trial Tr. at 2947 (Jacelyn Greenwell).

on his chest,"[53] and Devon's testimony that the punishments he received included being "punched in the chest" and "jacked up," and that Aubrey was among the officials who were responsible for physical punishment.[54] And importantly, the Court correctly instructed the jury that it may "accept or reject the testimony of any witness in whole or in part." (Doc. 475 at 52).

Aubrey next claims that Elijah could not have witnessed him orchestrating a beatdown of a member named Philip, because another government witness, Khalib B., testified that it happened in 2000, before Elijah moved to Kansas in 2002. But the testimony of Elijah and Khalib is easily reconciled—and the Cout should not summarily dismiss Elijah's testimony, as Aubrey argues— because they testified about events that happened many years ago as children. A difference of two years when discussing events that happened 25 years ago is no unreasonable. Moreover, while Aubrey relied on Khalib's testimony to discredit Elijah, Aubrey neglected to mention in his motion the portion of Khalib's testimony in which he explained that both Majeed and Aubrey orchestrated beatdowns of UNOI members.[55] The fact that Khalib also testified that Aubrey was involved in beatdowns of UNOI members both corroborates Elijah and undermines the argument that the evidence preponderates heavily against the verdict.

Aubrey next takes issue with Elijah's supposed "prevarications about his disconnection from his family," which Aubrey claims "are central to his false narrative that he stayed in the Nation because he had no choice." (Doc. 554 at 14). Aubrey contends that Elijah was surrounded by family and, thus, "stayed in the Nation because he wanted to." *Id.* Again, Aubrey mischaracterizes the facts and Elijah s testimony. Elijah testified: "I did not have anyone that could help me. I didn't have anybody that could help me. I didn't have any family. I didn't—I didn't

---

[53] Trial Tr. at 1394 (Maryum M.).
[54] Trial Tr. at 877, 883-84 (Devon Y.).
[55] Trial Tr. at 1992-93 (Khalib B.).

know anybody outside of the family that I had."[56]  But the entirety of Elijah's testimony added

helpful context.  Elijah's immediate family members, including his parents, were members of

UNOI.  Indeed, as was made clear from the testimony of Elijah's mother, Rhoda, at the time of

trial she was still operating under the same delusions as when she was a member of UNOI in the

early 2000s.[57]  Elijah obviously could not turn to his parents for help, because they were part of

the same cult; and they were the ones who agreed to ship him to Kansas in the first place.  Elijah

also testified that he had been "alienated from [his] family outside of the Nation."[58]  Viewed

through that lens, it is clear that it was his disconnection to his *non*-UNOI family members that

made it difficult for Elijah, a child with no resources, to leave the organization.

Aubrey and other defendants similarly attack Niesha's credibility, calling her a "liar by

reputation and opinion."[59]  (Doc. 554 at 15).  Again, with respect to the conspiracy conviction,

Niesha was one of many government witnesses, and the jury considered all government witnesses

and exhibits in rendering its verdict.  Also, Aubrey relies entirely on defense witnesses—like

Akiba, Atim Muhammad, and Winthrop's ex-wife, Sharon—to cast doubt on Niesha's testimony

about Rodney's physical abuse during a camping trip and Winthrop's denial of her inhaler.  (Doc.

554 at 15-16).  It was entirely reasonable—and not a miscarriage of justice—for the jury to believe

Niesha over witnesses like Akiba Majeed, A.M., and Sharon Staton, who are in close personal

relationships with the defendants.  It is striking how quickly Aubrey categorically rejects the

---

[56] Trial Tr. at 1102-03 (Elijah M.).

[57] On cross examination, Elijah's mother testified that she is still a member of the "universe." She
stated: "I'm a member of the universe, and the United Nation of Islam and The Nation of Islam
are under the sovereign rule of the sovereign of the universe, and the flag is the sun, the moon, and
the star." Trial Tr. at 4137 (Rhoda Mohammad).

[58] Trial Tr. at 1175 (Elijah M).

[59] Notably, to support this reputation and opinion evidence, Aubrey cites to the testimony of Akiba,
whose completely self-serving testimony included that she let Niesha watch Netflix on an iPad,
contrary to her own husband's testimony.

testimony of government witnesses, yet endorses without question the testimony of obviously biased defense witnesses.

Aubrey also attacks the testimony of Devon, because he knows that Devon's testimony undeniably implicates him in the agreement to commit forced labor and supports the jury's conviction of Aubrey on Count 1.  Because Aubrey highlighted Devon's testimony, the government will direct the Court to some notable portions of that testimony.  Specifically, Devon did not want to testify at trial.[60]  He wanted nothing to do with the case, he had nothing to gain from testifying, and harbored no ill will towards Aubrey or any of the defendants.[61]  Nevertheless, he complied with a trial subpoena and traveled to Kansas City from Florida, even though he was "losing out" by being there at trial.[62]  Devon even messaged Aubrey on Instagram days before his testimony, telling him that he did not want to testify.[63]  Despite all of that, Devon told the jury what Aubrey and other defendants, including Hadley, did to him. He testified that Aubrey and Hadley confronted him for stealing a salmon sandwich, took him outside, and one of them held him off the side of a bridge.[64]  Indeed, Devon stole that sandwich because Aubrey and the other defendants instituted a culture of starvation and abuse that left him with no choice. Devon, who was born in 1990, testified that it happened when he was 12 or 13 years old, putting the conduct within the charged time period.[65]  Aubrey points to discrepancies between Devon's testimony and details written in FBI reports summarizing Devon's prior interviews, claiming that Devon claimed in interviews that the incident happened in the 1990s.  Aubrey states "if his prior statement is to be believed, Devon was

---

[60] Trial Tr. at 844 (Devon Y.).
[61] *Id.*
[62] *Id.* at 889.
[63] *Id.* at 888-89.
[64] *Id.* at 881-83.
[65] *Id.* at 882.

nine years old when this incident happens." (Doc. 554 at 18). But a prior inconsistent statement is only admissible to show that the witness said something different on a prior occasion, not for the truth of the matter asserted. *United States v. Carter*, 973 F.2d 1509, 1512 (10th Cir. 1992). The Court repeatedly instructed the jury not to consider such statements for their truth, yet Aubrey improperly asks the Court to rely on Devon's prior statement for its truth.

Aubrey also repeatedly argues that because the defendants were "competing," they could not have entered into an illegal agreement. But the evidence made clear that Aubrey was a leader of UNOI—as were the other defendants—and furthered the organization's objectives by overseeing the entire male membership, attending meetings concerning what actions UNOI should take, and physically abusing victims to pressure them to cooperate with UNOI's rules. It is of no consequence that Aubrey did not get along with other members of the conspiracy. There is no requirement under the law that conspirators like each other.

Hadley similarly calls into question the jury's verdict based on a select number of supposed inconsistencies in the testimony of just a few government witnesses, including Elijah, Niesha, and Devon. But their testimony regarding Hadley's violent behavior towards themselves and other youth members was corroborated in a number of ways. For example, Khalib testified that Majeed and Hadley "seemed to enjoy the punishment" and that their "first instinct was to hurt" children.[66] Khalib also testified that Hadley paddled a youth member at the University.[67] Khalib said he heard the youth member "yell and scream." Khalib's testimony corroborated Elijah, who testified that when he was 13 years old, Hadley forced him and another youth member put their hands on a table inside the boiler room while he struck them once for every year they had been alive. When Elijah

---

[66] Trial Tr. at 2003-04 (Khalib B.).
[67] *Id.* at 1992.

and the other youth were not able to keep their hands on the table, Hadley started over.[68]  Elijah added that Hadley used "all his might to hit" him and "lacked empathy."[69]  In addition, Maryum corroborated Niesha's testimony about the "camping trip from hell," during which Hadley physically abused children.  Maryum testified she heard the screams of children coming from the woods.[70]

Hadley also takes issue with Devon's testimony that Hadley and Aubrey held him off the side of a bridge.  In his motion, Hadley argues that Devon could not say where it happened; and both Aubrey and Hadley highlight that there were no train tracks near the University in Kansas.  But Devon specifically remembered that it was Hadley and Aubrey who took him to the bridge after stealing food; and he testified that it happened in Maryland, not Kansas.[71]  Moreover, the jury evaluated Devon's credibility in light of a number of factors, including the trauma that he suffered.  Devon testified: "You're asking something that happened over a while ago and something that was traumatic that I have put behind me, and now I'm having to remember it.  No, I'm not going to know all the details.  That was a traumatic event, and I put that behind me."[72]  The government's exhibits further corroborated the witnesses whose credibility Hadley calls into question.  For example, Government's Exhibit 400-108 contained an email discussing Hadley being placed on probation because he was mistreating members, especially the female members.  The email stated that Hadley "abused the power of his position."

Rassoull claims that the jury's acquittals on the substantive counts of forced labor "lightened the weight of the evidence on conspiracy," necessitating a new trial.  (Doc. 558 at 4).

---

[68] Trial Tr. at 985-87 (Elijah M.).
[69] *Id.* at 1016.
[70] Trial Tr. at 1469 (Maryum M.).
[71] Trial Tr. at 939 (Devon Y.).
[72] *Id.* at 940.

Essentially, Rassoull contends that the jury's guilty verdict on the conspiracy count was inconsistent with their acquittals on the forced labor counts. Rassoull's argument is misplaced. Even if the verdict were inconsistent, it is well settled that an inconsistent verdict is not a sufficient reason for setting aside a verdict. *See United States v. Powell*, 469 U.S. 57, 64-66 (1984); *United States v. Harris*, 369 F.3d 1157, 1168 (10th Cir. 2004).

More importantly, the jury's verdict was not inconsistent. The Tenth Circuit has held that "[o]ne can be guilty of a conspiracy to commit an offense without committing the substantive offense itself." *United States v. Lake*, 472 F.3d 1247, 1263 (10th Cir. 2007) (citing *United States v. Horn*, 946 F.2d 738, 745 (10th Cir. 1991)). It is of no legal consequence that the jury acquitted Rassoull on two substantive counts of forced labor involving only two victims. Also, Rassoull and the other defendants were convicted of engaging in a far-reaching forced labor conspiracy involving countless victims, and the substantive forced labor counts that the jury considered against Rassoull related to just two victims: Amira and Tymiah. The jury's acquittal of the forced labor counts involving Amira and Tymiah does not "lighten the weight of the evidence of conspiracy" such that the evidence preponderates heavily against the verdict, because the jury heard from more than fifteen government witnesses who testified about Rassoull's role in the conspiracy. Almost every witness testified—and emails and UNOI documents showed—that Rassoull had a leadership role in UNOI, which included disseminating Royall's teachings and instilling fear among members. Indeed, evidence wholly unrelated to Amira and Tymiah shows that even after Royall left UNOI, Rassoull continued to spread fear among members, a central part of the defendants' agreement and scheme to commit forced labor. For example, Government's Exhibit 479 showed that in March 2012, after the newly formed board supposedly learned that Royall was a fraud, Rassoull, Majeed, and other board members were telling members that Earth

was center stage for attacks from reptilians, that billions of people around the planet would be targeted, that reptilians would use their spacecraft to scan people in groups to see if they had weakness, and that a war was being waged. Government's Exhibit 451 showed that around that time, a member of the board tasked Rassoull with telling members threatening messages like "if you raise a hand against those who remain Dedicated, MY Punishment for you will live on for eons." Government's Exhibit 400-137 contained an email, that included Majeed and Rassoull, in which a board member instructed Majeed to announce, "There will be severe consequences that not even Royall can protect you from," and, "If you do not believe that these words are True, Try ME." Other witnesses who were completely removed from Amira and Tymiah supported the jury's finding of guilt as to the conspiracy charge against Rassoull. For example, Wilma Muhammad testified that after UNOI officials kidnapped her children, Rassoull gave a teaching to the membership, asking why Wilma wanted to be with her children only to see her be destroyed.[73]

The cases cited by Rassoull in support of his argument are distinguishable. For example, in *Lake*, 472 F.3d at 1247, the Tenth Circuit set aside convictions for wire fraud, money laundering, and a related conspiracy charge. Notably, the court did not base its decisions merely on an acquittal, but on a finding that there was insufficient evidence to support substantive convictions for wire fraud and money laundering as charged in the indictment. *Id.* at 1260. In that case, the indictment stated that the specified unlawful activity for the money laundering charge was wire fraud, and no other predicate money laundering count was charged. *Id.* In setting aside those convictions, the court first found that the jury was not adequately informed of what was required for an SEC disclosure. Regarding the conspiracy, the court held that the jury could not accurately evaluate the conspiracy allegations without being informed regarding what was required to be in

---

[73] Trial Tr. at 3191-92 (Wilma Muhammad).

the SEC filings. *Id.* at 1263. "Those requirements are a critical consideration not only with respect to conspiracy to commit wire fraud (because no crime would be committed unless the SEC filings were false or fraudulent), but also conspiracy to commit money laundering (which requires wire fraud as a predicate offense)." *Id.* The charges at issue in *Lake* are not analogous to those at issue here, because the conspiracy count that the defendants were charged with was independent of the two forced labor counts involving Amira and Tymiah. Based on the evidence at trial, the jury could have found Rassoull guilty of conspiracy to commit forced labor, even if Amira and Tymiah had not testified.

Rassoull also relies heavily on *United States v. Medeiros*, No. 23-2019, 2023 WL 8752921, at (10th Cir. Dec. 19, 2023). There, the government charged two defendants with contracting fraud in a project of the Veterans Administration. A jury returned guilty verdicts on all counts. On the defendants' post-trial motions, the district court entered judgments of acquittal on three counts and ordered a retrial on the remaining conspiracy charge because the verdict on that count "was against the weight of the evidence and influenced by cumulative prejudice arising from multiple trial errors." *Id.* at *5. On appeal, the Tenth Circuit agreed that the acquittals on the substantive counts and their effect on the overt acts in furtherance of the conspiracy cast the evidence in a sufficiently different light that the district court did not abuse its discretion in ordering a new trial. *Id.* at *7-10.

Rassoull's reliance on *Medeiros* is misplaced. Aside from generally repeating his pretrial objections to certain evidence that the Court ruled was admissible, Rassoull has failed to articulate cumulative prejudice arising from multiple trial errors. Also, the charges in *Medeiros* are different than the charges here. In *Medeiros*, the government did not present evidence of a conspiracy whose scope far exceeded that of the substantive fraud charges. Here, the jury heard evidence of a

sprawling conspiracy that involved many conspirators and victims outside of those named in the Indictment. Rassoull's acquittal on two substantive forced labor charges does not call into question the evidence of the conspiracy as a whole. Indeed, the jury's verdict shows that it carefully considered and parsed the evidence on Counts 2 and 3 over its four days of deliberations. Moreover, Rassoull has not identified any overt act that the jury's verdict calls into question.

In Winthrop's Rule 33 motion, he contends that because the jury heard "vast testimony" of traumas and other abuses that he either did not commit or did not know about, the jury found him guilty by association. But the jury heard testimony and reviewed exhibits that distinguished the conduct and roles of the conspirators, including Winthrop. Witnesses testified about discrete incidents of abuse involving Winthrop, as well as his participation in the overall conspiracy. Importantly, as discussed in the Rule 29 section above, Winthrop knowingly and voluntarily entered into the conspiracy with his coconspirators and is liable for their actions. *See Lake*, 472 F.3d at 1265 ("[A] 'conspiracy participant is legally liable for all reasonably foreseeable acts of his or her coconspirators in furtherance of the conspiracy.'" (citations omitted)). Furthermore, the Court correctly instructed the jury that it may consider the acts or statements of co-conspirators, "even if they were done and made in the defendants' absence and without his or her knowledge." (Doc. 475 at 57).

Peach's Rule 33 motion primarily focuses on Tyneemah's testimony. Peach asks the Court to "completely disregard" Tyneemah's testimony as it relates to Peach, arguing that Tyneemah gave overwhelmingly conflicting testimony and is untruthful according to her father, Kaleb Glass. (Doc. 563 at 19). In support, Peach claims that Tyneemah must have been mistaken, because Peach was not in Kansas around the time that Tyneemah claimed Peach abused her at the University in 2006. Specifically, Peach claims that she was on the "east coast in Connecticut and New Jersey

from 2005-2008." *See id.*  Peach's argument relies on the false notion that once dispatched to certain locations, members and officials stayed there.   The evidence showed the opposite. Government and defense witnesses alike testified that members and officials were moved around a lot.  Indeed, Royall and his wives often drove around in Royall's RV, routinely taking trips around the country and back to Kansas.  That Tyneemah testified about Peach's abuse occurring in Kansas at a time when Peach was supposedly on the east coast is hardly the alibi that Peach claims it is. Moreover, Peach's supposed alibi is inconsistent with other evidence in the record.  For example, Amira testified that she lived with Peach and other wives at Heaven's Inn II in Kansas in 2005, during which time she took care of Peach's daughter.[74]  It is also worth clarifying that Tyneemah testified that Peach physically abused her, including after she was caught drinking water from the toilet, when she was 9 years old.[75]  Tyneemah was born in 1997, which means the incident would have happened in 2005, not 2006.  Additionally, as stated above, these witnesses testified largely in terms of approximate time frames.

Also, it is of no consequence that Tyneemah testified about certain facts that were not memorialized in FBI reports of prior interviews.  All witnesses testified about facts that did not come up during prior interviews, and the defense repeatedly raised that during their cross examinations and closing arguments.  The jury was tasked with evaluating the credibility of the witnesses in light of those and other facts, and it did so dutifully.

Additionally, witnesses like Amira corroborated Tyneemah in other ways.  For example, Amira testified that Peach was at a dinner table with some of Royall's wives, and "they were reenacting and discussing how different children behaved while being physically spanked and

---

[74] Trial Tr. at 689-90 (Amira K.).
[75] Trial Tr. at 1750 (Tyneemah J.).

laughing about it."[76]  And as Peach points out in her own motion, Stacey testified that Peach paddled her 18 times because Antoinette Kelly claimed Stacey brought the devil into the house. Whether Peach allegedly expressed remorse after the fact is immaterial.

Peach also asks the Court to disregard Tyneemah's testimony based, in part, on her father Kaleb Glass's obviously biased testimony that Tyneemah was a liar; yet Glass's own credibility was suspect at best.  When counsel for Rassoull asked Glass if he knew Tyneemah's year of birth, Glass incorrectly said he thought it was 1999.[77]  Additionally, he could not say when her actual birthday was. Indeed, he did not even know (or realize) that the day of his testimony—the same day he was in court calling his daughter a liar—was her actual birthday.[78]  When the government asked Glass on cross-examination, "The fact is you really don't know when your daughter's birthday is," Glass tried explaining, "I don't know a lot of birthdays. That's not nothing I – I've never been one to, like, celebrate birthdays. Sometimes I have to remember when mine is."[79]  Yet earlier in his testimony, Glass had no trouble recounting the exact dates of birth of the three children he shares with Akiba Majeed: "Eryith Majeed, 5/19/09; Shaheer Majeed, 9/1/05; Kaleyce, 11/22/06."[80]

And importantly, the jury's verdict against Peach did not rely on Tyneemah's testimony alone.  As stated above, the jury heard from many witnesses—witnesses who testified to the role of Royall's wives, including Peach, and how they agreed to work as a unit to spread Royall's rhetoric, systematically starve children, separate them from their families, and impose various punishments, among other things.

---

[76] Trial Tr. at 552 (Amira K.).
[77] Trial Tr. at 4201 (Kaleb Glass).
[78] *Id*. at 4237.
[79] *Id.*
[80] *Id*. at 4205.

Peach also improperly asks the Court to disregard Amira's testimony that Peach physically abused her, incorrectly stating that the abuse occurred outside of the charged time period. The conspiracy charged in the indictment ranged from October 28, 2000 through November 30, 2012. Amira testified that Peach physically disciplined her during the time she lived with her between the ages of 8 and 12. Amira was born in 1990, bringing that physical abuse into the end of 2000 through 2002.[81] The Court should reject Peach's argument. Moreover, Amira's testimony of Peach's physical abuse was not all that the jury considered. The jury also heard Amira testify, among other things, that after Amira's mother died, Peach told Amira, "If you don't get yourself together, you're going to be in her same position," meaning burning in hell.[82]

In sum, the defendants ask the Court to set aside the jury's verdict based on their own, distorted view of the evidence. They take issue with small portions of the testimony, attack the testimony of a handful of government witnesses, and argue that because these witnesses were either inconsistent with themselves or with other witnesses, the Court should categorically reject their testimony. Viewing the evidence as a whole, and because new trials are regarded with disfavor in the Tenth Circuit, these facts do not constitute "exceptional circumstances," the evidence does not preponderate heavily against the verdict, and the Court should deny the defendants' motions for a new trial.

## 2. The Court Should Deny Defendant Majeed's Motion for New Trial as to the Substantive Forced Labor Counts.

Majeed also seeks a new trial pursuant to Rule 33 for his forced labor convictions. Because the jury's verdict is consistent with the law and the evidence presented, the Court should deny Majeed's motion for a new trial. Other than the legal arguments for acquittal under Rule 29, the

---

[81] Trial Tr. at 348, 455-56 (Amira K.).
[82] *Id.* at 555-56.

only additional arguments Majeed identifies to support his "interest of justice" request for a new trial has to do with a baseless assertion that the testimony of the government's witnesses was incredible because the events occurred at least 12 years prior, was about events from the early 2000s, and the witnesses were generally untruthful. (Doc. 570). As explained in detail below, this position is not supported by the evidence at trial. If the Court denies defendants' Rule 29 motions, then it also should deny their motions for a new trial. *See Quintanilla*, 193 F.3d at 1146 (10th Cir. 1999); *Drage*, 681 F. App'x at 664 (10th Cir. 2017).

### a. Defendant Majeed Knowingly Provided or Obtained the Labor or Services of the Person Named in Each Count of Conviction.

Majeed's claim that the evidence by the witnesses at trial was entirely nonexistent as it relates to him committing forced labor is incorrect. Far from preponderating against the verdict and causing injustice, the evidence supported the jury's verdicts and justice was served.

Majeed's cherry-picked quotations from the trial transcript cannot be viewed in a vacuum but must be viewed in conjunction with all the evidence admitted in the case. A review of the transcript reveals substantial evidence supporting the finding that Majeed knowingly obtained the labor or services of each person named in the counts of conviction. Indeed, Majeed admitted as much in his own direct examination:

> Q. So we touched upon this a bit already because it was in the news, but basically, again, no secret that youth worked in the businesses?
>
> A. Correct.
>
> Q. And you knew this because you worked with them in some of those businesses too, correct?
>
> A. That is correct.[83]

---

[83] Trial Tr. at 4871 (Kaaba Majeed).

Majeed testified that he "got a specific directive to manage the New York restaurant."[84]  He explained that once the youth got to the New York restaurants, he became familiar with them: "Oh, anybody who, yea that I work besides daily, I would definitely be familiar with."[85]  He testified to transporting the youth who lived in Newark, to work in Harlem in that restaurant.[86]  He agreed that he was national lieutenant of UNOI at the time, and head of the New York restaurant.[87]  When asked about the New York Department of Labor (DOL), who investigated that restaurant for labor violations, he testified that he recalls the situation and recalls speaking with an investigator and generally telling her it was an extended classroom.[88]  This lie he told to the Department of Labor, and his admission of working with youth at the restaurant he managed, his national leadership position in UNOI, and admission of transporting youth to work is already overwhelming evidence of knowingly obtaining labor of youth, specifically in New York, where Elijah, Amira, Maryum, and Khalib were all present during the DOL investigation.  Moreover, his consciousness of guilt and own issues with credibility were evident when he lied to law enforcement about recalling the DOL situation at all.[89]  By convicting Majeed unanimously, the jury demonstrated that they found his self-serving testimony incredible and the evidence from the government's case-in-chief supports this conclusion.

Even disregarding every other witness summarized above, the DOL investigator, Carla Valencia, testified and provided confirmation of Majeed's role in knowingly obtaining labor of minors, including Elijah and Amira of Counts 2 and 7.  She summarized the red flags she saw at

---

[84] *Id.* at 4873.
[85] *Id.* at 4874.
[86] *Id.*
[87] *Id.* at 4875.
[88] *Id.* at 4876-77.
[89] *Id.* at 4875.

Food for Life Supreme in 2008 when she arrived to investigate a complaint and saw minor children working all over the restaurant. While on site, Valencia found a list of 23 workers, 19 of whom were minors. She noted that the children looked scared and did not want to speak with her. Her investigation led her to Majeed, who identified himself as manager, and he told her that the restaurant was part of education in a culinary arts program, which did nothing to make their work legal.

### b. Defendant Majeed Knowingly Used Prohibited Means.

As to the second element, the evidence at trial established that Majeed engaged in a coercive scheme involving fasting, isolation, physical beatings, ridicule, public shaming, condemnation, and excommunication to place youth members in fear of serious harm and compel their continued labor in UNOI. This evidence is outlined above and the government reincorporates it here. The testimony regarding these aspects of Majeed's conduct painted a multifaceted picture of the coercive scheme Majeed directed and took part in to compel the labor of the victims in his counts of conviction, limited not only to physical abuse but psychological manipulation, degradation, and starvation. In his positions as National Lieutenant, Supreme Captain, head of restaurants, transportation provider, leader in math classes, and every other position he held in UNOI, Majeed played a critical role in establishing and cultivating the climate of fear that compelled the labor of all victims named in his counts of conviction.

The overwhelming testimony from victims who recalled their interactions with him was also corroborated by physical evidence: lists of Royall Family Members that included Majeed, phone lists of people who held national positions within the entire organization, to include Majeed, and emails from members of the Board of Directors of UNOI, which also included Majeed.

Defendant Majeed had the opportunity to cross-examine each victim in the counts he was convicted of, and all the witnesses called by the government, and to present his theories of witness credibility to the jury. The jury nonetheless unanimously found Majeed guilty of Counts 1, 2, 3, 6, 7, and 8. That alone suggests that the testimony of the victims and corroborating witnesses was not inherently incredible.

### 3.  Other Issues Raised by the Defense.

#### a.  There Was No Improper Rebuttal Testimony.

Majeed is not entitled to a new trial because the rebuttal testimony was proper. After multiple witnesses testified to Majeed's role in violence at UNOI, and his role in assaulting Jamil, Majeed opened the door to Jamil's rebuttal by testifying himself and denying both. *See United States v. Burch*, 153 F.3d 1140, 1144 (10th Cir. 1998). Rebuttal evidence is evidence that attempts to "disprove or contradict" the evidence to which it was contrasted. *See Tanberg v. Sholtis*, 401 F.3d 1151, 1165 (10th Cir. 2005). The rebuttal testimony in this case was a proper method to impeach Majeed's credibility, and the Court exercised its sound discretion to allow the government to present its rebuttal evidence. *Burch*, 153 F.3d at 1143-4.

On direct examination, Majeed's attorney asked him many questions regarding aspects of physical violence and the climate of fear that other witnesses testified about and connected directly to Majeed. For example, following a line of questioning about Elijah being beat up with a phonebook because he was late for work, Majeed's counsel asked "did you ever participate in, see, condone any behavior like that ever when you were in The Nation?" to which Majeed responded: "No, sir."[90] When asked about whether "FOI beatdowns" existed, he said "that did not happen

---

[90] Trial Tr. at 4722 (Kaaba Majeed).

. . . I've never seen that happen."[91]  When Majeed's attorney asked about paddling, Majeed did admit knowledge of children being paddled in school.[92]  When asked about other forms of violence that victims testified about in the government's case-in-chief, Majeed denied the use of chest cavities.[93]  He also denied participation in Fight Club.[94]  In answering the questions about his knowledge of violence and observations of violence used against the victims and members of UNOI, Majeed opened the door to good-faith cross-examination about his participation in the very violence he denied.

On cross-examination, Majeed doubled down on his assertion that physical punishments did not happen in UNOI.[95]  In explaining why he did not believe the testimony of a victim who stated they had been hit in the face with a phonebook at Majeed's request, he explained that if things like burnt cookies, being late, or falling asleep in class deserved a type of beating "it would have been an absolute horror movie being in The Nation. It would have been beatings going on all the time."[96]  Following this line of questioning, where Majeed again denied a role in violence others had tied him to, the government directly asked Majeed if he had beatdown [Jamil], and Majeed denied it.[97]  There was no objection by any of the defendants to the question at the time. Majeed denied participating in aspects of physical violence and threats of physical force to which other witnesses directly tied the defendant. In fact, when the government questioned Majeed about instances of violence, the defendant denied engaging in acts of violence against Jamil specifically. To rebut this testimony, the government called Jamil on rebuttal to provide details about the

---

[91] *Id.* at 4725.

[92] *Id.* at 4726.

[93] *Id.* at 4725.

[94] *Id.* at 4727.

[95] *Id.* at 4869-71.

[96] *Id.* at 4871.

[97] *Id.*

defendant assaulting him.  Jamil's testimony thus contradicted and tended to disprove the defendant's testimony and was proper to impeach the substantive evidence offered by Majeed as well as his credibility.  *Burch*, 153 F.3d at 1143.

Moreover, Majeed's characterization of the circumstances of the testimony is incorrect and mischaracterizes the situation.  First, other witnesses described Jamil's assault, and their recollections were included in early discovery, so the background of this assault was no surprise.  Second, the government argued in pretrial motions that witnesses' recollection of the assault on Jamil was relevant evidence.  The Court agreed and ruled the evidence admissible because it is intrinsic to the crime of forced labor. (Doc. 317).  At trial, the Court followed its pretrial ruling and admitted testimony of the witnesses' various levels of knowledge about Jamil's assault in the government's case-in-chief.  For example, Amira testified about Majeed and Jamil on Day 3.[98]  Elijah testified about personally witnessing the assault of Jamil by Majeed on Day 5.[99]  Khalib testified about Majeed and Jamil on Day 8.[100]  The government was precluded from calling Jamil in its case-in-chief, but the Court never precluded Jamil's possible rebuttal testimony, stating:

> Rebuttal witnesses are not required to be on the original witness list, but they have to be truly rebuttal witnesses. It's not a free-for-all. So you don't get to put on witnesses you could have listed and put in your case in chief. They have to be -- I would have to make a decision as to whether what you're telling me this witness will testify truly rebuts something, and that is a pretty I think -- the way I do it is a pretty strict analysis because oftentimes I think when the government or the plaintiff, or whoever wants to offer rebuttal evidence, it's evidence they could have put in their case in chief. So I can't make that determination now except to say that rebuttal witnesses generally don't have to be on the original witness list. But whether or not this person – I would allow to be a rebuttal witness, I do not know.[101]

---

[98] Trial Tr. at 597 (Amira K.).
[99] Trial Tr. at 1126-27 (Elijah M.).
[100] Trial Tr. at 2029-30 (Khalib B.).
[101] Trial Tr. at 3050.

After the defendants rested, the government gave notice of its intent to call Jamil as a direct rebuttal witness to Majeed's own testimony that he did not assault him and agreed to limit the testimony to direct rebuttal of Majeed's denial.   Majeed objected.[102]   The Court overruled any objections and clarified its earlier ruling:

> I ruled that the government could not put him on in their case in chief because he hasn't been disclosed on the witness list. That's not a rule that applies to rebuttal witnesses. If, in fact, the witness rebuts something that comes up in the case in chief, then they -- it's the court's discretion, but it is proper rebuttal. So the fact that he wasn't disclosed on the witness list before this case went to trial does not prohibit or preclude him from being called as a rebuttal witness. I'll overrule the objection.[103]

The next day, Jamil testified in rebuttal and provided details of an assault by Majeed.[104] Transcript 4961.   He was cross-examined by Majeed's counsel, as well as Hadley's counsel. Because the Court did not preclude the government from calling Jamil as a witness in rebuttal, in its discretion found that the rebuttal topic was proper, and Majeed himself opened the door to the rebuttal topic by denying his role in various forms of violence against the victims and Jamil, there was no miscarriage of justice and the motion for a new trial should be denied.

### b.  The Government's Closing Argument Was Proper.

Three isolated statements in the government's closing argument—none of which were subject to contemporaneous objections—were not improper, let alone a sufficient basis for a new trial.

Allegations of prosecutorial misconduct in closing argument involve a two-step process for review.   First, a court must determine whether the conduct was improper.   *United States v. Rogers*,

---

[102] Trial Tr. at 4895.
[103] Trial Tr. at 4895-96.
[104] Trial Tr. at 4961 (Jamil M.).

556 F.3d 1130, 1140-41 (10th Cir. 2009).  Second, if it was improper, a court must determine whether a new trial is warranted.  *United States v. Fleming*, 667 F.3d 1098, 1103 (10th Cir. 2011).  The Tenth Circuit has noted that it will not overturn a conviction unless the misconduct "was enough to influence the jury to render a conviction on grounds beyond the admissible evidence presented."  *United States v. White*, 68 F. App'x 870, 875 (10th Cir. 2003) (internal citation and quotation marks omitted).  Courts are not "to consider the prosecutor's remarks in a vacuum but rather the trial as a whole, including the trial court's curative acts, the extent of the misconduct, and its role within the case."  *Id.*  Factors relevant to determining whether a prosecutor's argument deprived the defendant of fair trial include "whether the instance was singular and isolated, whether the district court instructed the jury that the attorneys' argument was not evidence, and whether there was substantial evidence of the defendant's guilt."  *Id.*

The government bears the burden of proving that the error is harmless beyond a reasonable doubt.  *See id.*  However, when a defendant fails to timely object to an alleged error, a court reviews only for plain error, and a defendant bears the burden of establishing prejudice.  *See United States v. Dazey*, 403 F.3d 1147, 1170 (10th Cir. 2005) (claims of prosecutorial misconduct during closing argument which are not the subject of contemporaneous objection are reviewed for plain error); *United States v. Fritzel*, 5:18-CR-40058, 2019 WL 4670204, at *9 (D. Kan. Sept. 25, 2019) ("Where the defense did not object to the prosecutor's comments, a defendant must demonstrate that the misconduct rises to the level of plain error to justify a new trial.").  "The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotations and citation omitted).

### i. Response to defense attacks on the government and government witnesses was not improper.

Defendant Hadley contends that a lone comment at the beginning of the government's rebuttal closing argument was an "improper, inflammatory" remark that warrants a new trial. (Doc. 557 at 12). To the contrary, this comment was in response to the defendants' arguments, not improper, and in any event not a sufficient basis for a new trial.

During closing arguments, defendants' counsel commented on the government's conduct in the investigation and prosecution of the case and claimed that certain government witnesses were "liars" and had committed perjury, and suggested that the government knew or should have known that. The four hours of defense closing arguments included the following statements, among many others:

- "It's okay as jurors to question the prosecution. I can tell you that there are some cardinal rules of prosecution that were absolutely ignored and broken by the United States Government in this case."[105]

- "I suggest to you that the prosecution has failed at the very first part of this prosecution because they didn't do it, they couldn't prove it, and this was certainly not the right thing to do to bring this case."[106]

- "The government never put together a paper trail showing anything. We had to put it together for you to show that their theory, their false narrative is completely and utterly wrong. They don't get it. It's just too bad."[107]

- "Credibility, the government talked about credibility. They must be lucky, they got a human lie detector. Apparently they can tell who's lying or not when they talk to you."[108]

- Discussing two witnesses: "You know with certainty that both of them have walked in the room, raised their hand, taken an oath, sat in that chair, and lied to your face on multiple occasions about important things."[109]

---

[105] Trial Tr. at 5091.

[106] *Id.*

[107] *Id.* at 5094.

[108] *Id.* at 5113.

[109] *Id.* at 5179.

- Talking about one witness: "But, I mean, this was some breathtaking perjury."[110]

- "And this trial has featured some of the most spectacular perjury you'll ever see in your life.  Why was this case so different than your regular case?  You have a bunch of smart, hard-working people working at government table and behind it. What happened? I don't know that I have a perfect answer, but I do have one. . . . He's over there because the government needs a Jenkins at defense counsel because they really, really, really wanted to prosecute Royall Jenkins, but Royall Jenkins died. And that is the best explanation that I can come up with as to what we're doing here."[111]

- "What happened is the government fell victim to a pair of awfully talented liars, and it trusted them instead of verifying their story.  This is the house the government wants you to buy.  They want you to trust [Elijah M.] and [Niesha K.]. They can't convict unless you do. That's gross. You know these people have lied to you about critical things."[112]

- "So you can see how the government is cherry-picking their witnesses and telling the story they want to tell. It's a clear case of tunnel vision."[113]

For his part, Hadley's counsel stated:

- "It means you're seeing one side of a very highly polished coin that has been polished over the course of seven years by people who have motivation, people who highly dislike this group, and very smart attorneys who are sitting in on these interviews and asking more and more pointed questions to individuals they know came to them as a result of knowledge of a lawsuit, individuals who came to them that they know might not be completely honest about their feelings and memories of what happened in the UNOI.  And what happens? They get closer to trial, and they say, well, did Rodney ever hurt you? Tell me, did Rodney injure you? And, of course, we get these statements that come out right before trial or even at trial that no one has ever testified to before, because that's what happens, ladies and gentlemen, when you prompt people who already want to lie and you give them the avenue to do it."[114]

On rebuttal, government counsel simply responded to the repeated attacks by noting: "I'd like to start by saying that the amount of insults about myself and my co-counsel in those closing arguments is—I've never heard in my 18 years practicing.  It was beyond insulting.  We're all here

---

[110] *Id.* at 5194.
[111] *Id.* at 5199-5200.
[112] *Id.* at 5201.
[113] *Id.* at 5216.
[114] *Id.* at 5177-78.

just doing our jobs.  Okay?  The suggestion that myself or any of my colleagues put a witness on the stand that we knew was lying was ridiculous.  The suggestion that Elijah coordinated this entire prosecution is ridiculous."  Counsel then reminded the jury that they were the ones who determine the credibility of witnesses.[115]

These comments by government counsel, which defense did not object to at the time, were within the bounds of proper argument.  They were not personal attacks, but rather in response to arguments defense counsel had made.  The comments were also made in the context of counsel properly telling the jury that they were the ones who judge credibility, make decisions about who to believe and who not to believe, and what evidence is credible.

Even if the remarks were improper in some manner, they did not amount to misconduct requiring a new trial, as there was no conceivable prejudice to any defendant.  These were fleeting rebuttal comments following a 22-day trial in which dozens of government and defense witnesses testified.  The trial transcript consisted of more than 5,000 pages; closing arguments alone were more than 200 pages.  The comments at issue took up 9 lines of transcript.  *See United States v. McBride*, 656 F. App'x 416, 423 (10th Cir. 2016) (comments were "fair game" when directed at defense counsel's argument, and even if not it was an isolated comment in a "closing argument transcript numbering almost 20 pages and of a trial transcript spanning over 700 pages"); *Fritzel*, 2019 WL 4670204, at *12 (new trial not warranted where "remarks were isolated and not egregious").

Moreover, the Court's instructions to the jury to decide the case based on the evidence rather than the attorneys' arguments, both at the beginning of the case and prior to closing arguments, eliminated any danger of unfair prejudice.  (Doc. 520 at 346) ("Opening statements

---

[115] *Id.* at 5225.

given by the lawyers, opening statements are not evidence. You'll hear closing arguments at the

end of the case. Closing arguments are not evidence. The evidence is what the witnesses tell you

and what the exhibits have to say."); (Doc. 475 at 69, Instruction 51) ("Statements, questions and

arguments of counsel are not evidence . . . . The evidence consists of the sworn testimony of the

witnesses and all exhibits received in evidence.").  Courts "presume jurors attend closely to the

language of the instructions in a criminal case and follow the instructions given them."  *United

States v. Almaraz*, 306 F.3d 1031, 1037 (10th Cir. 2002).[116]

   In short, not only were these comments not improper, especially considering the context of

the trial as a whole, but also Hadley has not met his burden to establish they affected his substantial

rights.

> ## ii. Government response to defense arguments concerning paddling was not improper.

   Hadley claims that one rebuttal comment concerning paddling improperly attacked defense

counsel for "making a legitimate legal argument."  (Doc. 557 at 14).  This claim is similarly devoid

of merit.

   In his closing, Hadley's counsel argued:

> Physical abuse is defined as hurting, damaging, injuring.
> We're not talking about ancillary acts of physical abuse that are not
> involved in the offense, meaning paddling or making young men
> hold push-up positions for non-work-related activities, for school-
> related violations is not physical abuse and is not involved in the
> offense. . . . Rodney paddled him on one occasion, which was
> discipline for fighting, not related to labor at all. This was not
> physical abuse. Physical abuse is hurting, damaging, or injuring

---

[116] Hadley's only citation in support of his argument is inapposite.  In fact, he cites a *dissenting
opinion* in fraud case in which the prosecution used various hypothetical "counterfactual"
scenarios to demonstrate that information the defendant did not disclose to a bank was material.
(Doc. 57 at 13) (citing *United States v. Gregory*, 54 F.4th 1183, 1224 (10th Cir. 2022)).  The
majority found that there was nothing improper about the prosecution's approach, which was
objected to during trial and therefore not before the Tenth Circuit on plain error review.  *See
Gregory*, 54 F.4th at 1216.

someone. He said he had a sore bottom for a week.  That's if you believe that he did not embellish.  This is what is supposed to occur when somebody is paddled. This is what is supposed to occur with discipline. That's why they use a paddle and not a belt or a fist or something else that may cause injury. That's why they drill holes in the paddle. Not to make it go faster through the air.
What does it do when you drill holes in wood? It significantly reduces weight of the paddle so it does not cause injury.[117]

On rebuttal, government counsel responded that she "cannot believe that [Hadley's counsel] was up here justifying the physical paddlings and suggesting that they were appropriate and not excessive."[118]  Government counsel went on to properly note that whether paddling was excessive was ultimately for the jury to decide and argued that what the jury heard "was absolutely excessive and not appropriate use of discipline."[119]  This was an appropriate response to the defendant's attempt to downplay the effect that paddling had on children and his argument that paddling did not constitute "physical abuse."  It was not a personal attack on defense counsel, but rather in direct response to counsel's argument.

In addition, for the same reasons discussed above, this isolated comment (to which the defendant did not object) does not justify a new trial, because the defendant cannot meet his burden to establish plain error.

### iii.  Government did not misstate the law concerning withdrawal.

During closing argument, the government noted, consistent with the Court's instructions and applicable law, that the defendants had the burden to prove the affirmative offense of withdrawal from the conspiracy.[120]  All of the government's comments were accurate statements of the law and appropriate argument.[121]

---

[117] Trial Tr. at 5172.
[118] *Id.* at 5248.
[119] *Id.*
[120] *Id.* at 5059.
[121] *Id.* at 5059-61.

Rassoul nonetheless makes one vague, conclusory suggestion that the government misstated the law concerning conspiracy and withdrawal. He does not, however, identify the statement about which he complains or why it misstated the law. (Doc. 558 at 9-10). Rassoul appears to simply rehash his argument that he did not join the conspiracy or withdrew from it, which were factual questions for the jury. In any event, he did not object to any such statement at trial and has not attempted to meet his burden to establish plain error. To the extent Rassoul's motion can be construed as arguing that some unidentified statement warrants a new trial, his motion should be denied.

### c. Cumulative Error Analysis is Not Warranted.

Rassoull argues that the Court made several errors before and during the trial, and the cumulative effect of those errors warrants a new trial. (Doc. 558). The government disagrees. The Court did not commit error when it denied the defendants' Motion to Dismiss on Statute of Limitations, Motion for Bill of Particulars, Motion for Pre-Indictment Delay, and Motion to Dismiss for Grand Jury Abuse. Nor did the Court err in granting the government's Motion in Limine to Admit Evidence as Direct and Intrinsic Evidence, or Alternatively Under Rule 404(b). Additionally, the instructions the Court gave to the jury—which were thoroughly briefed by the parties—were proper and supported by the law; thus, the Court did not err when instructing the jury. Further, Rassoull has not met his burden to prove any such error, thus a cumulative-error analysis is not warranted.

The purpose of a cumulative-error analysis is to address the possibility that the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error. *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990) (citing *United States v. Wallace*, 848 F.2d 1464, 1475 (9th Cir. 1988)) ("Although each of

the above errors, looked at separately may not rise to the level of reversible error, their cumulative effect may nevertheless be so prejudicial to the appellants that reversal is warranted."). In a cumulative-error analysis, courts "aggregate all errors found to be harmless and analyze whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *United States v. Toles,* 297 F.3d 959, 972 (10th Cir.2002) (quoting *Rivera*, 900 F.2d at 1470). Thus, first, a defendant must prove that "multiple non-reversible errors" infected the trial. *United States v. Barrett*, 496 F.3d 1079, 1121 (10th Cir. 2007). If a defendant can do so, only then does the Court consider "whether the defendant's substantial rights were affected by the cumulative effect of the harmless errors." *United States v. Battles*, 745 F.3d 436, 462 (10th Cir. 2014) (quoting *Toles*, 297 F.3d at 972). Additionally, if any errors to be aggregated are constitutional errors, the government "bears the burden of proving that [the] constitutional error[s] [were] harmless beyond a reasonable doubt." *Rivera*, 900 F.2d at 1470 n. 5 (citing *Chapman v. California,* 386 U.S. 18, 24 (1967)). However, the cumulative-error analysis evaluates only the effect of matters determined to be error, not the cumulative effect of non-errors. *Id.* at 1471; *see also Smith*, 776 F.2d at 899; *United States v. Barshow*, 733 F.2d 842, 852 (11th Cir. 1984).

Defendants filed many pretrial motions, including those listed in Rassoull's Motion for New Trial; the government filed a Motion in Limine to Admit Intrinsic Evidence. The government thoroughly responded to the defendants' motions in writing. Then the Court held lengthy hearings on the motions wherein the parties made additional oral arguments to supplement their written arguments. After allowing all parties to be fully heard on each of the legal issues, the Court ruled on the motions, some orally and others in writing. The government now relies on and incorporates arguments in all previous written pleadings, oral arguments from hearings on the motions, and oral

arguments made during trial. The Court properly heard each of the issues and ruled based on sound legal authority. Thus, the Court did not err.

Similarly, the government and the defendants submitted proposed jury instructions to the Court. The Court then held a hearing so that all parties could be heard and make appropriate objections and arguments to the Court's proposed jury instructions. The Court then ruled on the instructions and the instructions given to the jury were proper and supported by legal authority and precedent; thus, the court did not err in instructing the jury.

Rassoull also argues that giving the jury an *Allen* instruction was error. *See Allen v. United States*, 164 U.S. 492 (1896) (approving an instruction encouraging a deadlocked jury to continue deliberating). The government disagrees. An *Allen* instruction urges deadlocked jurors to review and reconsider the evidence in the light of the views expressed by other jurors to avoid a mistrial. *United States v. Cornelius*, 696 F.3d 1307, 1321 (10th Cir. 2012). It is well established that a district court may deliver an *Allen* instruction to encourage deliberation. *United States v. Coulter*, 57 F.4th 1168, 1192 (10th Cir. 2023) (affirming the district court's decision to deliver an *Allen* instruction and stating that a "district court may deliver an *Allen* instruction to encourage deliberation"); *see also Cornelius*, 696 F.3d at 1321 (affirming the district court's decision to deliver an *Allen* instruction and stating that a "district court may issue an *Allen* instruction urging deadlocked jurors to review and reconsider the evidence in the light of the views expressed by other jurors so as to avoid a mistrial, provided that the instruction does not impose such pressure on the jury such that the accuracy and integrity of the verdict becomes uncertain" (internal quotations omitted)); *United States v. Rivera*, 554 F. App'x 735, 741 (10th Cir. 2014) (same); *United States v. LaVallee*, 439 F.3d 670, 689 (10th Cir. 2006) (affirming district court's decision to give a modified *Allen* charge and stating that an "*Allen* charge is a supplemental instruction

given to the jury and designed to encourage a divided jury to agree on a verdict"); *United States v.*
*Duran-Salazar*, 123 F. App'x 946, 949 (10th Cir. 2005) (affirming district court's decision to
deliver both an *Allen*-like request to continue deliberations and a formal *Allen* charge).

However, a court must not deliver an "improperly coercive" *Allen* instruction. *Cornelius*,
696 F.3d. at 1321. Four factors are to be considered when assessing whether an *Allen* instruction
is improperly coercive: (1) the language of the instruction, (2) whether the instruction is presented
with other instructions, (3) the timing of the instructions, and (4) the length of the jury's subsequent
deliberations. *Id.*

The language of an *Allen* instruction is not improperly coercive if it "urges all jurors, not
just those in favor of acquittal, to reconsider their views" and "stresses the importance of integrity
in being an impartial, deliberate fact-finder." *Coulter*, 57 F.4th at 1192 (citing *Cornelius*, 696 F.3d
at 1322). "If the district court delivers an *Allen* instruction after the jury informed the court that it
was unable to reach a verdict, this weighs against a determination of improper coercion." *Id.*
"After a court delivers the instruction, a relatively long period of further deliberation tends to
negate an inference of improper coercion." *Id.* If the jury remains deadlocked after receiving
an *Allen* instruction, "that fact demonstrates that the jury was not compelled or coerced to reach a
unanimous verdict." *Id.* at 11192-93 (citing *United States v. Ailsworth*, 138 F.3d 843, 852 (10th
Cir. 1998).

Here, the Court's *Allen* instruction to the jury was entirely proper under the law and not
"improperly coercive." *Id.* First, the language of the instruction was neutral and did not single
out any hold-out jurors or jurors favoring acquittal.[122] Further, the *Allen* instruction was given

---

[122] Trial Tr. at 5280-82.

only after the jury indicated it was unable to reach a verdict on some on the charged counts.[123] After the instruction was given, contrary to Rassoull's argument that the jury "returned very quickly," the jury continued to deliberate and then went home overnight and returned the next day to continue deliberating.[124]  (Doc. 558 at 7-8).  Thus, after considering all the factors, the *Allen* instruction given by the Court was not improperly coercive, and as such, it was not error for the Court to give the instruction.

Because the Court did not commit error and Rassoull has not proven any such error occurred, a cumulative error analysis is not warranted.

## III.  CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny the defendants' motions for judgment of acquittal and motions for a new trial.

Respectfully submitted,

DUSTIN J. SLINKARD
ACTING UNITED STATES ATTORNEY

By: */s/ Ryan J. Huschka*
Ryan J. Huschka
Assistant United States Attorney
United States Attorney's Office for the
District of Kansas
500 State Avenue, Suite 360
Kansas City, KS 66101
Phone:  913-551-6730
Fax:  913-551-6754
Email:  Ryan.Huschka@usdoj.gov
KS Bar No. 23840

---

[123] *Id.* at 5276, 5280.
[124] Trial Tr. at 5280-84.  It is unclear from the record exactly how long the jury deliberated immediately after the *Allen* instruction was read or when it continued deliberations the next day.

MAC WARNER
DEPUTY ASSISTANT ATTORNEY GENERAL

By: */s/ Kate A. Alexander*
Kate A. Alexander
Trial Attorney
USDOJ Civil Rights Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Phone:  202-353-3539
Email:  Kate.Alexander@usdoj.gov
FL Bar No. 27393

By: */s/ Maryam Zhuravitsky*
Maryam Zhuravitsky
Trial Attorney
USDOJ Civil Rights Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Phone:  202-532-3592
Email:  Maryam.Zhuravitsky@usdoj.gov
MD Bar No. 1312190348

By: */s/ Francisco Zornosa*
Francisco Zornosa
Trial Attorney
USDOJ Civil Rights Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Phone:  202-616-4588
Email:  Francisco.zornosa@usdoj.gov
NY Bar No. 5477245

**CERTIFICATE OF SERVICE**

I hereby certify that on February 28, 2025, I caused the foregoing pleading to be filed with the Clerk of the Court, with a true and accurate copy provided to each counsel of record in the case.

/s/ Ryan J. Huschka
Ryan J. Huschka
Assistant United States Attorney
United States Attorney's Office for the District of Kansas