IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

      Plaintiff,

      v.

KAABA MAJEED,
YUNUS RASSOUL, a.k.a. Yunus Rassoull,
JAMES STATON, a.k.a. Adam Winthrop,
RANDOLPH RODNEY HADLEY,
DANIEL AUBREY JENKINS, and
DANA PEACH,

      Defendants.

Case No. 21-20060-JAR

**MEMORANDUM AND ORDER**

The Government filed an eight-count Indictment on October 20, 2021, against eight

Defendants who belonged to the United Nation of Islam ("UNOI"), a religious organization that

operated multiple temples and businesses across the United States.  The Indictment charged all

Defendants—Kaaba Majeed, Yunus Rassoul a.k.a. Yunus Rassoull, James Staton a.k.a. Adam

Winthrop, Randolph Rodney Hadley, Daniel Aubrey Jenkins, Dana Peach, Etenia Kinard, and

Jacelyn Greenwell—with conspiracy to commit forced labor in violation of 18 U.S.C. §§ 371

and 1589 in Count 1.  Counts 2 through 8 charged substantive forced labor violations under 18

U.S.C. §§ 1589, 1594(a), and 2.  Each substantive forced labor count was tied to a different

victim and was alleged against different Defendants or subgroups of Defendants. [1]  The

---

[1] The Indictment did not identify the minor victims by name, consistent with statutory authority that provides crime victims with the rights to be protected from the accused and "to be treated with fairness and with respect for the victim's dignity and privacy."  *See* 18 U.S.C. § 3771(a)(1), (8).  Also, 18 U.S.C. § 3509(d)(3)(A), provides that "[o]n motion by any person the court may issue an order protecting a child from public disclosure of the name of or any other information concerning the child in the course of the proceedings, if the court determines that there is a significant possibility that such disclosure would be detrimental to the child."

On November 30, 2021, presiding Magistrate Judge James P. O'Hara granted the Government's unopposed motion for protective order, which provided in relevant part: "In all filings with the Court and during all pre-trial

Government voluntarily dismissed Count 5 before trial.[2]  Defendants Etenia Kinard and Jacelyn Greenwell pled guilty to Count 1; the remaining Defendants went to trial.

Trial began on August 5, 2024.  At the close of the Government's case, Defendants Rassoul, Staton, Hadley, Jenkins, and Peach orally moved for judgment of acquittal on all counts under Fed. R. Crim. P. 29, arguing the evidence was insufficient to convict them of the charges. Defendant Majeed orally moved for judgment of acquittal on Counts 1, 2, 3, 4, 6, and 8.  The Court reserved judgment on the motions.  Defendants orally renewed their motions for judgment of acquittal at the close of their cases, and  the Court again reserved judgment and permitted the case to proceed to the jury.  On September 16, 2024, after deliberating for four days, the jury returned its verdict, finding Defendant Majeed guilty on count Counts 1, 2, 3, 6, 7, and 8, and not guilty on Count 4; and finding Defendants Rassoul, Staton, Hadley, Jenkins, and Peach guilty on Count 1 and not guilty on all other counts charged.

Now before the Court are Defendants' post-trial motions: Defendant Majeed's Motion for New Trial and Supplemental Suggestions in Support of Motion for Judgement of Acquittal and, or in the Alternative, New Trial (Docs. 549, 570); Defendant Rassoul's Renewed Motion for Judgment of Acquittal (Doc. 556) and Motion for New Trial (Doc. 558); Defendant Staton's Motion for Judgment of Acquittal and for New Trial (Doc. 567); Defendant Hadley's Motion for Acquittal or New Trial (Doc. 557); Defendant Jenkins' Motion for Acquittal and Motion for

---

proceedings, all parties and witnesses shall refer to the victims by their initials or first names only." Doc. 65 ¶ 4.  At trial, the Court and the parties struggled to fully comply with this provision given the amount of individual names in the record, and the fact that many of the victims share either first names or last names.  None of the minor victims was a minor by the time of trial.  Thus, at trial, in the jury instructions, and in this Memorandum and Order, the minor victims are identified by name.  The minor victims in the Indictment are: Amira Kelly (Count 2—MV 3), Tymiah Kelly (Count 3—MV 7), Doneika Dempsey (Count 4—MV 8), Kendra Ross (Count 6—MV 10), Elijah Muhammed  (Count 7—MV 5), and Niesha Kelly (Count 8—MV 4). *See* 18 U.S.C. § 3771(b)(1) (providing that "[t]he reasons for any decision denying relief under this chapter shall be clearly stated on the record").

[2] Doc. 391.

New Trial (Doc. 554); and Defendant Peach's Motion for Acquittal and for New Trial (Doc. 562). These motions are fully briefed and the Court is prepared to rule. As described more fully below, the Court denies Defendants' post-trial motions.

## II.    Evidence Presented at Trial

The Government's case-in-chief spanned 15 days, during which the jury heard testimony from 18 witnesses and viewed hundreds of exhibits. The defense spanned six days, during which the jury heard additional evidence that included Majeed's and Rassoul's testimony. Viewing the evidence in the light most favorable to the Government, a reasonable jury could find the following beyond a reasonable doubt.

### A.    UNOI History, Structure, and Beliefs

UNOI was a religious organization that operated multiple temples and businesses across the United States from on or about October 28, 2000 to November 30, 2012. UNOI began in Temple Hills, Maryland and grew to have locations in at least 12 states with membership between 3,000 and 4,000 members.

Royall Jenkins ("Royall") founded UNOI in the early 1990s as an independent nation of believers that provided housing, food, education, transportation, employment, and other necessities to full-time members. Full-time members, in turn, devoted themselves to UNOI by providing uncompensated labor and contributions of money and other assets. Part-time members enjoyed access to UNOI's teachings, but maintained separate employment and housing, while funding UNOI with their donations. Royall and others preached that UNOI was an organization based on Black empowerment, self-sufficiency, and self-determination, without reliance on the government or outside world. However, UNOI often took advantage of government programs; some of their members lived in public housing and most of them received food stamps that were communally shared with other UNOI members. In the final years of UNOI, some of the

members received Medicaid benefits.  The Unified Government of Wyandotte County and Kansas City, Kansas gifted UNOI dilapidated houses, a dilapidated school, and other condemned commercial buildings.  And UNOI also readily took in-kind donations from businesses that allowed UNOI to rehabilitate those structures.

UNOI members believed that Royall was Allah and the arbiter of whether they would have salvation or burn in hell.  UNOI taught that adherents whose faith and works passed muster would accompany Royall on a spaceship that would exit the Earth and take them to safety while the rest of the world, the so-called "lost/founds"[3] succumbed to hellfire.  Many former UNOI adherents referred to UNOI as a "cult."

At some point, Royall moved the center of UNOI's operations to Kansas City, Kansas, which he referred to as "Heaven."  UNOI operated restaurants, bakeries, and temples in various locations, including New Jersey, Connecticut, New York, Georgia, Ohio, North Carolina, Maryland, Rhode Island, Michigan, and Wichita, Kansas.  But UNOI's headquarters was in Kansas City, Kansas, where many full-time members lived.  Kansas City was the situs of many UNOI businesses, including a supermarket, clothing store, restaurant, sewing factory, products laboratory, biodiesel laboratory, bakery, gas station, warehouse, and wellness center.  UNOI also owned and operated farms in Maryland and West Virginia, where it grew produce to supply to UNOI's full-time members and its many food service establishments.

Most, if not all, of UNOI's businesses were heavily staffed with children, usually between the ages of 11 and 18, although some were as young as 8.  While UNOI operated a school in Kansas City, Kansas, which it called the University of Islam, many of the children, particularly those that joined during or after the mid-2000s, received little or no traditional

---

[3] When referring to UNOI terminology, the Court uses quotation marks.

education in math, science, English, social studies, or other basic classes. Instead, their education focused on learning UNOI ideology and its many rules concerning behavior, diet, health, household duties, marital relations, member communication and engagement, and rules on how to treat the "Royall Family."

The Royall Family consisted of the progeny of Royall, their "spouses" and children, and specially favored UNOI members who were considered "adopted" family. Royall had a large family that included 13 or 14 of his wives and "concubines," who produced numerous children and grandchildren. One of Royall's "wives" was also his stepdaughter, Joy. UNOI members were encouraged to engage in polygamy, though none of the marriages were legal. UNOI male members were also encouraged to date and marry women who were much younger and who were sometimes still minors. For example, Defendant Daniel Aubrey Jenkins ("Aubrey") married Doneika Dempsey when she was 15 or 16 and he was 20 or 21. Some young UNOI females were encouraged to date and marry much older men.

In the early years, until 2002, Royall's daughter Moreen Jenkins, a.k.a. the "Mother of Civilization," and her husband Joseph Kelly, a.k.a. "Father of the Planet," were high-ranking officials in UNOI. Moreen left UNOI in 2002 and was excommunicated. Her ten children stayed in UNOI. Her oldest child, Aubrey, was Royall's only grandson, and held leadership positions in UNOI. Moreen's nine other children, all daughters, were considered Royall Family. Some members of the Royall Family—Amira Kelly, Tyneemah Jenkins, and Tymiah Kelly— were demoted for various reasons and are among the alleged minor victims underlying the charges in this case.[4]

---

[4] Amira and Tymiah Kelly are Moreen's daughters. Tyneemah Jenkins' parents are Fatima Jenkins and Kaleb Glass; she was also Royall's granddaughter.

UNOI adherents were not allowed to interact with the outside world without permission. They needed permission from Royall or a member of UNOI leadership to obtain medical care, travel, date, marry, engage in recreational activities, see non-UNOI family, and sometimes to interact with family that was in UNOI. They followed a strict dress code, wearing clothes supplied and sometimes manufactured by UNOI. They were not allowed to individually own any property. They followed a prescribed set of rules concerning housekeeping and personal hygiene. UNOI members routinely inspected UNOI residences for compliance with these many rules.

These strict rules generally applied to Royall's many grandchildren, but did not apply to him, the rest of the Royall Family, or to UNOI leadership, some of whom were bestowed with honorary or "adopted" family status by Royall. These strict, isolationist rules were not without consequence. Several UNOI members reportedly died because they were prevented from seeking necessary medical care, including one young girl named Shaquanta who died in 2009 during the so-called "90 Days" period of UNOI. UNOI members were treated in accordance with UNOI's alternative-medicine practices, which included fasting, herbal teas, colonics, and a strict vegetarian diet. UNOI had an association with a licensed physician, "Dr. Marvin," but many members did not receive medical care from him. Royall and his ministers and leaders taught that illness was incompatible with a faithful life and that Royall or those acting under Royall's direction could spiritually heal the infirm.

Not only were UNOI members prohibited from individual contact with the outside world, but at times children in UNOI were not allowed to see their parents or siblings, even those who were also members of UNOI. There were occasions when parents who were UNOI members or non-UNOI members demanded access to their children and were denied. UNOI children were typically housed with other UNOI adults and not allowed to live with their biological parents.

And phone calls to their biological families were monitored and timed, often by Defendant Staton.

UNOI had a military-like structure and hierarchy, headed by Royall. While Royall's many wives and concubines had special status that operated outside of the military structure, these women also had a hierarchy based on their stature with Royall. The wives and concubines also had power and control over certain aspects of the organization, including over the local military officials and child laborers. Though Royall's grandchildren were considered Royall Family and had special or favored status, they were required to work, unlike the wives, children, and other adult members of the Royall Family. The grandchildren were also subject to discipline, which could include being "demoted" and no longer shielded by favored status.

Beyond the family, the military officials included National and Local Captains ("CPT"), Lieutenants ("LT"), and Secretaries. There were two arms of UNOI—the Fruits of Islam ("FOI") arm was the male structure, and the Muslim Girls Training ("MGT") arm was the female structure. Defendants were each ranking officers in the military structure or had the special status of a wife or concubine.

### B.    Defendants' Roles in UNOI

Defendant Kaaba Majeed was a member of UNOI throughout the time of the charged conspiracy. He rose to become second in command to Royall and was considered an adopted member of the Royall Family by virtue of being married to Myesha Jenkins, one of Royall's grandchildren. Majeed rose through the ranks from Local First Lieutenant to National First Lieutenant, then to National Captain, and finally to National Supreme Captain. Once he rose to National Supreme Captain, he had authority to make and execute decisions without prior authorization from Royall. Later, from 2011 to 2012, when Royall was less active in UNOI, Majeed served on the Board of Directors that was founded to operate and grow UNOI. In this

capacity, Majeed made both independent decisions and decisions upon conferral with Royall. Majeed also performed many hands-on duties during the life of this conspiracy. At various times he managed UNOI's restaurants in New York City and Newark. In earlier years, he managed the UNOI gas station in Kansas City and managed the male barracks in Kansas City and New Jersey.

Defendant Yunus Rassoul was a member of UNOI throughout the time of the charged conspiracy. He was raised in UNOI; his parents were active members with preferred status in the organization. Rassoul eventually married Mariah Kelly, Royall's granddaughter, and was considered adopted into the Royall Family. As a young teen, Royall selected Rassoul to become the National Youth Minister, in recognition of Rassoul's advanced talent in preaching and teaching the UNOI ideology. Over the years Rassoul rose in rank from National Youth Minister. By 2011, Rassoul was the "Supreme Minister," meaning all temple ministers reported to him. But in earlier years, Rassoul performed hands-on duties in UNOI, including heading the local temple in Connecticut from 2004 to 2006, managing the bakery in Kansas City, and being in charge of the temples and businesses in Connecticut and Rhode Island.

Defendant James Staton a.k.a. Adam Winthrop[5] was National Secretary throughout the life of the conspiracy, reporting directly to Royall. In April 2011, Staton was demoted, and sent with his family to the Maryland farm. But before this demotion, Staton essentially acted as UNOI's Chief Financial Officer, managing UNOI's financial matters. He also engaged with the outside world, marketing UNOI and managing its public relations. Staton oversaw UNOI's "Secretarial Department" at headquarters, where business proceeds were collected, deposited, and spent, and where members' identity documents such as social security cards and birth

---

[5] Staton changed his name to Adam Winthrop at some undisclosed time during the life of the conspiracy. During the trial, witnesses referred to him by one or both names. For clarity and consistency, the Court refers to him as James Staton, the name he was indicted under.

certificates were kept.  Staton recorded, compiled, and published various guides and UNOI writings, including the "Laborer's Guide."[6]  He also manned the UNOI hotline, answering questions from members and outsiders.  And he was involved in monitoring the calls between UNOI children and their absent parents.  Staton was also involved in phone meetings concerning staffing of UNOI businesses.  He was involved in starting new temples as UNOI expanded.  He went to New Jersey to tour the UNOI restaurant while it was under construction there.  And he was known as the "Math Man," leading "math class," where adherents were not taught math or arithmetic, but were taught to engage in so-called "mathematical thinking."  This was a UNOI concept where members were presented with "scenarios," often involving conflict among members, and were "taught" how to communicate and resolve these scenarios, usually with discipline and punishments prescribed by Staton and other UNOI leaders.  Despite being demoted in 2011, Staton stayed in UNOI until as late as January 13, 2012, providing financial information to the UNOI Board that was operating UNOI.

Defendant Randolph Rodney Hadley was a local FOI Captain in Kansas, meaning he had responsibility for teaching FOI classes and overseeing the men.  He previously served as a Temple Secretary in Maryland, which included responsibility for financial matters of that temple.  Hadley was a chemist by education and he developed and ran the biodiesel lab that made diesel fuel for UNOI's trucks and other vehicles.  He also taught math and science at the University of Islam, but he focused his efforts on teaching the children how to perform limited tasks in their assigned work duties, rather than teaching the children math and science that would educate them for the outside world.  Although Hadley was not a national official or an adopted member of the Royall Family, he reported directly to Royall or Majeed and, according to Defendant

---

[6] Ex. 302.

Etenia Kinard, Hadley had authority to make some decisions independently. He also enjoyed some special privileges and lived better than the average member, with live-in household labor and childcare, more freedom to engage with the outside world, and owning vehicles, including his own motorcycle.

As already mentioned, Aubrey was the son of Moreen Jenkins and Royall's only male grandson. Unlike most other members, Aubrey was able to leave UNOI and return to UNOI with favored status. He left and returned to UNOI several times according to many of the witnesses. Aubrey was a Captain at one point, and a head of FOI in 2003. According to his sister Amira Kelly, Aubrey was second in command before that role went to Majeed. Various witnesses described Aubrey as having responsibility or a leadership role in Kansas City in 2000–2002 and in New Jersey in 2004–2005. Aubrey went to Wichita and developed a temple and restaurant there. In 2008, he displeased Royall and was cast out of UNOI, something that Royall announced in a national call with members. Aubrey never announced or otherwise took steps to communicate that he had withdrawn from UNOI, however. According to Kinard, Aubrey returned to UNOI within a few months of Royall's announcement and continued to have favored status and power in UNOI. No other witnesses identified Aubrey as having a role in UNOI after he left in 2008, but Amira Kelly testified that she last saw Aubrey in 2014 when he was still in a family relationship with Royall and was accompanying Royall on a trip to North Carolina where Aubrey and Royall were pitching two new organizations, Value Creators and Promise Keepers, to former UNOI members.

Defendant Dana Peach was one of Royall's wives.[7] Peach worked in the Secretarial Department, where she handled bank deposits, and she ran the Kansas City Wellness Center,

---

[7] None of the wives were legally married to Royall. In addition to wives, he had "concubines," who also had no formalized or legal relationship with him.

where she trained others to administer colonics and other UNOI-approved treatments.  Though she had no medical training, UNOI members called her "Dr. Peach."  She also opened a UNOI Wellness Center in New York and at various times supervised members in Cincinnati, Maryland, Kansas City, and New Jersey.  According to multiple witnesses, including Kinard, Peach had power over local officials, and some national officials.

### C.    UNOI Duty Requirements and the Climate of Fear

All full-time members of UNOI worked in its various businesses and ministries.  Adult members and minors were both required to work without monetary compensation, but minors contributed much of the free labor staffing UNOI's businesses.  At one point, there were 42 working minors in the Kansas City businesses alone.[8]  UNOI officials and leadership worked, but many did not perform "regular duty," with set hours and responsibilities.  Although the Royall Family did not generally perform regular duty, Royall's minor grandchildren did, working in UNOI businesses along with other minors without monetary compensation.  Near the end of UNOI in 2012, a newly formed UNOI "Board" undertook changes in the organization and paid some, but not all members for their labor.  But even these UNOI members were not compensated consistently or fully for their labor.  For example, Tymiah Kelly, one of Royall's minor grandchildren, was paid $100 per month and Amira Kelly, another minor grandchild, was paid $300 to $400 a month, in exchange for working 40 hours or more per week.

Royall and his leadership, including Defendants, obtained the labor of minor children and adult members by creating a climate of fear and coercion.  Members were taught that they must provide free labor as part of their "duty" to UNOI and Royall, who they were taught was Allah.  This climate pervaded all aspects of members' lives—home, school, and work.  They were

---

[8] Ex. 708.

isolated from the outside world and prohibited from any unsupervised interaction with non-UNOI members (including members of their biological family), in order to instill and maintain in them an unshakeable belief that Royall was Allah and that their continued faithful membership in UNOI was their ticket to salvation instead of hellfire and death.  Members received weekly, if not daily, instruction in the UNOI ideology and rules.  They were taught to blindly follow the rules and directives of UNOI leadership and the Royall Family.  They were taught that "detractors" would be punished with death.  Royall told Amira Kelly and her sisters that their mother, Moreen, died because she had become a detractor who tried to expose UNOI, and that Royall had caused her death.  Royall also announced this to all of the UNOI members on a national conference call.  UNOI members feared reprisal, corporal discipline, and excommunication if they did not perfectly follow rules, instructions, and directives.

Multiple witnesses, including but not limited to those who were identified as minor victims in the Indictment, testified about their experiences in UNOI, the climate of fear, and the abuse they suffered at the hands of UNOI members and leaders, including Defendants.  In their various roles, Defendants carried out Royall's directives, identified members who had violated rules, and ordered or imposed discipline to wayward members, including minor children.

### 1.    Physical Abuse

Discipline was imposed for even minor infractions, such as eating a cookie while baking batches of cookies for UNOI fundraisers or for the bakeries and restaurants.  Minor children were deprived of an adequate amount of food, and punished if they ate food prepared at work.  They were confined to a strict diet, often comprised of only bean soup and salad.  Many testified that they were always hungry as children.  They were punished for falling asleep in class or UNOI meetings, while suffering sleep deprivation from their heavy work schedules.  Some minor children would spend daytime hours at the University of Islam, then work after school

until the late evening, then attend mandatory UNOI meetings, then return home to household

chores, repeating the cycle after just a few hours of sleep.  The female minor victims in

particular, were often required to cook, clean, and provide childcare for the Royall Family or

other favored UNOI members, including for Majeed, Rassoul, Staton, Hadley, Aubrey, and

Peach.  Male minor victims had additional duties too, including doing lawn care for "donations"

from outsiders.  All the minor victims also were required to work fundraisers for "donations"

from outsiders and assist with two annual multiday UNOI Celebration events at the headquarters

in Kansas City. They were punished for mistakes or infractions regarding household work,

schoolwork, or work in UNOI businesses.

 The punishments imposed by Royall, Majeed, Staton, Aubrey, Rassoul, Hadley, and

Peach varied from minor to severe.  Minor victims testified that punishments included

humiliation in front of the UNOI congregation at "math classes" or other meetings; being forced

to fast for days at a time; being denied water; being required to work "extra duty," meaning

longer hours at work; and being forced to take colonics in which an 8-inch-long speculum was

inserted into their rectum to forcefully pump 59 gallons of water into their rectum.  Female

minor victims who were perceived to be overweight were subjected to weigh-ins; humiliated

with their weight being disclosed to other UNOI members; and were placed on strict diets, fasts,

colonics, herbal medicines, and forced exercise routines.  Amira Kelly testified that at the age of

8 she was disciplined with fasting for two days, and at ages 7 through 12 she was subjected to

twice weekly colonics against her will.

 Even more severe punishment was imposed at times.  Minor victims, as well as adult

victims, were subjected to severe beatings.  Many described being struck multiple times with a

heavy wooden paddle that had been engineered to swing hard and fast.  There were times in

"math class" that an adult or minor child was publicly disciplined for infractions.  The discipline

sometimes included beatings that were then witnessed by everyone attending the "math class."
Male UNOI members, both adults and minors, were sometimes disciplined in "beat downs,"
where one or more UNOI members would gang up on the victim and beat him with their fists.
The climate of fear was created by not only subjecting someone to discipline, but by subjecting
others to witnessing or even hearing about the discipline of someone else.

### 2.    Psychological Abuse

Not only did UNOI members suffer physical abuse, but they also suffered several forms
of psychological abuse at the hands of Defendants and other UNOI officials.  UNOI members,
including minors, had no freedom of movement or freedom of association.  They were not
allowed to interact with outsiders without UNOI permission.  Their clothing was confiscated
upon arrival in Kansas City, and they were required to wear whatever clothing was provided to
them.  They were not allowed to choose where or with whom they lived.  Male minors and single
adult males were often housed in bunk-bed outfitted "barracks."  Female minors were typically
assigned to live with families they were not related to in order to provide live-in household labor
and childcare, usually in addition to their other work duties.  UNOI members were not allowed to
date or "marry" without permission.  Although none of their marriages were legal, polygamy was
sanctioned by UNOI if approved by Royall or UNOI leadership.  Some members, including
Amira Kelly, were forced to "marry" spouses they did not want to.

Minor children were not allowed to live with their parents or siblings and were not
allowed to talk to or visit with their biological families, without monitoring and oversight by
UNOI members.  Biological family was not the focus at UNOI; members were taught that UNOI
was their family.  Minor victims were intimidated and afraid to share with their families the
abuses they were suffering at the hands of Defendants and other UNOI officials and members.
Minors were also periodically "dispatched" to work in UNOI businesses in other states, without

notice to their parents.  This too, acted to isolate minors from their biological families and demonstrate that they had no choice but to follow the dictates and directives of Defendants and others at UNOI.  This also deprived some parents of the ability to communicate with their children, for they did not know where their children were.  There were parents who unsuccessfully demanded to see their children, including Moreen Jenkins, the excommunicated daughter of Royall, who unsuccessfully tried to retrieve her children from the control of UNOI.  Moreen was deprived of access to her minor daughters; Royall told them that their mother worked for Satan.  After Moreen died, Royall told them he had caused Moreen's death.  Wilma Muhammad testified about her efforts to locate her children after they had been dispatched without notice to her, and how UNOI turned her children against her.

Deprivation of medical care was another form of psychological abuse.  UNOI members, other than the Royall Family and a favored few, were not allowed to seek medical attention for illness or injury.  Instead, they were "treated" by Peach and others with colonics, fasting, strict diets, and infrared sauna treatments, among other things.  The fact that severely ill UNOI members such as Shaquanta, Aron, and Jacelyn Greenwell's mother were forced to die rather than be allowed to obtain medical care contributed to the climate of fear surrounding UNOI.  Royall and other UNOI officials and leadership taught that these people died because they had not followed UNOI's prescripts and Allah was punishing them as a consequence.

UNOI also utilized public humiliation as a form of psychological abuse.  This included forcing so-called overweight female members, including prepubescent minors, to undergo weigh-ins, fasting, restricted diets and other treatments, and disclosing this to other UNOI members to instill shame in the targeted UNOI member.  UNOI members were not allowed to show emotion and would be punished if they did.  Public humiliation was also a central feature of math class.  These classes often happened on Friday nights in an auditorium and could last

anywhere from two to six hours.  The class was always led by a speaker—Staton, Rassoul, Aubrey, Hadley, and Majeed were speakers at different times.  Members were singled out about "scenarios" that came up that week and any member of the audience could contribute. Punishments were meted out by the speaker and "transgressors" were called to "the mic" to answer for their transgressions.

Also contributing to the climate of fear and coercion were UNOI's rules and directives that members report other members' infractions or be themselves subjected to punishment. Consequently, UNOI members constantly worried about whether they were being "snitched" on, or they felt pressured to snitch on others to avoid their own punishment.

Some of the psychological abuse was part of UNOI's teachings and ideology that Royall was himself Allah.  Members were taught that Royall was taken around the universe in a spaceship accompanied by "five scientists," who showed him the secrets of the universe and eventually took him into the sun.  They were taught that everyone outside of UNOI, as well as wayward, non-obedient UNOI members, would be destroyed and banished to hellfire and eternal damnation.  But members could secure eternal life through their obedience, faithful labor, and allegiance to Royall such that, at the end of the world, they would be saved by having a seat on Royall's spaceship.  Royall taught that overweight members would not be able to squeeze into an assigned seat on the spaceship which is why there was such an emphasis on maintaining a strict vegetarian diet, receiving UNOI sanctioned "medical" treatments, and not being overweight. Members were told at meetings that they would burn in hell if they left the organization or did not believe in its teachings.

In the latter years of UNOI, some members were subjected to "clearings" or spiritual cleansings conducted by "The Healer," a non-UNOI member named Dr. Satterwhite.  In these

"clearings" members might be told that they were "demon-possessed" or "reptilians," meaning they were no longer in the status of receiving salvation.

This UNOI climate of fear and coercion, marked by physical and psychological abuse, depersonalization, lack of traditional education, and isolation caused UNOI members to stay in the organization even when they desperately wanted to leave. Some witnesses described their attempts to escape while they were minors or young adults. For example, Devon Young stole and saved tip money from a UNOI restaurant until he could purchase a bus ticket and successfully escape. He knew he would have faced severe punishment had he been caught escaping. But many more not only lacked resources to escape, but also lacked familial support or practical knowledge of how to exist in the outside world without education, housing, or employment. They had inadequate education, and no diploma or documentation showing they had ever even attended school. Some decided to stay because other family members were UNOI members and they feared losing all contact, albeit supervised contact, with them. Some members became suicidal, including Stacy Gordon and Royall's granddaughter, Tyneemah Jenkins.

All of the victims who testified described how the abuse they suffered at the hands of Defendants and others at UNOI resulted in years of psychological problems and other challenges. Some managed to get formal education, with great effort. All managed to find work, with great effort.

### D.    UNOI Changes and Unwinding, 2009–2012

The organization began to change in important ways starting in 2009, when Royall declared a "90 Day" period in which members underwent evaluations and clearings. During the 90 days, members were not allowed to communicate with one another, even within their residential unit. By 2011, a non-UNOI member, Dr. Raymond Satterwhite, befriended Royall

after being introduced by Akiba Majeed, a UNOI member who was Defendant Majeed's sister. Dr. Satterwhite started making a number of suggestions and recommendations concerning UNOI's operations. During this time period other individuals took on spiritual prominence in the organization, most notably KareemAllah, formerly known as Lamira Jenkins, one of Royall's daughters. She was also known as "the Host." KareemAllah reportedly had the power to communicate with special entities, including "The Healer," and "The Universe," as well as with one or more of the five scientists Royall claimed had shown him the secrets of the universe on his intergalactic trip through the sun and to all of the planets in this solar system.

Also during this period, however, Royall started spending less time on UNOI operations and more time in Arizona, where he and two of his favored wives bought a ranch near Tucson, which they named "The Land of Peace." Royall spent significant monies acquiring the land, outfitting his residence there, and purchasing an Arabian racehorse for his amusement. At this point, Royall controlled the finances and UNOI's operational hierarchy consisted of Majeed, Rassoul, and others, including attorney Wayman Favors (Rassoul's stepfather).

At the suggestion of Dr. Satterwhite, and with Royall's approval, a UNOI Board of Directors was formed in July 2011. The Board members were Kaaba Majeed, Yunus Rassoul, Akiba Majeed, Laota Rassoul, Jason Staton, Henry Munoz, and Wayman Favors. The goal of the Board was two-fold: (1) to restructure some UNOI entities to avoid a tax problem, and (2) to develop and continue to grow UNOI. The tax problem was addressed by splitting off Food for Life Supreme, the profit-making restaurant business owned by UNOI, from the not-for-profit UNOI entity. But the Board did not have access to all of the financial accounts and records. At Dr. Satterwhite's suggestion, and with Royall's approval, the Board gained such access.

In the fall of 2011, the Board learned about certain transactions in the UNOI financial records to which the Board had only recently gained access—Royall had been using the

"Cheerful Giving" UNOI bank account to fund his lavish lifestyle in Arizona. They learned that in May 2011 alone, Royall withdrew $180,000 from the account; at one point that account had held more than $600,000. Rassoul and Majeed in particular were alarmed by their perception that Royall had offered them a bribe to not investigate the finances. The Board first questioned and then came to believe that Royall was a fraud, not Allah as he represented himself to be. The Board also learned around this time that Royall had been forcing his wives to have sex with one another.

The Board, primarily under the leadership of Kaaba and Akiba Majeed, began addressing inefficiencies in UNOI's business operations, some of which were not profitable.[9] They announced certain changes in UNOI's operations, which largely did not come to fruition. For example, they announced that UNOI children would now be allowed to attend public school, but the only two children who were given permission to do so were two of Royall's grandchildren. One mother's request in March 2012 for permission to send her child to a public school was denied until she "change[d] [her] thinking."[10]

After a September 7, 2011 meeting, the Board announced that members were free to leave UNOI without consequences and that they could seek help and UNOI resources to transition back into the outside world. In practice, only some members received any help; and some members who merely sought documentation that would allow them to find a job or enroll in school were rejected.

The Board announced that UNOI members who stayed would receive compensation for their labor. But few received any compensation; the only checks that were cut were during the

---

[9] This period coincided with the clearings on members that led to some being turned away due to negative energy, or being "demon-possessed." A reasonable jury could conclude that the clearings were a pretext for leadership to reduce UNOI's membership due to the organization's poor financial condition.

[10] Ex. 2085.

months of September, October and November 2012, and none of the members received anything close to minimum wage. Various witnesses testified that they received between $100 and $300 total in compensation over the period of three months; these witnesses were adults by 2012. There was no evidence that any of the children who continued to be forced to labor for UNOI were compensated.

Though the Board determined by September 7, 2011, that Royall was a fraud, it decided to not share this information with any UNOI members. Instead, throughout 2012, Majeed, Rassoul, and others continued to teach the UNOI ideology without change. They continued to impose and enforce strict rules on UNOI members. For example, in December 2011, there is an email from a member asking for permission to open a new bank account while assuring UNOI that it would still have full access to her social security benefit checks. And the psychological threats and culture of fear continued. In March 2012, Akiba sent Rassoul, Majeed, and the other Board members an email from "the Host," asking them to pass on a warning to "dedicated" UNOI members that the Earth would be attacked by "reptilians" that they must resist.[11] In April 2012, Jason Staton, who was "channeling the Universe," sent an email to the Board that directed Majeed to announce that there would be severe consequences to wayward members that not even Royall could protect them from.[12]

And, they continued to run the businesses. Majeed and Rassoul were officers in the newly formed for-profit corporation, Food For Life Supreme. They continued to accept donations from their adherents. They continued to fund Royall's lifestyle, though at Dr. Satterwhite's suggestion, they put him on a monthly stipend. In January 2012, they received

---

[11] Exs. 479, 479-A.

[12] Ex. 400-137.

assistance from Defendants Staton, who instructed them on the system he had put in place to monitor the Cheerful Giving account before he was demoted in April 2011. In April 2012, they received Kinard's help in accessing other UNOI accounts and passwords. In May 2012, Rassoul and Favors met with an attorney to discuss formation of new business entities. Also in May 2012, Jason Staton sent a "plan for success" to Rassoul by email.

And after determining that Royall was a fraud, the Board never ceased utilizing free child labor in UNOI's businesses. This continued throughout 2012 until UNOI was disbanded. In fact, the Board created a form evaluation for UNOI workers and there are forms in evidence demonstrating that UNOI was evaluating minor children's labor in 2011 for minors as young as 11 years old.[13]

On January 6, 2013, Akiba Majeed sent out a National Announcement by email to all members effectively shutting down UNOI. It instructed members to refrain from communicating with UNOI headquarters in Kansas City or with the UNOI email address, to refrain from sending donations, and relieved all national and local officials of their duties.[14]

Royall died in 2021.

## II.    Legal Standards

 Fed. R. Crim. P. 29(a) provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." The rule permits the court to reserve decision on a Rule 29 motion and decide it "after [the jury] returns a verdict of guilty."[15] When a court reserves decision, "it must decide the motion on the basis of

---

[13] Exs. 1030–1057.

[14] Ex. 400-26.

[15] Fed. R. Crim. P. 29(b).

the evidence at the time the ruling was reserved."[16]  Because Defendants renewed their motions for judgment of acquittal at the close of all evidence, the Court considers all evidence presented at trial.

A defendant who challenges the sufficiency of the evidence after a conviction "bears a heavy burden."[17]  In ruling on a motion for judgment of acquittal, the court asks "only whether, taking the evidence—both direct and circumstantial, together with reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt."[18]  In so doing, the court does not weigh "conflicting evidence or the credibility of witnesses."[19]  "But even under this deferential standard," the court will enter a judgment of acquittal "if the evidence does no more than raise a mere suspicion of guilt or requires piling inference upon inference to conclude the defendant is guilty."[20]  "While the jury may draw reasonable inferences from direct or circumstantial evidence," inferences cannot be based on mere "speculation and conjecture."[21]  And "[t]he evidence supporting the conviction must be substantial and do more than raise a suspicion of guilt."[22]

Under Rule 33(a), "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  When considering a Rule 33 motion, courts are generally "free to weigh

---

[16] *Id.*

[17] *United States v. Almaraz*, 306 F.3d 1031, 1040 (10th Cir. 2002).

[18] *United States v. Baldridge*, 559 F.3d 1126, 1134 (10th Cir. 2009) (quoting *United States v. Beers*, 189 F.3d 1297, 1301 (10th Cir. 1999)).

[19] *United States v. Tennison*, 13 F.4th 1049, 1059 (10th Cir. 2021).

[20] *United States v. Cordova*, 25 F.4th 817, 824 (10th Cir. 2022) (alteration in original) (quoting *United States v. Dewberry*, 790 F.3d 1022, 1028 (10th Cir. 2015)).

[21] *Dewberry*, 790 F.3d at 1028 (quoting *United States v. Arras*, 373 F.3d 1071, 1073 (10th Cir. 2004)).

[22] *United States v. Valadez-Gallegos*, 162 F.3d 1256, 1262 (10th Cir. 1998).

the evidence and assess witness credibility."[23]  But the Tenth Circuit has held that "[s]ufficiency-of-the-evidence challenges made in a Rule 29 or Rule 33 motion are adjudicated and reviewed under the same standard."[24]  While courts have greater discretion under Rule 33 than Rule 29, "a motion for new trial is regarded with disfavor"[25] and should be granted "only in exceptional circumstances in which the evidence preponderates heavily against the verdict."[26]

## III.    Discussion

### A.    Rule 29 Motions

#### 1.    Count 1: Conspiracy

The Indictment alleges that from at least October 28, 2000, continuing through November 30, 2012, Defendants engaged in a conspiracy to obtain the unpaid labor of children for UNOI. The jury convicted all six Defendants on this count, and all six now move for judgment of acquittal on the basis that the evidence was insufficient to support their convictions.  The Government was required to prove the following elements on the conspiracy charge: "(1) an agreement by two or more persons to violate the law; (2) knowledge of the objectives of the conspiracy; (3) knowing and voluntary involvement in the conspiracy; and (4) interdependence among co-conspirators."[27]  Moreover, "[d]uring the conspiracy, at least one of the coconspirators must commit an overt act in furtherance of the conspiracy."[28]

---

[23] *United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir. 1999).

[24] *Dewberry*, 790 F.3d at 1028.

[25] *Quintanilla*, 193 F.3d at 1146.

[26] *United States v. Evans*, 42 F.3d 586, 593 (10th Cir. 1994).

[27] *United States v. Foy*, 641 F.3d 455 (10th Cir. 2011).

[28] *United States v. Wardell*, 591 F.3d 1279, 1287 (10th Cir. 2009).

The Court is mindful that "[s]ecrecy and concealment are often necessary to a successful conspiracy, and, as a result, direct evidence of the crime is frequently difficult to obtain."[29] Therefore,  "conspiracy convictions may be based on circumstantial evidence, and the jury may infer conspiracy from the defendants' conduct and other circumstantial evidence indicating coordination and concert of action."[30]

### a.    Agreement to Violate the Forced Labor Statute

Under the first element of the conspiracy claim, the Government was not required to show an express agreement.[31]  "[T]he jury can infer an agreement between parties based solely on circumstantial evidence demonstrating that the parties took concerted action in furtherance of a shared objective."[32]  The Tenth Circuit has identified the following relevant circumstantial evidence of agreement:

> the joint appearance of defendants at transactions and negotiations in furtherance of the conspiracy; the relationship among codefendants; mutual representations of defendants to third parties; and other evidence suggesting "'unity of purpose or common design and understanding' among conspirators to accomplish the objects of the conspiracy."[33]

Agreement can also be shown by circumstances such as: "sharing a common motive, presence in a situation where one could assume participants would not allow bystanders, repeated acts, mutual knowledge with joint action, and the giving out of misinformation to cover up [the illegal activity]."[34]

---

[29] *United States v. Thompson*, 518 F.3d 832 (10th Cir. 2008) (quoting *United States v. Weidner*, 437 F.3d 1023, 1033 (10th Cir. 2006)).

[30] *Id.* (quoting *Weidner*, 437 F.3d at 1033).

[31] *United States v. Clark*, 717 F.3d 790, 805 (10th Cir. 2013).

[32] *United States v. Woodmore*, 127 F.4th 193, 220 (10th Cir. 2025).

[33] *Wardell*, 591 F.3d at 1287–88 (quoting *United States v. Dowlin*, 408 F.3d 647, 657 (10th Cir. 2005)).

[34] *United States v. Brown*, 654 F. App'x 896, 909 (10th Cir. 2016) (alteration in original) (quoting *United States v. Whitney*, 229 F.3d 1296, 1301 (10th Cir. 2000)).

Viewing the evidence in the light most favorable to the Government, a reasonable jury could infer there was an agreement to commit forced labor by all six Defendants based on the following substantial evidence.  As described in detail above, each Defendant held a leadership role in UNOI and worked closely with Royall to obtain unpaid, forced labor by the victims.  In fact, the evidence shows that UNOI was entirely financed by member and government donations, public assistance, and forced labor.

Aubrey argues that the evidence only showed that the Defendants who were in UNOI leadership roles competed rather than cooperated to please Royall.  This is of course one inference that a reasonable jury could have made.  But under Rule 29, the Court looks to the evidence in the light most favorable to the Government.  Under this framework, a reasonable jury could have believed that Aubrey and others in leadership roles took actions in furtherance of the conspiracy, and such conduct is not necessarily at odds with some amount of competition. For example, Aubrey was second in command at UNOI before that role went to Majeed. Various witnesses described Aubrey as having responsibility or a leadership role in Kansas City in 2000–2002 and in New Jersey in 2004–2005.  Thus, while he perhaps was in competition with Majeed for the "second-in-command" role at UNOI in the early aughts, he maintained a leadership role and there were multiple witnesses who testified about his participation in the climate of fear that allowed UNOI to obtain forced labor.

Defendants argue that their respective leadership roles are not sufficient to show agreement or membership in the conspiracy, and that "[m]ere association with conspirators, even with knowledge of their involvement in crime, is insufficient to prove participation in their conspiracy."[35]  They cite cases holding that a person's position in a business with conspirators

---

[35] *United States v. Fox*, 902 F.2d 1508, 1514 (10th Cir. 1990).

does not, standing alone, give rise to a reasonable inference that the person was a member of the conspiracy.[36]  But the jury was instructed to evaluate each Defendant's conduct separately without regard for the others, and this Court has done the same when considering whether the evidence supports the convictions.  Unlike the cases cited by Defendants, there was evidence to support the jury's finding that each Defendant's role in UNOI supported an inference that their activities within those rules were part of a common design to accomplish the objects of the conspiracy.

For example, Defendants communicated with each other on a regular basis in meetings and by phone about the methods required to obtain unpaid labor for UNOI's many businesses, particularly from minor victims.  Victims testified about phone meetings where Defendants discussed which kids should work where and when they should be transported, what one witness described as akin to the "NFL draft."  Elijah Muhammed testified about his time as Acting Lieutenant when he would be on these calls about dispatching youth.  He testified that the calls often included Majeed, Hadley, and Rassoul.  And Amira took notes for weekly calls with the National Ministers for a period of time, and testified that these calls included Majeed, Hadley, and Peach.

By virtue of their leadership roles and responsibilities in the organization, each Defendant promoted the climate of fear necessary to compel the victims to work without pay.  Victims

---

[36] *See, e.g.*, *United States v. Migliaccio*, 34 F.3d 1517, 1521–22 (10th Cir. 1994) (finding no agreement for purposes of mail fraud conspiracy because the fact that the defendants "practiced medicine together, shared one billing system, assisted each other in surgery, and advertised heavily in the Lawton, Oklahoma area simply does not constitute facts upon which a reasonable juror could infer an agreement to commit mail fraud"); *United States v. Zimmerman*, 943 F.2d 1204, 1209–10 (10th Cir. 1991) (explaining that the defendant's position as a senior lawyer at law firm could not, standing alone, demonstrate his involvement in fraud conspiracy, but finding other circumstantial evidence supported conviction); *Fox*, 902 F.2d at 1514 ("Mere association with conspirators, even with knowledge of their involvement in crime, is insufficient to prove participation in their conspiracy."); *see also United States v. Hamilton*, 587 F.3d 1199, 1206–07 (10th Cir. 2009) ("We are mindful to guard against the mass application of guilt when conspiracy charges are involved because guilt is always dependent on personal and individual conduct, not on mere association or unknowing involvement.").

testified about their genuine fears of physical and verbal abuse, fasting, colonics, hellfire, excommunication, homelessness, and starvation if they did not perform unpaid labor.  Witness testimony and documentary evidence showed that Defendants' statements to one another and to the victims suggested a unity of purpose to accomplish the goal of the conspiracy—unpaid labor—which allowed the co-conspirators to maintain their leadership roles within the organization, as well as their homes, cars, clothing, and lifestyles.

Staton suggests that the evidence does not support a reasonable inference of agreement beyond a reasonable doubt, citing the recent Tenth Circuit opinion in *United States v. Goldesberry*.[37]  In that case, involving a single defendant convicted of aggravated sexual abuse of a minor under 12 in Indian Country, the court found that the evidence of the defendant's mens rea required inferences that, at best, were in equipoise and therefore did not support a finding beyond a reasonable doubt.[38]  The Court finds this case distinguishable.  The element at issue here is agreement (the Court discusses knowledge in the next section), and the evidence here is based on a large body of circumstantial evidence upon which the jury could draw an inference beyond a reasonable doubt that Defendants agreed to violate the law.  Evidence of agreement went beyond the mere fact that these Defendants held leadership roles in UNOI or associated with one another.  And that evidence of their leadership positions is important because it allowed for the reasonable inference beyond a reasonable doubt that those roles provided them with knowledge about the details of the forced labor, as well as an incentive to obtain forced labor.  There was evidence that they all worked together and held themselves out to the UNOI members as having a common understanding of the object of the conspiracy.

---

[37] 128 F.4th 1183 (10th Cir. 2025).

[38] *Id.* at 1197–98.

### b.    Knowledge of the Objectives of the Conspiracy

A defendant's knowledge of the objectives of the conspiracy must be shown by clear, unequivocal evidence.[39]  However, "[a] defendant need not have knowledge of all the details or all the members of the conspiracy and may play only a minor role in the conspiracy."[40]  According to the Government, the objectives of the conspiracy were "to obtain uncompensated labor and services of at least one victim in the District of Kansas and elsewhere" through means prohibited by 18 U.S.C. § 1589.[41]

Defendants argue that while they may have agreed to join UNOI and promote its teachings, the evidence at trial does not show that they knew that UNOI's objective was to obtain forced labor and they did not use the UNOI teachings, including threats of serious harm, for the purpose of obtaining child labor.  Rassoul, for example, argues that he was a true believer and points to his membership and indoctrination into UNOI as a child.  Defendants claim that they genuinely believed that they were spreading UNOI's religious teachings, which included members' obligation to perform duty.  Defendants certainly made this argument to the jury, but the jury rejected it.  Viewed in the light most favorable to the Government, the evidence at trial viewed as a whole supports the jury's contrary finding that Defendants knew that the common goal was to obtain forced labor from UNOI members.

As described above, the evidence showed that UNOI members were taught that they must provide free labor as part of their duty to UNOI and Royall, and the concept of duty was an overarching part of UNOI's teachings at home, school, and work.  And circumstantial evidence

---

[39] *United States v. Austin*, 786 F.2d 986, 988 (10th Cir. 1986).

[40] *United States v. Murry*, 31 F.4th 1274, 1298 (10th Cir. 2022) (quoting *United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005)).

[41] *See* Doc. 1.

supports the reasonable inference that Defendants knew the concept of duty as taught by UNOI
went beyond religious principles. Members, especially minors, were isolated from the outside
world and prohibited from any unsupervised interaction with non-UNOI members (including
members of their biological family), in order to instill and maintain in them an unshakeable
belief that Royall was Allah and that their continued faithful membership in UNOI was their
ticket to salvation instead of hellfire and death. Members received weekly, if not daily,
instruction in the UNOI ideology and rules. They were taught to blindly follow the rules and
directives of UNOI leadership and the Royall Family. They were taught that "detractors" would
be punished with death.

Evidence that Defendants tried to cover up their forced labor activities also demonstrates
that they knew it was unlawful.[42] There was evidence that UNOI represented to its members that
their children would receive a quality education if sent to Kansas City for school. But the
children of UNOI worked long hours instead of receiving a proper education. UNOI, through
Defendants, falsely branded their various businesses as "extended classrooms," and they
communicated to members and the outside world that the children staffing these businesses were
learning and participating in education akin to internships. But this claim was false, and the jury
could infer from the evidence that Defendants knew it was false, given the many victims'
testimony that they worked in diners and restaurants with little sleep and for long hours, the
Kansas-City-based "University" was not licensed or accredited, and its meager curriculum did
not include traditional, state-required subjects like reading or math.[43] Increasingly, the little bit

---

[42] *United States v. Wyatt*, 964 F.3d 947, 953 (10th Cir. 2020).

[43] Elijah Muhammad testified members were taught to recognize that UNOI beliefs took priority over
traditional academic subjects and that reading and writing were "weary to the soul." Trial Tr. vol. 4 at 966:9–10
(Doc. 522). Maryum Muhammed testified that UNOI downplayed the importance of education. Trial Tr. Vol. 6 at
1386:10–1387:6 (Doc. 524).

of traditional curriculum that was provided gave way to religious studies only, designed to further indoctrinate the children. Some of the victims testified that they were pulled out of school at young ages in order to work full time. For example, Amira was pulled out of school at the age of 13; she was told that she was needed more in the bakery. Rather than leaving UNOI empowered and educated, many victims found themselves homeless, unable to get into real schools, unable to get their GEDs, and unable to find appropriate work based on their shoddy UNOI education.

There was also substantial evidence that Defendants used the "Celebration" event to recruit new members by falsely promoting UNOI as an organization dedicated to Black empowerment and promising the children education in Kansas City, Kansas. Celebration was a three-day holiday event derived from the Nation of Islam during which special foods were prepared and there was dancing and musical performances. Members were allowed to spend that time with family. Wilma and Maryum Muhammed and Niesha King testified about the differences between the UNOI portrayed at Celebration and the realities of day-to-day life. Several witnesses testified that Celebration was their first exposure to UNOI and convinced them to join. UNOI did not empower or educate its members. Rather, it took money members earned outside of UNOI for the benefit of Royall and others in positions of power, like Defendants.

Also indicative of Defendants' knowledge, Majeed and others instructed children working at restaurants to lie about their work to customers and labor officials. Majeed and Staton instructed children like Khalib Butler to lie to customers in the restaurant and say they were working in an internship under their school; and after learning that members of the public submitted complaints of child labor to local authorities, Staton instructed certain businesses to staff public-facing positions, like cashiering and serving, with adults. Majeed directed the minors to work at the New Jersey restaurant after labor officials visited because the New York

restaurant was "too hot."[44]  According to New York Department of Labor Investigator Carla Valencia, Majeed represented to her later that the minors had been sent back to Kansas, and that the school was not religious but was a not-for-profit school.

The Court also agrees with the Government that there was substantial evidence at trial that Defendants did not follow the same UNOI principles that they taught members.  A reasonable jury could infer from this evidence that Defendants understood that their tactic of imposing fear in order to obtain duty from members was more than just religious teaching, and was instead designed to obtain forced labor.  Defendants' freedom was not limited and controlled like the victims' freedom was—some Defendants drove expensive cars and lived comfortably in nice houses relative to the victims; some ate otherwise prohibited foods like chicken and pizza and enjoyed meals in non-UNOI restaurants.  Some members dressed in nicer clothing or prohibited clothing.  They were not required to attend school and perform duty both at home and in the businesses like the children were expected to.  A reasonable jury could infer that Defendants' different adherence to UNOI teachings shows that they knew the essential objective of the conspiracy was forced labor and not spreading the word of UNOI.

Defendants insist that the evidence consistently showed that they did not learn of Royall's scheme to use UNOI money for his own use, rather than for the good of the organization, until 2011, and at that point they took measures to pay members for their labor. But the jury could have viewed this evidence as further support of the knowledge element of this claim.  Even after Defendants supposedly became aware for the first time in 2011 of Royall's scheme, they continued to hold leadership roles in UNOI, continued to promote its teachings, and continued to rely on unpaid labor.  The evidence showed that even then, the UNOI members

---

[44] Trial Tr. vol. 8 at 2035:1–11 (Doc. 526).

who were compensated were not compensated consistently or fully for their labor. For example, Tymiah Kelly, one of Royall's minor grandchildren, was paid $100 per month and Amira Kelly, another minor grandchild, was paid $300 to $400 a month, in exchange for working 40 hours or more per week. Maryum Muhammed was never paid.

After determining that Royall was a fraud, the Board never ceased utilizing free child labor in UNOI's businesses. The use of unpaid labor continued throughout 2012 until UNOI was disbanded. In fact, the Board created an evaluation form for UNOI workers and there are forms in evidence demonstrating that UNOI was evaluating minor children's labor in 2011, including minors as young as 11 years old.[45] The evidence was sufficient for the jury to find beyond a reasonable doubt that Defendants knew the objective of the conspiracy was forced labor.

### c.    Knowing and Voluntary Involvement

While the Government must prove that each Defendant knowingly and voluntarily participated in the conspiracy, "[t]he law is clear a defendant need not know all the details or all the members of a conspiracy. Moreover, a defendant's participation in the conspiracy may be slight and may be inferred from the defendant's actions so long as the evidence establishes a connection to the conspiracy beyond a reasonable doubt."[46] "A jury may presume a defendant is a knowing participant in the conspiracy when he or she acts in furtherance of the objective of the conspiracy."[47]

Much of the same evidence cited in support of the second element also supports the third element that Defendants knowingly and voluntarily participated in the conspiracy. In terms of the specific Defendant's participation, there was evidence that each Defendant either personally

---

[45] Exs. 1030–1057.

[46] *United States v. Caro*, 965 F.2d 1548, 1556 (10th Cir. 1992).

[47] *United States v. Carter*, 130 F.3d 1432, 1440 (10th Cir. 1997).

participated in, or was aware of, physical and verbal abuse toward children that created the climate of fear used to obtain their forced labor, as described above. Evidence summarized below of each Defendant's overt acts in furtherance of the conspiracy also support a finding that they knowingly and voluntarily participated in the conspiracy.

Defendants argue that to the extent they engaged in physical violence, it was not tied to labor; it was a part of the UNOI religious culture and was a method of discipline in school and beyond. But this argument fails for several reasons. First, there was evidence that physical violence was used as duty-related discipline. Elijah testified about being hit with a phone book at the New York diner for arriving late; Donika and Tyneemah both testified that they were punished with fasting for failing to perform duty correctly. Tyneemah testified about paddling, including by Hadley, that she received for labor-related infractions like mixing up ingredients, spilling, and being late. Shakira Mullen testified that "every official" issued punishments to children when they made mistakes, and that she was punished with extra work that took days and weeks for burning pies when on duty at the bakery.

Second, and most importantly, the Court has already ruled in limine that the forced labor statute only requires the Government to show that Defendants secured labor either through threats of serious harm or physical restraint, or through a scheme, plan, or pattern intended to cause the victim to believe that non-performance would result in serious harm; it does not require a "quid pro quo" showing of nexus.[48] Viewing the evidence in the light most favorable to the

---

[48] Doc. 317; *see United States v. Toure*, 965 F.3d 393, 401–02 (5th Cir. 2020) (considering sufficiency of the evidence on appeal of a forced labor conviction and finding that physical acts of violence not directly tied to the victim's own labor "caused [the victim] to remain with the defendants because she faced threats of serious harm, or reasonably believed she would face serious harm, if she did not provide them with her labor and services"); *see also United States v. Kalu*, 791 F.3d 1194, 1212 (10th Cir. 2015) (considering 2008 version of the statute and holding "[t]he evidence at trial demonstrated Mr. Kalu repeatedly threatened the foreign nationals with legal action, revocation of their visas, deportation, and financial ruin, and some individuals testified he put them in fear of physical harm. These are precisely the types of threats that could 'compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid

Government, a reasonable jury could have found that there was a sufficient nexus between the physical abuse UNOI members sustained and the performance of labor—there was substantial evidence upon which the jury could find that UNOI's school and businesses were part of the same organization and any punishment suffered in the school setting created the climate of fear that caused these minors to perform labor or services against their will.[49]

### d. Interdependence

"Interdependence exists where each co-conspirator's activities constituted essential and integral steps toward the realization of a common, illicit goal."[50]  However, the Government need not show that "the coconspirators know the identities or details of each scheme or have connections with all other members of the conspiracy."[51]

Viewing the evidence in the light most favorable to the Government, a reasonable jury could find that Defendants were interdependent, each performing one or more roles that were essential to the UNOI organization and its forced labor conspiracy.  This included but was not limited to Majeed's leadership role as the second-in-command under Royall, directing UNOI officials in running its many businesses; Rassoul's role as the Supreme Minister, teaching UNOI adult and minor children the ideology and rules of UNOI and making dispatch decisions about minors; Staton's role as the CFO, overseeing marketing, public relations, and being the primary

---

incurring that harm.'"); *United States v. McIntyre*, 612 F. App'x 77, 80 (3d Cir. 2015) (explaining that coercion under § 1591(a), even before the 2008 amendments, "does not require the direct cause-and-effect connection [the defendant] posits").

[49] *See United States v. Marcus*, 487 F. Supp. 2d 289, 310 (E.D.N.Y. 2007) ("[T]he government could satisfy the second element by showing a connection between punishments imposed by the defendant and the labor or services at issue or a climate of fear that was sufficient to cause her to perform labor or services against her will."), *vacated by* 538 F.3d 97 (2d Cir. 2008), *rev'd*, 560 U.S. 258 (2010), *aff'd in part, vacated in part, remanded on other grounds*, 628 F.3d 36 (2d Cir. 2010).

[50] *United States v. Foy*, 641 F.3d 455, 465 (10th Cir. 2011) (quoting *United States v. Edwards*, 69 F.3d 419, 431 (10th Cir. 1995)).

[51] *Id.* (quoting *Edwards*, 69 F.3d at 431).

leader of "math class" where teachings were applied and discipline ordered; Hadley's role in developing and running the biodiesel lab, teaching at the University of Islam, and directly imposing discipline, including severe punishments such as "beat downs;" Aubrey's role developing business and imposing severe discipline; and Peach's role in developing and running the Wellness Centers and imposing discipline.

Defendants also shared in mutual benefits. UNOI's many businesses brought in cash that was collected in Kansas City; temples and businesses in other states paid a share of their earnings to the Kansas City headquarters. For example, Amira Kelly testified that the New York City restaurant had revenue of $10,000 to $12,000 a day. With this cash flow, unlike the UNOI minors who were forced to work long hours with food and sleep deprivation with little or no creature comforts, Defendants lived better lives under relaxed rules. Defendants lived in UNOI-owned residences with their own families, often served by free live-in labor from UNOI minors. Unlike the rank-and-file UNOI membership, Defendants had assets including nice furnishings and nicer homes, televisions, computers, and other electronics. Unlike other UNOI members, Defendants owned or had ready access to vehicles. Majeed, Rassoul, Hadley, and Staton all relied on live-in help for childcare, cooking, and cleaning. Hadley drove a Harley Davidson motorcycle. Defendants had access to credit cards and money, unlike other UNOI members, and were able to shop for themselves for food and clothing.

Unlike other UNOI members, Defendants had freedom of association, were given permission to obtain outside medical care, and had the freedom to eat meat and other foods outside of the bean soup and salad regimen prescribed to most. While rank-and-file UNOI members were directed to obtain food stamps to surrender to UNOI, Defendants used these UNOI members' food stamps to shop for whatever food items they desired. Majeed, unlike

rank-and-file UNOI members, was allowed to develop his own profit-making business selling a product called Biocoffee in UNOI establishments.

In short, all Defendants benefited in their favored status, by enjoying extra food, clothing, personal products, vehicles or access to vehicles, vacations, nice furnishings, and personal property. And none had "set duty," enjoying more freedom to accomplish their roles, without the long laborious, uncompensated hours spent by rank-and-file UNOI members. The jury could have relied on multiple witnesses' statements about these shared benefits to find that the Government established the interdependence element for each Defendant beyond a reasonable doubt.

### e.    Overt Acts

The Government only needed to prove that one of the coconspirators commited an overt act in furtherance of the conspiracy.[52] Nonetheless, the Court finds that a reasonable jury, viewing the evidence in the light most favorable to the Government, could conclude that each Defendant committed overt acts in furtherance of the conspiracy, as set forth below.[53]

### i.    Majeed

There was evidence at trial that Majeed himself imposed punishments, including "beatdowns." He disciplined minor UNOI members Stephon and Leif Jamil Muhammad by punching them. He ordered in math class that Amira Kelly be disciplined, and participated in conference calls that discussed how to discipline Amira Kelly and where to "dispatch" her and other minors to work in UNOI businesses. Majeed denied Niesha King's requests to speak with her family, and told Amira Kelly and her sisters that they needed to be separated and dispatched

---

[52] *United States v. Thompson*, 518 F.3d 832, 854 (10th Cir. 2008).

[53] This list is a summary; the Court will not catalogue every overt act by Defendants.

to separate locations.  Majeed ordered that Devon Young and Atim Muhammad be disciplined with fasting, disciplined Aubrey for wearing non-sanctioned clothing, and punished Maryum Muhammed for refusing to take care of his children.  He dispatched Elijah Muhammed to the farm as punishment for breaking the chain of command by snitching on Majeed for breaking a rule.  In 2011, Majeed sent an email to UNOI members that they were to shun Amira Kelly.  He picked up minors working at the New York City restaurant to evade detection by New York Department of Labor personnel investigating wage and hour violations, and directed UNOI minors what to say to Department of Labor personnel in order to avoid them finding out that they were violating wage and hour laws.  He collected money from UNOI restaurants and managed the UNOI gas station in Kansas City.  Majeed also conducted a "courtship hearing" for Doneika Dempsey and Juan Delarosa ahead of their arranged marriage.  Majeed was on the Board of Directors at the end of the conspiracy, which a reasonable jury could find perpetuated the forced labor conspiracy even after learning about the full extent of Royall's fraud.  Under Majeed's leadership, UNOI continued to take advantage of forced labor by minors, and while there was some testimony that the Board encouraged some of the children to return to public school, it denied that opportunity to others.[54]

Majeed points to evidence that when he and the other Board members learned in September of 2011 that Royall was a fraud, they told members that they were free to leave the organization without repercussion.  But, as the former Board member witnesses all admitted, they did not tell the members what they had supposedly just learned about Royall—that he was not Allah, but was a fraud and had used UNOI's money for his own personal gratification.  In January 2012, Staton gave instructions to another member about monitoring the Cheerful Giving

---

[54] *See, e.g.*, Ex. 2085.

account.  The Board was trying to separate UNOI from the restaurant entities, putting their names on the registered entities.  They planned to create Food for Life Supreme as a separate entity that could then donate its profits to UNOI.  They continued to send Royall a stipend.  They maintained ownership of UNOI property, including vehicles.  They did not in fact help all members who sought help, and some who merely sought documentation in order to enroll in school or get a job, were rejected.  In October 2012, the Board finally started to sell UNOI property and vehicles.  It was not until January of 2013 that the Board sent an email to members telling them that they were relieved and UNOI no longer exists.  They did not remove children from working in the UNOI or Food for Life businesses prior to January 2013.

### ii.    Rassoul

There was evidence at trial that Rassoul discussed discipline on national conference calls. Amira Kelly testified that when she was eight years old, Rassoul drove her home after she passed out working at UNOI's restaurant in Connecticut while working "extra duty" and fasting as punishment.  She also testified that Rassoul made her return to work the next day despite still suffering head pain.  Rassoul and Majeed together made the decision to split up Amira and her sisters in New Jersey in 2009.  And Rassoul regularly participated in national phone calls with UNOI leaders where they discussed dispatching youth and discipline decisions.

There was evidence that Rassoul ordered discipline in math class, ordered all UNOI members except the Royall Family to undergo evaluations and clearings during the so-called "90-day period," ran some math classes, utilized Tyneemah Jenkins' live-in labor in his home when she was 9 years old, participated in banishing Tyneemah to a youth group home in 2009, transported Amira Kelly to North Carolina during the 90-day period, managed the bakery in Connecticut, preached and taught in his role as national youth minister and later Supreme Minister, and headed UNOI's Connecticut temple.  Rassoul was on the Board of Directors at the

end of the conspiracy, which a reasonable jury could find helped prolong the forced labor conspiracy. Under the Board's leadership, UNOI continued to rely on forced labor, even if there were some instances where members were paid inconsistently.

Rassoul insists that the only illegality he knew about was a possible tax law violation, and he immediately took steps to split up the organization once he learned about it. But a reasonable jury could conclude that Rassoul took the above overt acts in furtherance of the conspiracy, even if he did not understand its full scope. He was part of the day-to-day decision making, especially after September 2011. As discussed in detail above, a reasonable jury could conclude that, instead of immediately shutting down the organization, Rassoul and others agreed to continue presenting UNOI as a legitimate religious organization, and failed to end forced labor.

### iii.    Staton

Staton imposed paddling and fasting as discipline of Devon Young, physically punished minor Tyneemah Jenkins, punished Niesha King by denying her access to her asthma inhaler while she was working as a live-in laborer in his home in 2002-2003, and physically punished Shakira Mullen when she was working as his maid.

Staton "tutored" Greenwell when she was advised she was demon-possessed, taught UNOI members Greenwell's mother had died in part because Greenwell was demon-possessed and her sister had left UNOI. Staton participated in a conference "clearing" call with Amira Kelly.

He was the "math man" and in that role, he presented scenarios, berated UNOI members for the slightest infractions, and imposed discipline including threatening many UNOI members that they would not make it on the spaceship. He kicked an adult male out of UNOI for being overweight.

Staton discussed discipline on national conference calls, including directing on one call that only those 18 years or older could work in the New York City restaurant because of the Department of Labor investigation. Staton told Khalib Butler to lie and tell Department of Laborer investigators that he was there on a student internship.

Staton's additional overt acts include transporting Elijah Muhammed on a dispatch from Atlanta to Kansas City; collecting monies from UNOI businesses; participating in starting new UNOI temples; compiling UNOI's Laborer's Guide and other publications; designing UNOI's website; and managing UNOI's money and members' identity documents during the many years he headed the national "Secretarial Department."

### iv.    Hadley

As the defacto head of the University of Islam, Hadley was primarily known as the disciplinarian. He taught math and science at the school, and developed and ran the biodiesel fuel lab where he also instructed minors how to make biodiesel. He led minor children on camping and swimming expeditions.

Hadley imposed severe discipline to multiple minor victims including making them hold sandbags for prolonged periods and beatdowns; paddled Niesha King and Atim Muhammad while on a camping trip; threatened to beat Maryum Muhammed; paddled Devon Young who still bears the scars; beat up Jalil causing observable physical injuries; paddled Tyneemah Jenkins in the boiler room at the school building; imposed pushups as a punishment for Khalib Butler; beat a UNOI teen in 2004 and 2005 so severely his face was swollen and unrecognizable; beat Khalib Butler in the UNOI supermarket; imposed a chest cavity (punch to chest) on Dubois rendering him unconscious; and held Devon Young over a bridge, threatening to drop him on the train tracks below. Several witnesses discussed the fear that Hadley's actions caused them.

Hadley insists his role in UNOI was akin to a Catholic school principal, who might impose harsh discipline without a broader intent to commit forced labor.  The Court is not persuaded by the analogy.  While UNOI functioned due to the culture of fear that Defendants all participated in, the evidence when viewed the light most favorable to the Government showed that Hadley was a particularly harsh disciplinarian.  Some witnesses testified that he appeared to enjoy physically disciplining children.  And the consistent and brutal accounts of this discipline could convince a reasonable jury beyond a reasonable doubt that Hadley was not simply enforcing discipline based on his religious principles, but instead intended to impose fear in the children so that they would perform unpaid labor in leaders' homes and in UNOI businesses.

### v.    Aubrey

Aubrey disciplined Devon Young with Hadley by holding him over a bridge, threatening to drop him on the train tracks below; he ordered beatdowns; imposed beatdowns, neck smack, and a chest cavity on Elijah Muhammed; imposed a beatdown of a UNOI member named Philip Bledsoe; directed a chest cavity of Steven 2X; and threatened Maryum Muhammed and others in classes he taught that bad things happen to those who leave UNOI.  Kinard testified that Aubrey was in and out of UNOI frequently, and that he returned for some period after being "put out" in 2008 by Royall.  By 2014, he was on a national tour with Royall promoting new religious organizations with him.

### vi.    Peach

Peach directed Amira to do unpaid housework in New Jersey, including cooking, cleaning, taking care of children, and laundry.  Peach paddled minor females, including nine-year-old Tyneemah Jenkins and Amira Kelly; disciplined Tyneemah for having a seizure and locked her in the boiler room; imposed fasting and colonics as treatments; imposed twice-weekly colonics to punish Amira; threatened Amira that she would suffer the same fate as her mother

Moreen Jenkins, who died after being excommunicated; paddled Stacy Gordon 18 times in New Jersey after accusing her of bringing a demon into the house; repeatedly disciplined Tyneemah while she was serving as a live-in maid at Peach's home; ran Wellness Centers; and came to New York and New Jersey to tighten up business operations there.  Amira testified that she saw Peach handle bank deposits for UNOI—Peach and Staton were two of the very few people allowed into the vault in the secretarial department.

### 2. Counts 2–3 and 6–8: Majeed's Substantive Forced Labor Convictions

Majeed alone was convicted of the substantive forced labor charges in Counts 2, 3, 6, 7 and 8, which also charged aiding and abetting as a basis for liability.  The jury acquitted Majeed on Count 4.  Majeed moves for judgment of acquittal on the substantive forced labor convictions on the basis of insufficient evidence.

The elements of forced labor are:

> (1) the defendant obtained the labor or services of another person; (2) the defendant did so through one of the following prohibited means (a) through threats of serious harm to, or physical restraint against that person or any other person; or (b) through a scheme, plan or pattern intended to cause the person to believe that non-performance would result in serious harm to, or physical restraint against, that person or any other person; or (c) through the abuse or threatened abuse of the law or the legal process; and (3) that the defendant acted knowingly.[55]

As the Court has previously ruled, a "climate of fear" that coerces victims into performing labor satisfies the means element of the offense under both the forced labor statute and the sex trafficking provision of the TCPA,[56] which was passed at the same time and contains a definition

---

[55] *United States v. Sabhnani*, 539 F. Supp. 2d 617, 629 (E.D.N.Y. 2008), *aff'd*, 599 F.3d 215 (2d Cir. 2010); *see also* 18 U.S.C. § 1589 (2000); *United States v. Bello*, 503 F. App'x 910, 915 (11th Cir. 2013).  The 2000 version of the forced labor statute applies to these counts of conviction.  *See* Doc. 206 at 15–17.

[56] 18 U.S.C. § 1591; *see Roe v. Howard*, 917 F.3d 229, 235–36 (4th Cir. 2019) (explaining that Congress created forced labor and sex trafficking offenses as part of the TVPA).

of coercion that tracks the language of the means element of the forced labor statute.[57]  And a reasonable person standard applies to the "serious harm" component of the statute's means, which takes into account the victim's "special vulnerabilities," such as age.[58]

### a.     Count 2: Amira Kelly

Count 2 concerns minor victim Amira Kelly, who was born in 1990.  She testified extensively at trial.  She testified that Majeed knowingly obtained her labor or services through the culture of fear Majeed and others utilized through UNOI.  She testified that she worked without compensation for UNOI in Kansas City, New York, New Jersey, North Carolina, Ohio, and Connecticut.  She began working in UNOI businesses at the age of 7 or 8, first being assigned to work in the UNOI supermarket in Kansas City.  She worked in Peach's home at the age of 11, providing childcare.  At the ages of 12 and 13 she worked for Staton in the "Secretarial Department" of UNOI in Kansas City.  In 2003, she worked for Rassoul in the UNOI bakery in Connecticut.  She worked for Majeed in the New York and New Jersey

---

[57] *See, e.g.*, *United States v. Wilkins*, 538 F. Supp. 3d 49, 72 (D.D.C. 2021) (considering sex trafficking statute, 18 U.S.C. § 1591, and explaining that "[w]hen evaluating if a defendant exerted coercive force over a complainant, juries are thus directed to evaluate the totality of a defendant's conduct toward a trafficking victim, including any threats or specific instances of past violence that may have created a 'culture of fear' such that the victim's conduct was rendered involuntary"); *United States v. Aman*, No. 19-CR-85, 2022 WL 3371320, at *12 (E.D. Va. Aug. 16, 2022) (finding evidence of abuse, even if not explicitly connected to the labor provided, contributed to climate of fear used to coerce victim into labor); *United States v. Wysinger*, No. 17-CR-00022, 2018 WL 4956515, at *4 (W.D. Va. Oct. 12, 2018) (explaining that evidence of threats "is relevant to show the climate of fear [the defendant] created, which goes directly to the element that he used threats and coercion to get women working for him in prostitution and to intimidate them from reporting him to the police, as referenced in the indictment"); *Marcus v. United States*, No. 14-CV-5780, 2015 WL 3869689, at *10  (E.D.N.Y. June 22, 2015) (considering in the context of an ineffective assistance claim, trial counsel's failure to object to certain "climate of fear" evidence that the government relied on to prove the means element of the offense, and explaining how it "was necessary and appropriate to explain" why the plaintiff stayed with the petitioner and engaged in labor); *United States v. Askarkhodjaev*, No. 04-CR-W-ODS, 2010 WL 11541630, at *2 (W.D. Mo. Oct. 12, 2010) (finding "climate of fear" evidence beyond expert testimony on forced labor charge would not be cumulative); *United States v. Kelly*, No. 07-CR-374, 2008 WL 5068820, at *6 (E.D.N.Y. July 10, 2008) (collecting cases).

[58] *See, e.g.*, *United States v. Calimlim*, 538 F.3d 706, 713 (7th Cir. 2008) ("A statement is a threat if a reasonable person would believe that the intended audience would receive it as a threat, regardless of whether the statement was intended to be carried out."); *United States v. Bradley*, 390 F.3d 145, 153 (1st Cir. 2004) (finding no plain error with a jury instruction stating objective test for fear of serious harm that is "reasonable for an individual with [the person's] special vulnerabilities"), *judgment vacated on other grounds*, 545 U.S. 1101 (2005).

restaurants at ages 17 and 18. At various times she also worked in UNOI's carryout restaurants in Ohio and North Carolina.

Viewing the evidence in the light most favorable to the Government, Amira did not work consensually; she was forced to work for UNOI and continued to work because of the climate of fear and coercion created and maintained by Majeed, the other Defendants, and officials and leadership of UNOI. She endured multiple punishments that included physical and psychological abuse. As outlined above in the section on overt acts, Amira had multiple interactions with Majeed, in addition to working for him in New Jersey and New York. In 2009 or 2010, Majeed and Rassoul split up Amira and her sisters, dispatching them to different states to isolate them from one another. Amira testified that Majeed and others publicly humiliated her in math class. In 2009, when Amira was 18 or 19, Majeed participated in a conference call regarding Amira having a "clearing" from being demon-possessed. And in September 2011, Majeed directed Kinard to shun Amira.[59] Majeed forced Amira to work as a minor and aided and abetted others who forced her to work. Thus, this evidence when viewed in the light most favorable to the Government supports Majeed's conviction on Count 2, directly and for aiding and abetting.

### b.        Count 3: Tymiah Kelly

Count 3 concerns minor victim Tymiah Kelly, Amira's sister, who was born in 1992. She worked without compensation in Kansas City, Ohio, Michigan, Alabama, North Carolina, New Jersey, Georgia, and Connecticut, before she left UNOI in February 2012, at the age of 20. She began working at the age of 8 in the bakery in Kansas City, which was managed at that time

---

[59] Ex. 400-68.

by Rassoul.  In Kansas City she also worked at UNOI's sewing factory and the "Secretarial Department."

Viewing the evidence in the light most favorable to the Government, Tymiah did not work consensually; she was forced to work for UNOI and continued to work because of the climate of fear and coercion created and maintained by Majeed, the other Defendants and officials and leadership of UNOI.  She endured multiple punishments, and physical and psychological abuse, including after Rassoul announced at a 2011 temple meeting that Tymiah was a detractor, in retaliation for Tymiah reporting Majeed for violating a rule.  As outlined in the section on overt acts, Tymiah had multiple interactions with Majeed.  In New Jersey, she worked for Majeed at the restaurant and also performed household labor for him.  He isolated her from her sister, Amira.  And Majeed also isolated her from her mother Moreen Jenkins, blocking Moreen's access to her.  This evidence when viewed in the light most favorable to the Government supports Majeed's conviction on Count 3, both directly and as an aider and abettor.

### c.    Count 6: Kendra Ross

Count 6 concerns minor victim Kendra Ross, who was born in 1991 and worked without compensation from 2001 until she left UNOI in November 2012.  Ross worked in Kansas City, Georgia, New York, New Jersey, and Ohio.  She began working at the age of 8 or 9 in Georgia on fundraisers.  At the age of 11 she began working at the supermarket in Kansas City and at the age of 12 she worked in the bakery in Kansas City.  At age 15 she was assigned to work full time at a UNOI diner while simultaneously providing household labor and childcare.  At age 16 she worked in the restaurant in Atlanta, Georgia.  At age 16 to 17 she was back working in the bakery in Kansas City.  At age 17 she was dispatched to New York and New Jersey where she worked for Majeed, sometimes working double shifts at the restaurant, on top of her other

household and childcare duties.  Majeed coached Kendra what to say in response to questions from the Department of Labor investigators.

Viewing the evidence in the light most favorable to the Government, Kendra did not work consensually; she was forced to work for UNOI and continued to work because of the climate of fear and coercion created and maintained by Majeed, the other Defendants, and officials and leadership of UNOI.  She endured physical and psychological abuse, including being publicly humiliated in math class, being physically punished by Hadley's wife, and having her body inspected by Hadley and his wife.  This evidence when viewed in the light most favorable to the Government, supports Majeed's conviction on Count 6, both directly and as an aider and abettor.

### d.      Count 7: Elijah Muhammed

Count 7 concerns minor victim Elijah Muhammed who was born in 1990 and worked without compensation from 2002 until he left UNOI in November 2011.  Elijah worked in Kansas City, New York, New Jersey, Maryland, Ohio, and Georgia.  He began working at the age of 12.  In 2003, he worked for Majeed at the gas station in Kansas City.  In 2005, he worked for Hadley in the biodiesel lab in Kansas City.  He also worked in the Ohio carryout restaurant, the Atlanta restaurant, and doing painting and lawn care work for UNOI in Kansas City.  He worked for Majeed in the New York and New Jersey restaurants, and Majeed managed the barracks where Elijah resided.

Viewing the evidence in the light most favorable to the Government, Elijah did not work consensually; he was forced to work for UNOI and continued to work because of the climate of fear and coercion created and maintained by Majeed, the other Defendants, and officials and leadership of UNOI.  Elijah could not rely on his parents for assistance even when he talked to them in monitored phone calls; his parents were firmly entrenched as faithful and allegiant

members of UNOI.  Elijah endured multiple punishments from Majeed, Aubrey, and Hadley, including physical and psychological abuse.  This evidence when viewed in the light most favorable to the Government supports Majeed's conviction on Count 7, both directly and as an aider and abettor.

### e.    Count 8: Niesha King

Count 8 concerns minor victim Niesha King who was born in 1994.  She worked from the age of 8 until she left UNOI at the age of 17 or 18, in Kansas City, Ohio, New York, and New Jersey.  She began working at age 8 in the sewing factory and biodiesel lab in Kansas City. She performed live-in household labor and childcare at various times for Staton and for Akiba Majeed.   She worked for Defendant Majeed in the New York and New Jersey restaurants, and he coached her to lie about her age to Department of Labor investigators.

Viewing the evidence in the light most favorable to the Government, Niesha did not work consensually; she was forced to work for UNOI and continued to work because of the climate of fear and coercion created and maintained by Majeed, the other Defendants, and officials  and leadership of UNOI.  Niesha endured multiple punishments, including Staton denying her a prescribed asthma inhaler during a severe asthma attack and taunting her by calling her demon-possessed.  Hadley paddled her on the "camping trip from hell."  Niesha was also in fear and under coercion by virtue of witnessing severe physical punishment of others, including Hadley administering a beatdown of an unknown male, and on a separate occasion, dragging Khalib into the back room of the supermarket and beating him.  This evidence when viewed in the light most favorable to the Government supports Majeed's conviction on Count 8, both directly and as an aider and abettor.

### B.    Motions for New Trial

#### 1.    Weight of the Evidence

##### a.    Witness Credibility

Defendants first move for a new trial on the basis that even if the verdicts were based on legally sufficient evidence, they were against the weight of the evidence.  Defendants argue that the evidence preponderates in their favor because several of the victim-witnesses either perjured themselves or presented unreliable testimony due to inconsistencies or lack of corroboration. Specifically, Defendants ask the Court to order a new trial based on what they deem obvious problems with the following witnesses' testimony: Elijah Muhammed, Niesha King, Devon Young, Etenia Kinard, and Tyneemah Jenkins.  Defendants argue that: (1) because most of these witnesses testified about matters that occurred when they were children many years ago, their testimony is inherently weak and the Court should determine they are not credible; (2) defense witnesses testified that certain victims had a reputation for dishonesty; (3) some of their testimony was contradicted by other witnesses; (4) some of their testimony was not plausible; and (5) some of their testimony conflicted with or was missing from prior statements they gave to the FBI.  They go on to argue that Niesha King's and Etenia Kinard's testimony was perjurious.

The Court has considered each of these witnesses' credibility and weighed the evidence as "the thirteenth juror."[60]  In doing so, the Court determines that this is not the exceptional case where the evidence preponderates against the jury's verdicts necessitating a new trial.  First, the Court agrees with the Government that Defendants only address 5 out of 18 witnesses that the Government called at trial, and there were hundreds of exhibits that also supported the verdicts.

---

[60] *See United States v. Lopez*, 576 F.2d 840, 845 n.1 (10th Cir. 1978).

Second, inconsistencies and lack of corroboration do not dictate a finding that testimony cannot be believed, nor does it mandate a finding that a miscarriage of justice occurred.[61]  The fact that these victims were testifying as adults about events that occurred many years before when they were children was fully explored by both parties.  To be sure, defense counsel repeatedly attempted to box the witnesses into specific dates and times during cross-examination. But the evidence showed that these children were repeatedly moved around the country to different temples, and that as part of the "depersonalization" of UNOI, they did not celebrate birthdays.  Thus, the witnesses were often unable to recall exact dates or even ages when certain events occurred.  They did their best to use other landmarks, such as 9/11, to estimate when certain events happened.[62]  The Court will not discount their testimony on this basis, particularly since their testimony was generally consistent with one another and with other victims, and corroborated by documents in the record.

Third, the jury could have easily parsed through the victims' testimony and determined that there were facts or details about which they were mistaken while not finding them to be wholly incredible.  Each witness admitted that their ability to recall specific dates was made difficult with the passage of time, and the Court finds them to be believable on this point; they often admitted when they were unsure about a memory or a detail in their testimony.  And to the extent there were inconsistencies or lack of corroboration, the Court does not wholly discount their testimony as a result.  As but one example, several Defendants challenge Elijah's testimony about witnessing chest cavities in math class as untruthful, citing other witnesses' testimony that they were not aware of chest cavities.  While it may be true that Kinard did not recall chest

---

[61] *Tapia v. Tansy*, 926 F.2d 1554, 1562 (10th Cir. 1991) ("Contradictions and changes in a witness's testimony alone do not constitute perjury.").

[62] *See* Trial Tr., vol. 4 at 850:19–24 (Doc. 522).

cavities, other witnesses did such as Greenwell, Maryum Muhammed, and Devon Young, who corroborated Elijah's testimony. It was well within the jury's province to credit these witnesses and the Court does not find grounds to disturb that finding.

Fourth, as the Court repeatedly ruled during trial, that certain facts testified to did not appear in a witness's prior statement(s) to the FBI does not mean that the jury was required to discount it. Defense counsel could and did point out when the witnesses' prior statements in the FBI Form 302 memos were either inconsistent with their trial testimony, or did not include details or information presented at trial. When there was an inconsistency, the defense was permitted to impeach. But, as the Court repeatedly ruled, these statements could only be used for impeachment if there was an inconsistent statement; impeachment was not permissible if there was new information offered at trial that was not included in the earlier Form 302.[63]

One of the few inconsistencies identified was between Devon Young's testimony about being held over railroad tracks and beaten during math class by Aubrey and Hadley after he refused to admit to stealing a salmon sandwich from the restaurant where he was working. His trial testimony was that he did not recall exactly what year it was, but he thought he was 12 or 13 years old when it happened and he believed it happened in Maryland. The 302 summary from 2021 indicated that he was in Kansas when this happened, and that he was put on a fast after the railroad incident, not that he was paddled. And in the 302, Devon indicated that he was 9 years old. While these are certainly discrepancies, the Court ruled during trial that they are not irreconcilable, requiring appointment of an attorney. Indeed, Devon explained during trial that in his mind, many of the events ran together and he had difficulty remembering the timeline; he

---

[63] *See United States v. White*, 68 F. App'x 870, 873 (10th Cir. 2003) ("Under Rule 613(b), extrinsic evidence of a prior inconsistent statement may be introduced to impeach a prior witness' testimony, but may not be used as substantive evidence.").

testified that he did not remember what year it was, and he did not recall telling Agent Ramana that the incident happened in Kansas. While this prior inconsistent statement was admissible to show that Devon told Agent Ramana that this event occurred in Kansas at around age 9 on a prior occasion, neither the jury nor the Court may consider it as substantive evidence of the truth of the matter asserted.[64] Like the jury, this Court believes Devon Young's trial testimony, which recalled what was clearly a traumatic event from his childhood.[65] He testified as much, and admitted that he did not remember all of the details after working hard over the years to put the event behind him. Devon made clear that he did not want to testify, particularly against Aubrey—he messaged Aubrey on Instagram just before he testified telling him he did not want to testify. The Court cannot find that he was motivated to lie.

Fifth, Defendants point to character evidence about Elijah Muhammad, Niesha King, and Tyneemah Jenkins—defense witnesses testified that they had a propensity for not telling the truth—but the Court does not discount their testimony on this basis. The Court was not persuaded by the defense witnesses' opinions on their propensity for untruthfulness because they all had a personal interest in asserting such opinions.

For example, Kaleb Glass testified that his daughter Tyneemah had a reputation for untruthfulness. But the Court found her testimony to be credible that she suffered horrific emotional and physical abuse by members of UNOI, which if believed, does not reflect well on her parents. Given Kaleb Glass's loyalty to Royall and Majeed, and his estrangement from Tyneemah for many years after she left UNOI, he was motivated to paint her testimony as

---

[64] *United States v. Carter*, 973 F.2d 1509, 1512 (10th Cir. 1992).

[65] Indeed, his testimony was corroborated in part by Shakira Mullen, who testified that she remembered Devon being brought to the mic by Aubrey, Hadley, and Majeed during math class for stealing food and then put on disciplinary action.

untruthful. Moreover, given his failure to even be able to identify her birthdate, the Court is not persuaded that he knew his daughter well at all.

Akiba Majeed testified that Niesha King had a reputation for dishonesty. But their testimony directly conflicted about certain events. While there were certain parts of Niesha's testimony that appeared to be embellished at times, the Court found her testimony overall to be highly credible and corroborated by other evidence in the record. Her experience working both in UNOI's businesses and in its leaders' homes was consistent with other female victims' experiences. Her experiences with discipline was consistent with other victims'. Her testimony about UNOI's disapproval of mainstream medicine was consistent with other victims'. While Atim disclaimed Niesha's story about being beaten by Hadley on a camping trip, the Court does not find her testimony on this point to be wholly unbelievable. The Court found credible Niesha's testimony about the shame the male UNOI members in particular felt when disciplined, which could have motivated Atim to either downplay or misremember that event, particularly given his testimony that he was close with Majeed. Atim admitted being close with Rassoul's family and Majeed. And, again, witnesses' failure to recount certain events to the FBI prior to their trial testimony does not render them wholly incredible. The Court is mindful that these victims were testifying about childhood trauma, which is often remembered in pieces. It is not uncommon for a person to remember more details from their childhood upon further reflection.

Some witnesses testified about Elijah's reputation for dishonesty, but again, the Court finds that these witnesses had a vested interest in undermining his credibility. Defense witnesses in particular harbored animosity toward Elijah for publicizing his criticism of UNOI after he left, including by appearing in a documentary that was critical of the organization and by allegedly "recruiting" victims to speak to the FBI about this case. Rayshawn Davis testified about Elijah's reputation for dishonesty and his opinion that Elijah was dishonest. But he admitted during cross

examination that he is friends with Aubrey, cares about him, and does not want to see anything bad happen to him.  He also admitted that Elijah had reported his transgressions to UNOI officials years ago—a practice that multiple witnesses testified was encouraged by UNOI leadership.  Romella Jenkins testified about Elijah's reputation for dishonesty, but she admitted that she never worked in UNOI restaurants with him, and she was wholly unaware of how he testified at trial.  The Court does not discount Elijah's testimony based on this character evidence.

Aubrey argues that Khalib Butler's testimony contradicts Elijah's account that Aubrey ordered a beatdown of Philip Bledsoe.  Khalib testified that the incident occurred in 2000, not in 2002 when Elijah said it occurred, at which time Elijah was in Ohio and not in Kansas where the incident occurred.  But again, the Court declines to find a witness's testimony to be incredible because of timeline mistakes and their difficulty to recall with specificity the year something occurred.  Moreover, Khalib also testified that he witnessed beatdowns by both Majeed and Aubrey; thus, his testimony was not inconsistent with Elijah's testimony on this point.

Finally, to the extent Defendants assert that Niesha King and Kinard committed perjury in their testimony, they fall short.  "Contradictions and changes in a witness's testimony alone do not constitute perjury."[66]  "Perjury occurs when a witness willfully and falsely swears to a material fact upon oath before a court."[67]  The Court cannot find that Niesha King willfully and falsely testified at trial about a material issue.  She testified about events that occurred when she was a child many years ago.  The Government established at the beginning of each victim-witness's testimony that it would be based on childhood memories after a long passage of time.

---

[66] *Tapia v. Tansy*, 926 F.2d 1554, 1563 (10th Cir. 1991).

[67] *Skepnek v. Roper & Twardowsky, LLC*, No. 11-04102-DDC, 2017 WL 3970778, at *6 (D. Kan. Sept. 8, 2017).

Defense counsel was able to fully cross-examine them about the limitations of their memory and point to contradictory testimony.

While there were some inconsistencies and contradictions, much of Niesha King's testimony about UNOI and Defendants was credible and corroborated by others; specifically, testimony about the hours she worked, the types of labor she was expected to perform, fasting, education, and the climate of fear imposed on children in UNOI. The Court does not find that Niesha King perjured herself at trial, and further finds her testimony overall to be credible.

Likewise, the Court does not find that Kinard perjured herself when she testified about Aubrey's role in the conspiracy and that he returned to UNOI after being publicly turned out by Royall in 2008. The mere fact that she is a cooperating Defendant does not require this Court to discount her testimony. Defendants rely on Majeed's testimony that it was "literally impossible" for Aubrey to have been allowed back into UNOI after Royall turned him out. But the Court finds that the jury could have properly determined that Kinard was more credible on this point than Majeed and therefore cannot find that this testimony was perjurious.

In sum, the Court finds that any holes, inconsistencies, or lack of corroboration in these victim witnesses' testimony do not demonstrate that a miscarriage of justice occurred necessitating a new trial. They do not call into question the entirety of their testimony, or suggest that an event did not happen. And they certainly do not amount to the witnesses being "caught in untruths o[r] half-truths on cross examination" as Rassoul states in his new trial motion.[68] The Court has considered each identified witness's testimony and determined it to be believable overall, and chalks up any inconsistencies to the passage of time and the fact that most of them were testifying about childhood memories despite UNOI's failure to provide them with

---

[68] Doc. 558 at 5.

the benchmarks of time that are available to most people—age and grade in school. Their testimony was generally consistent with one another and with other evidence in the record and the Court is not persuaded that the defense witnesses who called their reputations for honesty into question are credible. The Court does not find that the evidence preponderates in Defendants' favor on the basis of witness credibility.

### b.    Substantive Count Acquittals

Next, Rassoul and Staton argue that their acquittals on the substantive counts call into question the weight of the evidence on the conspiracy count convictions.[69] Rassoul and Staton were acquitted on all substantive counts alleged against them. Specifically, they were both acquitted on Counts 2 (Amira Kelly), and 3 (Tymiah Kelly). Staton was also acquitted on Counts 4 (Doneika Dempsey), 6 (Kendra Ross), 7 (Elijah Muhammed), and 8 (Niesha King). They both argue that under Tenth Circuit law, a new trial may be warranted on a conspiracy count where the defendant is acquitted on the underlying substantive counts. The Government argues that there was sufficient evidence of conspiracy against Rassoul and Staton to commit forced labor despite the substantive acquittals. It argues that the conspiracy involved many more victims than those identified in the seven substantive counts charged, and it distinguishes the cases cited by Defendants to support their arguments that the substantive offense acquittals necessitate a new trial on the conspiracy charge. The Court agrees with the Government that the substantive count acquittals do not weaken the evidence on the conspiracy counts such that a new trial is warranted.

---

[69] Peach also suggests in her new trial motion that, to the extent her liability on the conspiracy count is premised on Amira Kelly's testimony, its weight is limited since she was acquitted of the substantive count charging her with obtaining Amira's forced labor. Doc. 563 at 20. The Court's analysis as to Rassoul and Staton applies equally to Peach.

The law is clear that "[o]ne can be guilty of a conspiracy to commit an offense without committing the substantive offense itself."[70]  Defendants rely on two Tenth Circuit cases where new trials were warranted after juries returned guilty verdicts on the conspiracy counts and argue that, like in those cases, a new trial is warranted here given the jury's substantive count acquittals.[71]

In *Lake*, the Tenth Circuit found there was insufficient evidence to support substantive count convictions for wire fraud, money laundering, and circumvention of internal controls based on the court's failure to instruct the jury on underlying SEC filing requirements that formed the basis of those charges.[72]  The court in turn determined that the jury could not have considered the conspiracy conviction without being informed about the SEC requirements that pertained to the substantive offenses.[73]  It therefore set aside the conspiracy convictions and ordered a new trial.[74]

Defendants also rely on the unpublished decision in *United States v. Medeiros*, where the jury convicted two defendants of conspiracy to defraud the United States, major fraud against the United States, and false statements.[75]  The district court granted a motion for judgment of acquittal on the substantive counts and a new trial on the conspiracy counts.[76]  The Tenth Circuit found no abuse of discretion in the trial court's decision to order a new trial on the conspiracy count.[77]  The court determined that the scope of the conspiracy count overlapped with the

---

[70] *United States v. Lake*, 472 F.3d 1247, 1263 (10th Cir. 2007); *United States v. Horn*, 946 F.2d 738, 745 (10th Cir. 1991).

[71] *United States v. Medeiros*, No. 23-2019, 2023 WL 8752921, at *6, *10 (10th Cir. Dec. 19, 2023); *Lake*, 472 F.3d at 1263.

[72] *Lake*, 472 F.3d at 1263.

[73] *Id.*

[74] *Id.*

[75] *Medeiros*, 2023 WL 8752921, at *1.

[76] *Id.*

[77] *Id.* at *10.

substantive counts, such that the acquittals lightened the weight of the evidence on the conspiracy count.[78]  Also, in *Medeiros*, the indictment alleged nine overt acts and, as in this case, there was no special verdict that specified which overt act(s) the jury relied on to convict the defendants on the conspiracy charge.[79]  The court reviewed the overt acts alleged in the indictment and found that the substantive count acquittals affected the weight of the evidence that each of the nine overt acts furthered the conspiracy's objectives.[80]  Thus, the Tenth Circuit determined that the district court did not error in ordering a new trial.[81]

This case is distinguishable from *Lake* and *Meideros*.  Here, the conspiracy alleged in the Indictment was far broader than the substantive count allegations, which each focused on a single victim.  And the conspiracy count did not hinge on evidence that supported each of the substantive counts.  The Government presented evidence of a far-reaching conspiracy that targeted most full-time members of UNOI and their children.  Amira testified that at the height of its membership, UNOI had more than 3,000–4,000 members; at one point, there were at least 42 youth in Kansas City alone.  The evidence supported that Defendants used UNOI's religious tenants to create a climate of fear to obtain forced labor from minors.  And the conspiracy evidence went well beyond the victims named in the substantive counts of the Indictment that the jury acquitted on, distinguishing this case from *Lake*.

Also, unlike *Meideros*, there were several overt acts alleged in the Indictment that were not dependent on the substantive counts on which Defendants were acquitted.  And several overt acts were alleged to have been committed by Majeed, who was convicted on several of the

---

[78] *Id.* at *6–7.

[79] *Medeiros*, 2023 WL 8752921, at *8.

[80] *Id.*

[81] *Id.*

substantive counts.  The Government only needed to prove that one of the conspirators committed an overt act in furtherance of the conspiracy.[82]  For the same reasons set forth in the Court's discussion of the Rule 29 motion, the Government's evidence supported this showing. *Medeiros* is thus distinguishable and does not persuade the Court that a new trial is warranted here.

Defendants also suggest that because these Defendants were acquitted of aiding and abetting on the substantive counts the evidence is weaker and therefore preponderates in their favor on the conspiracy count.  But this is not the law.  Aiding and abetting liability is premised on the defendant being a principal, not a conspirator.[83]  "An aider or abettor is one who 'consciously shares in a criminal act,' and such person is to be punished as a principal, 'regardless of the existence of a conspiracy.'"[84]  In contrast, "the charge of conspiracy requires proof not essential to the convictions on the substantive offenses—proof of an agreement to commit an offense against the United States—and it cannot be said that the substantive offenses and the conspiracy are identical, any more than that the two substantive offenses are identical."[85] In other words, Defendants could be acquitted of aiding and abetting Majeed or another Defendant on the discrete substantive offenses charged, but still convicted on conspiracy because they agreed to commit the offense of forced labor with at least one other person, even if the

---

[82] *United States v. Thompson*, 518 F.3d 832, 854 (10th Cir. 2008).

[83] 18 U.S.C. § 2.

[84] *United States v. Blanton*, 531 F.2d 442, 444 (10th Cir. 1975) (quoting *Pereira v. United States*, 347 U.S. 1, 11 (1954)); *see also United States v. Bowen*, 527 F.3d 1065, 1077–78 & n.10 (10th Cir. 2008) (discussing differences between aiding and abetting and *Pinkerton* co-conspirator liability).

[85] *Pereira*, 347 U.S. at 11–12; *see also United States v. Pursley*, 474 F.3d 757, 769 (10th Cir. 2007) ("[A]n agreement is not an element of the crime of aiding and abetting.").

underlying offense pertaining to that victim was not successful.[86]  And there was ample evidence at trial that this conspiracy went well beyond the forced labor of the specific victims at issue in Counts 2–4 and 6–8, as the Court extensively discussed above in its denial of the motions for judgment of acquittal.  For all of these reasons, the Court does not find that the substantive count acquittals weakened the conspiracy evidence in this case, requiring a new trial.

### 2.    Improper Rebuttal Testimony

Majeed argues that the Court erred by allowing the Government to call Leif Jamil Muhammad as a rebuttal witness, requiring a new trial.  Early in the Government's case-in-chief, the parties advised the Court that Leif had contacted the Government after learning that other ex-UNOI members were in Kansas City testifying at trial, and that the Government was planning to interview him and possibly call him as a witness.  At this point in the trial, Amira Kelly had testified that Majeed physically disciplined Leif and another minor after learning that they had viewed pornography.  Amira testified that she did not see Majeed hit Leif, but saw his injuries after the fact—a bruised face, black eye, and split lip—and that she was present when Royall and Majeed discussed the punishment.  Leif was not on the Government's witness list, nor was he previously interviewed by the Government.  The Court sustained Majeed's objection to the Government calling this witness during its case-in-chief because he was not previously disclosed; however, the Court left open the door to him testifying as a rebuttal witness if appropriate.

The Government asked Majeed during his cross-examination if he hit Leif and the other minor, and Majeed denied it.  Thus, the Government called Leif as a rebuttal witness to ask him

---

[86] *See Standefer v. United States*, 447 U.S. 10, 20 (1980) ("[A]ll participants in conduct violating a federal criminal statute are "principals."  As such, they are punishable for their criminal conduct; the fate of other participants is irrelevant.").

about whether he was disciplined by Majeed for watching pornography. As the Court explained when Majeed again objected, the Government's failure to disclose Leif as a witness before trial did not probit it from calling Leif as a rebuttal witness on the narrow issue of his discipline for this incident, which was covered during Majeed's testimony in the defense's case.

Majeed argues that it was erroneous for the Court to allow Leif to testify as a rebuttal witness because the information that the Government sought to rebut was elicited during its cross-examination of Majeed. Majeed asserts that the rebuttal testimony would only be permissible if Majeed had denied physically punishing Leif during his direct examination. The Court disagrees and finds no error. The Court has broad discretion to regulate the mode and order of examining witnesses under Fed. R. Evid. 611(a), including whether to allow rebuttal evidence and regulate its scope.[87] "The function of rebuttal is to explain, repel, counteract or disprove evidence of the adverse party."[88] And the Supreme Court has explained that, "[w]ithin limits, the judge may control the scope of rebuttal testimony."[89] In the case of a defendant testifying in his own case, "he waives his privilege against self-incrimination, a waiver that subjects him to cross-examination on all 'relevant facts.'"[90] Given that Leif directly contradicted Majeed's testimony about whether Majeed physically disciplined him, it was proper to allow the Government to call him as a rebuttal witness on that narrow issue; the Court did not err in permitting it.[91]

---

[87] *See, e.g.*, *United States v. Ackies*, 918 F.3d 190, 206 (1st Cir. 2019); *United States v. Burch*, 153 F.3d 1140, 1144 (10th Cir. 1998).

[88] *United States v. Luschen*, 614 F.2d 1164, 1170 (8th Cir. 1980).

[89] *Geders v. United States*, 425 U.S. 80, 86 (1976).

[90] *United States v. Crockett*, 435 F.3d 1305, 1313 (10th Cir. 2006) (quoting *Johnson v. United States*, 318 U.S. 189, 195 (1943)).

[91] *See United States v. Kelley*, 187 F. App'x 876, 888 (10th Cir. 2006) ("[T]he decisions as to what constitutes proper rebuttal evidence and the order in which the parties present their evidence lie within the sound

### 3.    Government's Closing Argument

There were no contemporaneous defense objections to the Government's closing argument.  But Hadley and Rassoul now argue that the Government made statements that necessitate a new trial.  Rassoul argues without further explanation that the prosecutor misstated the law during closing argument by suggesting that because UNOI members were still working without pay after October 2011, and Defendants had not yet withdrawn, the conspiracy was ongoing.  Hadley challenges a comment by Government counsel lamenting "the amount of insults" directed at her and her co-counsel in defense counsels' closing arguments, and another comment by the Government challenging Hadley's counsel's closing argument attempting to justify the paddlings some witnesses testified about Hadley performing.

As to Rassoul's point of error, he fails to explain how the prosecutor's statements about the conspiracy continuing into 2011 misstated the law.  The Indictment alleges that the conspiracy lasted up to and including November 30, 2012.   While it is true that an attorney may not misstate the law during closing argument, Rassoul fails to identify a misstatement of the law.  Instead, he appears to take issue with the evidence upon which the Government relied in arguing that the conspiracy extended past 2011.  "A prosecutor is allowed to comment on the evidence and draw inferences therefrom, but he may not speculate or refer to evidence never presented to the jury."[92]  There was evidence presented at trial that many UNOI members continued to work without pay after Rassoul and other UNOI leaders learned that Royall was not in fact Allah, and that even those who were paid were not paid consistently or in full.  And the Government took the position that Defendants' actions after learning of Royall's scheme were not sufficient to

---

discretion of the trial judge and are subject to substantial deference." (quoting *United States v. LiCausi*, 167 F.3d 36, 52 (1st Cir.1999))).

[92] *Thornburg v. Mullin*, 422 F.3d 1113, 1134 (10th Cir. 2005).

constitute withdrawal from the conspiracy.[93]  These statements were permissible—they were supported by the evidence or a reasonable inference from the evidence.

As to Hadley's objection to the prosecutor's reference to defense counsels' "insults," the Court also finds no error.  At the beginning of the Government's rebuttal closing, counsel stated: "I'd like to start by saying that the amount of insults about myself and my co-counsel in those closing arguments is—I've never heard in my 18 years practicing.  It was beyond insulting. We're all here just doing our jobs.  Okay?"[94]  Again, there was no contemporaneous objection to this comment.  Hadley argues that the prosecutor failed to confine her comments to the evidence in the record, and attempted to paint defense counsel in a poor light as compared to the prosecutors.   The Government argues that its statements were not improper and do not require a new trial.  The Court agrees.

In determining whether a prosecutor's statement during closing arguments constitutes prosecutorial misconduct, the Court considers first whether the statement was improper, and second, "whether the prosecutor's improper statements were 'harmless beyond a reasonable doubt.'"[95]  "When the defendant fails to timely object to an alleged error . . . '[i]t is the defendant, rather than the Government who bears the burden of persuasion with respect to prejudice.'"[96]  As the Government points out, counsel's statement in rebuttal was in direct response to several comments by defense counsel during their closing arguments that questioned

---

[93] "Withdrawal terminates the defendant's liability for postwithdrawal acts of his co-conspirators, but he remains guilty of conspiracy."  *Smith v. United States*, 568 U.S. 106, 111 (2013).  In order to prove withdrawal, a defendant must show "affirmative action . . . to disavow or defeat the purpose" of the conspiracy.  *Id.* at 113 (quoting *Hyde v. United States*, 225 U.S. 347, 369 (1912)).

[94] Trial Tr. vol. 22 at 5225:11–15 (Doc. 540).

[95] *United States v. Fleming*, 667 F.3d 1098, 1103 (10th Cir. 2011) (quoting *United States v. Irvin*, 656 F.3d 1151, 1171 (10th Cir. 2011), *superseded on other grounds by United States v. Irvin*, 682 F.3d 1254 (10th Cir. 2012)).

[96] *United States v. Crabbe*, 364 F. App'x 412, 422 (10th Cir. 2010) (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)).

the Government's adherence to "rules of prosecution,"[97] and accused Government counsel of "falling victim to" lies by its witnesses and "cherry-picking" witnesses."[98]  Hadley's counsel made statements during his closing that suggested the Government attorneys prompted witnesses to answer questions untruthfully.[99]  The Government's brief rebuttal response to these statements was not improper.[100]

And even if the Government's comments in closing were improper, Hadley fails to demonstrate prejudice.  "In evaluating the harm or prejudice of an [allegedly] improper statement, this court    . . . considers the extent of the misconduct; whether the district court took steps to mitigate the impact of the misconduct; and the role of the misconduct within the case as a whole."[101]  The jury was instructed that the statements and arguments of counsel are not evidence,[102] and the Court must presume that the jury followed that instruction.[103]  Hadley complains that the Court did not give the jury a contemporaneous curative instruction when the statement was made.  But there was no contemporaneous objection to the statement and the Court saw no need to interrupt closing argument to provide one given the responsive nature of counsel's statement.  Moreover, the statement was a brief portion of the Government's lengthy closing argument, which spanned three hours total, of which the rebuttal was approximately one hour.  While Hadley is correct that this statement was made at the beginning of the rebuttal argument, in the context of the government's lengthy closing argument, it was hardly the focus.

---

[97] Trial Tr. vol. 22 at 5091:6–10 (Doc. 540).

[98] *Id.* at 5201:8–10; 5216:11–13.

[99] Trial Tr. vol. 22 at 5177:10–5178:1 (Doc. 540).

[100] *Fleming*, 667 F.3d at 1105 (finding no error where prosecutor's statement, read in context, was in response to defense counsel's arguments).

[101] *Id.* (quoting *Irvin*, 656 F.3d at 1171).

[102] Jury Inst. No. 51 (Doc. 475 at 69).

[103] *See Fleming*, 667 F.3d at 1098.

In sum, the Court finds no impropriety in the prosecutor's statement, and even if there was, the error was harmless.

Finally, Hadley argues that the Government improperly provided a personal opinion about his own counsel's closing argument when she stated:

> I also cannot believe that Mr. Duma was up here justifying the physical paddlings and suggesting that they were appropriate and not excessive. I mean, that's for you to decide, but I would argue to you that what we heard in this courtroom was absolutely excessive and not appropriate use of discipline.[104]

Hadley characterizes this statement as an attack on defense counsel's legitimate argument, and an improper personal opinion about the evidence. Hadley is correct that "[a] prosecutor may not express [her] personal opinion" during closing argument."[105] But the Court questions whether the prosecutor's statement is one of personal opinion. She explicitly told the jury that the question of whether Defendants' use of paddling in UNOI was excessive was "for you to decide," and then stated that she "would argue to you that what we have heard . . . was absolutely excessive and not appropriate use of discipline."[106] This was a statement of argumentative disagreement, not a statement of personal opinion. And even if it was an improper statement of personal opinion, Hadley has not demonstrated prejudice. The statement was isolated within a several-hour-long closing argument and the Court instructed the jury that the attorneys' statements are not to be considered evidence. The Court finds that any error did not amount to a miscarriage of justice necessitating a new trial.

---

[104] Trial Tr. vol. 22 at 5248:12–17 (Doc. 540).

[105] *United States v. Jones*, 468 F.3d 704, 708 (10th Cir. 2006).

[106] Trial Tr. vol. 22 at 5248:14–17 (Doc. 540).

4.    **Renewed Pretrial Motions and Jury Instruction Objections**

Majeed and Rassoul generically renew their pretrial motions and jury instruction objections that were overruled.  The Court stands by its earlier rulings on these issues and finds no error.

5.    **Modified *Allen* Instruction**

Majeed and Rassoul renew their trial objection to the Court reading the modified *Allen* instruction to the jury on the third day of their deliberations.  That afternoon, the jury submitted three questions to the Court in this order: (1) "On Counts 2, 3, 4, 6, 7, 8 did the victims or the government decide who was involved on the count[?]";[107] (2) "Do the yes and [no] questions require a 12-0 yes or no vote?";[108] and (3) "If we cannot come up with a unanimous decision on on [sic] all counts, what happens?"[109]  After the third question, received at 3:15 p.m., the Court told counsel that it intended to bring the jurors into open court and read to them the modified *Allen* instruction:

> Members of the jury, I'm going to ask that you return to the jury room and deliberate further.  I realize that you are having some difficulty reaching a unanimous agreement, but that is not unusual.  Sometimes after further discussion jurors are able to work out their differences and agree.
>
> This is an important case.  If you should fail to agree upon a verdict, the case is left open and must be tried again.  Obviously another trial would require the parties to make another large investment of time and effort, and there's no reason to believe that the case can be tried again by either side better or more exhaustively than it has been tried before you.
>
> You are reminded that the defendants are presumed innocent and that the government, not the defendants, has the burden of proof.  And it must prove the defendants guilty beyond a

---

[107] Doc. 477.

[108] Doc. 478.

[109] Doc. 479.

reasonable doubt.  Those of you who believe that the government
has proved a defendant guilty beyond a reasonable doubt should
stop and ask yourselves if the evidence is really convincing enough
given that other members of the jury are not convinced.  And those
of who you who believe that the government has not proved a
defendant guilty beyond a reasonable doubt should stop and ask
yourselves if the doubt you have is a reasonable one given that
other members of the jury do not share your doubt.  In short, every
individual juror should reconsider his or her views.

It is your duty as jurors to consult with one another and
deliberate with a view toward reaching an agreement if you can do
so without violence to individual judgment.  Each of you must
decide the case for yourself, but do so only after an impartial
consideration of the evidence with your fellow jurors.  In the
course of your deliberations, do not hesitate to re-examine your
own views and change your opinion if you are convinced it is
erroneous, but do not surrender your honest conviction as to the
weight or effect of evidence solely because of the opinion of your
fellow jurors or for the mere purpose of returning a verdict.

What I have just said is not meant to rush or pressure you
into agreeing on a verdict. Take as much time as you need to
discuss things.  There is no hurry.

I will ask now that you retire once again and continue your
deliberations with these additional comments in mind to be
applied, of course in conjunction with all of the instructions I have
previously given you.[110]

Defendants objected to the second paragraph of this instruction, arguing that it was coercive.

The Court found that the instruction was not at all coercive and that there was other cautionary

language within the instruction that made clear that the jury should not hurry or feel pressure to

render a decision.

Majeed does not offer further argument on this issue in his post-trial motion.  Rassoul

argues that the jury returning "very quickly with all unanimous verdicts," suggests that the

---

[110] Trial Tr. vol. 25 at 5280:24–5282:18 (Doc. 543); Tenth Cir. Crim. Pattern Instr. 1.42 (2021).

instruction was unduly coercive.[111]  For the same reasons offered on the record, the Court finds

no error in this instruction, which is part of the Tenth Circuit's Criminal Pattern Instructions.

The Court incorporated the cautionary language required by Circuit precedent, which balanced

any potential coercive effect of the objected-to language in the second paragraph of the

instruction.[112]

Moreover, the Tenth Circuit has identified four factors to consider when determining

whether an *Allen* instruction is improperly coercive: "(1) the language of the instruction, (2)

whether the instruction is presented with other instructions, (3) the timing of the instruction, and

(4) the length of the jury's subsequent deliberations."[113]

Here, the instruction "urge[d] all jurors, not just those in favor of acquittal, to reconsider

their views" and "stresse[d] the importance of . . . being an impartial, deliberate fact-finder,"

which the Tenth Circuit suggests points away from coercion.[114]  Under the second factor, the

Court told the jury to apply the *Allen* instruction together with all of the other instructions it read.

Third, with respect to timing, the Court read the instruction after several questions in a row that

made clear the jury was struggling with the issue of reaching a unanimous verdict.  The Court

did not "issu[e] the instruction sua sponte in order to hasten the return of a verdict."[115]  And

finally, contrary to Rassoul's characterization, the jury did not immediately return a verdict after

---

[111] Doc. 558 at 7.

[112] *See United States v. McElhiney*, 275 F.3d 928, 949 (10th Cir. 2001) ("When a district court issues an instruction encouraging a unanimous verdict, the following cautionary language should be incorporated to balance the potential coercive effect of the charge: (1) that no juror should relinquish his or her conscientiously held convictions simply to secure a verdict and (2) that every individual juror should reconsider his or her views, whether in the majority or in the minority.").

[113] *United States v. Coulter*, 57 F.4th 1168, 1192 (10th Cir. 2023).

[114] *Id.* (quoting *United States v. Cornelius*, 696 F.3d 1307, 1322 (10th Cir. 2012)).

[115] *Cornelius*, 696 F.3d at 1322; *see also United States v. LaVallee*, 439 F.3d 670, 690 (10th Cir. 2006) (explaining fact that the District Court called the jury in to give the instruction on the court's own accord, before the jury indicated that it was deadlocked . . . makes this instruction less coercive.").

hearing the *Allen* instruction. The jury returned to the jury room and deliberated for the rest of that afternoon, until 4:45 p.m. The jury also deliberated the following morning, and Court was convened at 11:40 a.m. in order to announce the verdict. The Court does not agree that several hours of deliberation constitutes the jury "very quickly" reaching a verdict after the *Allen* instruction. Indeed, in the case relied on by Rassoul, the Tenth Circuit determined that the jury's deliberation "for several hours after the district court delivered the *Allen* instruction" was a "relatively long period," which "tends to negate an inference of improper coercion."[116] After balancing all four factors, the Court finds no evidence of improper coercion in the modified *Allen* instruction it provided on the third day of the jury's deliberations.

### 6. Cumulative Error

Majeed and Rassoul urge that even if the Court does not find any of the preceding arguments amount to a miscarriage of justice standing alone, it should order a new trial based on cumulative error.

> A defendant is entitled to reversal on cumulative error grounds if the cumulative effect of the errors he identifies rendered "the trial [ ] so fundamentally unfair as to deny [him] due process." "We consider cumulative error only if the appellant has shown at least two errors that were harmless." Then the "question [becomes] whether the two or more harmless errors together constitute prejudicial error."[117]

Here, Defendants fail to identify two or more harmless errors; therefore, the Court need not engage in a cumulative error analysis.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant Majeed's Motion for New Trial and Supplemental Suggestions in Support of Motion for Judgement of Acquittal

---

[116] *Coulter*, 57 F.4th at 1193 (quoting *Cornelius*, 696 F.3d at 1323).

[117] *Id.* (alterations in original) (quoting *United States v. Christy*, 916 F.3d 814, 827, 840 (10th Cir. 2019)).

and, or in the Alternative, New Trial (Docs. 549, 570); Defendant Rassoul's Renewed Motion for Judgment of Acquittal (Doc. 556) and Motion for New Trial (Doc. 558); Defendant Staton's Motion for Judgment of Acquittal and for New Trial (Doc. 567); Defendant Hadley's Motion for Acquittal or New Trial (Doc. 557); Defendant Jenkins' Motion for Acquittal and Motion for New Trial (Doc. 554); and Defendant Peach's Motion for Acquittal and for New Trial (Doc. 562) are **denied**.

**IT IS SO ORDERED.**

Dated: April 30, 2025

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE